# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| **UNITED STATES COMMODITY** | ) | |
| **FUTURES TRADING COMMISSION,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **07 C 3598** |
| | ) | |
| **LAKE SHORE ASSET MANAGEMENT** | ) | |
| **LIMITED, et al.,** | ) | |
| **Defendants.** | ) | |

## MEMORANDUM AND ORDER

The CFTC's motion for appointment of a receiver, its submission regarding documents relating to the Lake Shore Funds' separately managed account ("SMA") documents, Lake Shore Limited's submission regarding these documents, which the court construes as a motion for a protective order, and Lake Shore Limited's "notice of related action" are before the court. This order will also address the effect of the Canadian receivership on this action.

Lake Shore Limited's request for a protective order directed at the SMA documents is denied, and the CFTC's motion for appointment of a receiver is granted. Moreover, as discussed below, there is a fine line between, on the one hand, a party's pursuit of a particular position and vigorous advocacy from that party's lawyer and, on the other hand, obstructionism. Lake Shore Limited and its lead counsel, William Nissen, may well find that they have landed far on the wrong side of this line. Thus, for the following reasons, a rule to show cause why it should not be held in civil contempt and sanctioned pursuant to Fed. R. Civ. P. Rule 37(b)(2) and the court's inherent powers is issued against Lake Shore Limited, and a rule to show cause why he should not be sanctioned under Fed. R. Civ. P. 37(b)(2), 28 U.S.C. § 1927, and the court's inherent powers is issued against Mr. Nissen.

# I.    Background

## A.    Recent Events

The court assumes familiarity with its August 28, 2007, order addressing the CFTC's motion for a preliminary injunction and thus will summarize developments post-dating that order. *See CFTC v. Lake Shore Limited*, No. 07 C 3598, docket # 118 ("Injunction Order"). First, despite the fact that the Injunction Order required immediate production of or access to certain CTA/CPO documents and the Seventh Circuit denied Lake Shore Limited's request for a stay pending appeal, Lake Shore Limited has produced no documents and refused to allow the CFTC to inspect any of its records. Instead, it raises a new argument: that foreign secrecy laws prevent it from producing SMA and fund documents.[1]

Second, the reader may recall the dead-of-night "office move" of Lake Shore's London office (more specifically, the Lake Shore Group of Companies Inc. Limited's office) at the direction of Philip Baker, the Managing Director, Principal and President of Lake Shore Limited and the co-founder and managing partner of the Lake Shore Group of Companies, as well as a principal in numerous other Lake Shore entities.[2] The CFTC represents that Lake Shore has

---

[1] Lake Shore Limited does not assert that this argument applies to CTA/CPO documents. Thus, the purported applicability of blocking laws does not justify the failure to produce these documents. Moreover, even if Lake Shore Limited raised this argument, it would fail as discussed later in this order.

[2] In a hearing before this court on August 30, 2007, regarding Lake Shore Limited's motion for a stay pending appeal, Lake Shore Limited elected not to provide any evidence relating to this far from ordinary "office move." On the following day, Lake Shore Limited's counsel – who has disclaimed any knowledge as to Mr. Baker's whereabouts or any ability to obtain information about the location of Lake Shore's documents – attached an August 31, 2007, affidavit from Mr. Baker to its renewed motion for a stay pending appeal filed with the Seventh Circuit. Putting aside the fact that Lake Shore Limited failed to disclose to the Seventh Circuit that it was attempting to rely on evidence not presented to this court and the fact that counsel can

recently vacated its Hong Kong office and that Mr. Baker has been sending letters to certain of its

agents, employees and sales representatives stating:

> We ask that you return any and all Lake Shore property that is in your possession, including name cards, cell phones/pdas, computers and peripheral devices, VOIP phones and all files whether hard copy or electronic relating to the business of Lake Shore.  Your '@lakeshorefunds.com' email account shall be deactivated, and you will lose access to the Lake Shore 'Microsoft Exchange Server.'

In response, Lake Shore Limited denies that Mr. Baker is trying to collect and hide

records, and characterizes the letters as part of the normal course of business and caused by the

termination of the employer-employee relationship between Lake Shore and the recipients of the

letters.  Mr. Nissen also has assured the CFTC that the records are more likely to be preserved if

they are collected by the Lake Shore Group, as opposed to being left with the former employees.

The court is, to say the least, skeptical of this unsupported position given Lake Shore Limited's

refusal to turn over *its own* 2007 CTA/CPO records as ordered by the court, let alone its refusal

to turn over other CTA/CPO records for other members of the Lake Shore common enterprise.

The third recent development of note is that Mr. Baker has caused an action to be filed in

the High Court of Justice, Queen's Bench Division, Commercial Court in England.  In this

---

communicate with Mr. Baker immediately when he chooses to do so, the affidavit is unconvincing.  Actions speak louder than words, so Mr. Baker's denial that he was fleeing is meaningless when viewed against a backdrop of activities which caused Mr. Baker's landlord to believe that Lake Shore's offices had been robbed and that Mr. Baker was about to abscond. Moreover, the court finds it interesting that although Lake Shore Limited continuously stresses that it has nothing to do with the Lake Shore Group, Mr. Baker – who is in an excellent position to know the relationship of the various Lake Shore entities – himself stated that the asset freeze and cost of defense associated with this action led to financial hardship and necessitated the closure of the Lake Shore Group's London office.  The court also finds Mr. Baker's assertions about the financial hardship to the Lake Shore Group flowing from this case are suspect, given that Lake Shore purportedly is managing $829M of assets allegedly held by the SMAs, which are not subject to any asset freeze.  *See* Exhibit 1 to the Injunction Order.

action, Lake Shore Alternative Financial Asset Limited, Lake Shore Alternative Financial Asset Limited Account I Limited, Lake Shore Alternative Financial Asset Limited Account II Limited, Geneva Corp. Funds World Limited (formerly known as Lake Shore Alternative Financial Asset Fund IV Limited), and Hanford Investments Limited sought relief as to the money held at the three London FCMs (Lehman, Fimat, and Man).[3] Specifically, they ask for an order transferring the money there to them and:

> an injunction restraining each of the Defendants from complying with any request or demand by the United States Commodities and Futures Trading Commission or the United States National Futures Association or any branch or agent thereof or any receiver appointed at the suit thereof, to transfer the sums and assets standing to the credit of the Claimants with the relevant Defendants as referred to above out of the jurisdiction of this Court or to deal with them in any way contrary to the instructions of the relevant Claimant, save to the extent that the appointment of such receiver and/or the validity of his request or demand in respect of such sums or assets has been recognised and enforced by this Court.

Fourth, on September 24, 2007, in *In re Sentinel Management Group*, No. 07-14987 (Bankr. N.D. Ill.), attorneys from Vedder, Price, Kaufman & Kammholtz filed appearances on behalf of "Ernst & Young, Inc., as Receiver for Lake Shore Alternative Financial Asset Corporation Limited and Lake Shore Alternative Financial Asset Corporation 2006 Limited."[4]

---

[3] In the event that it is helpful to the reader, the court notes that CFTC exhibits 17 and 26 from the preliminary injunction hearing contain specific information about the accounts at the London FCMs and Sentinel.

[4] Lake Shore Alternative Financial Asset Corporation Limited and Lake Shore Alternative Financial Asset Corporation 2006 Limited must be distinguished from other Lake Shore entities with confusingly similar names (including but not limited to Lake Shore Alternative Financial Asset Ltd., Lake Shore Alternative Financial Asset Account, and a wide variety of different Lake Shore Alternative Financial Asset funds which share almost identical names).

The court takes judicial notice of this filing and the September 13, 2007, order from the Ontario Superior Court of Justice, No. 07-CL-7168, appointing Ernst & Young as a receiver.

The September 13, 2007, order appoints Ernst & Young as a receiver of all Lake Shore Alternative Financial Asset Corporation Limited and Lake Shore Alternative Financial Asset Corporation 2006 Limited's "current and future assets, undertakings and properties of every nature and kind whatsoever, and wherever situate including all proceeds thereof." *Id.* at ¶ 2. Evidence presented at the preliminary injunction hearing showed that familiar names are associated with Lake Shore Alternative Financial Asset Ltd.: Mr. Baker is the President and Secretary and John Kurgan is the Chief Executive Officer. With respect to Lake Shore Alternative Financial Asset Corporation 2006 Limited, Lawrence Rosenberg is the Chairman of its Board of Directors, Mr. Baker is its President, and John Kurgan is its Secretary.

Rod Macdonald, the Director and Chief Financial Officer of KRG Children's Charities (the applicant in the Canadian case), submitted an affidavit to the Canadian court stating that Lake Shore Asset Management Inc. was the portfolio manager of the hedge funds at issue in the Canadian case. The reader may recall that Lake Shore Inc. is the firm name for Lake Shore Alternative Investment, which is 100% owned by Senior Management of Lake Shore Asset Management. In addition, Lake Shore Limited's legal name is "Lake Shore Group of Companies Inc., Ltd." and Lake Shore Limited is the reorganized version of Lake Shore Inc.

**B.      Hearing Relating to the Impact of the Canadian Case**

This court held a hearing on September 28, 2007, to address the impact of the Canadian case on this case and asked the Canadian receiver's counsel to appear. Counsel did so and indicated that if this court treated all of the Lake Shore entities as a single entity, there could be a

conflict between it and any receiver appointed by this court, but that any such conflict could be addressed, possibly by referring to protocols established between Canadian and U.S. courts dealing with cross-border insolvencies. The court reserves this issue for another day, as it has not made any findings as to the total number of Lake Shore entities that are part of the common enterprise. Indeed, it could not at this time, given the lack of complete Lake Shore records and the fact that additional Lake Shore enterprises requiring complex diagraming seem to be constantly popping up.[5]

The receiver also clarified that the Canadian court was not presently attempting to control all of Lake Shore's assets, but instead was exercising jurisdiction over Lake Shore Alternative Financial Asset Corporation Limited and Lake Shore Alternative Financial Asset Corporation 2006 Limited.

The parties disagree as to the relationship between Lake Shore Alternative Financial Asset Corporation Limited and Lake Shore Alternative Financial Asset Corporation 2006 Limited and the Lake Shore Funds. According to Lake Shore Limited, these entities are customers of the Lake Shore Funds. As depicted in the chart attached to the Injunction Order, this clarification is not particularly helpful as Lake Shore Funds I, II, III, and IV flow downward

---

[5] At this point, however, for the reasons discussed in the court's August 28, 2007, order, the record supports a finding that the Lake Shore common enterprise includes the following entities and accounts: Lake Shore Asset Management Limited, Lake Shore Group of Companies Inc. Ltd., Lake Shore Asset Management Inc., Lake Shore Alternative Financial Asset Limited, Lake Shore Alternative Financial Asset Limited Account I Limited, Lake Shore Alternative Financial Asset Limited Account II Limited, Lake Shore Alternative Financial Asset Fund III Limited, and Lake Shore Alternative Financial Asset Fund IV Limited (which appears to be now known as Geneva Corp., Funds World Limited). Additional evidence is necessary to determine if Hanford Investments and Anglo International Associates Limited are part of the common enterprise.

into numerous places. Mr. Brodersen, however, testified during the preliminary injunction hearing that their status as bona fide customers was unclear. (Brodersen Tr. at 177:25-178:8).

During the September 28, 2007, hearing, there was also some discussion as to whether Lake Shore Alternative Financial Asset Corporation Limited and Lake Shore Alternative Financial Asset Corporation 2006 Limited could be a pool within a pool. In addition, the CFTC suggested that Mr. Baker had created a maze of interrelated companies and in this instance, one entity may have loaned money to another and sold an investment vehicle as part of that transaction. These questions are all open and cannot be resolved based on the present record.

With respect to timing for distribution of monies if a receiver is appointed, the CFTC represented that an interim distribution could occur within a relatively short period of time. The court also heard an offer of proof from an attorney representing a South American investor, who stated that her client would testify that Mr. Baker contacted him and indicated that if he cooperated with the CFTC and a receiver was appointed, it could take five to seven years to receive any money. This conversation "was in the context of trying to get the customer to kind of weigh in and work with Mr. Baker rather than cooperating with the CFTC." The customer contacted counsel because this "didn't sound right to him." (9/28/07 Tr. at 19:22-21:3). Lake Shore Limited then characterized this conversation as nothing more than a factual representation that a receivership could delay distribution of funds.

**C.     Affidavit of Antonio Recabarren**

Finally, in further support of its motion to appoint a receiver, the CFTC submitted an affidavit dated September 27, 2007, from Antonio Recabarren, a partner in Recabarren y Asociados in Santiago, Chile. In November of 2006, Mr. Recabarren met with Mr. Baker and

others, they discussed Lake Shore's trading programs, and Mr. Baker gave Mr. Recabarren documents relating to Lake Shore Funds I, II, III, and IV. These documents stated that the investment manager for each fund was Lake Shore Limited, an entity located in Chicago and a member of the NFA. The marketing materials represented that the annualized returns for each fund ranged from a low of 10.9% (Lake Shore II) to a high of 37.2% (Lake Shore IV). Based on these representations, Recabarren y Asociados entered into a distribution referral agreement with Lake Shore Group, and Mr. Baker signed the agreement as the Managing Director of that Lake Shore entity. Under that agreement, Recabarren y Asociados referred more than 20 Chilean investors who invested approximately $14M.

Mr. Recabarren recently learned about this case, the Injunction Order, and the case filed in England seeking release of money held at the British FCMs to members of the Lake Shore common enterprise and Hanford Investment. He stated that he believed that it was in the best interests of the investors he referred to Lake Shore for a receiver to be appointed in this case as soon as possible, and for the receiver to handle the distribution of assets to investors. He also opined that it would not be in the investors' best interests for any Lake Shore assets to be released to Lake Shore Group, any of its affiliates, or Mr. Baker or any entity controlled by him.[6]

_____

[6] Lake Shore Limited previously submitted declarations about freezing assets. Mr. Recabarren's affidavit, unlike the declarations proffered by Lake Shore Limited, evinces knowledge of the fraud allegations and litigation relating to the funds. *See* Injunction Order at 78 n.15 (discussing lack of relevancy of the declarations submitted by Lake Shore Limited).

## II.    Discussion

### A.    Failure to Produce Documents from Lake Shore Limited/Lake Shore, Inc./Lake Shore Group of Companies Relating to Their Activities as a CTA and CPO for the Lake Shore Alternative Financial Asset Funds

The Injunction Order required Lake Shore Limited, Lake Shore, Inc. (which Lake Shore Limited is a mere continuation of), and the Lake Shore Group of Companies (which consists of Lake Shore Limited) to immediately produce documents relating to any activities as the CTA and CPO for the Lake Shore Alternative Financial Asset Funds.  On September 7, 2007, the Seventh Circuit denied Lake Shore Limited's motion for a stay of the Injunction Order pending disposition of Lake Shore Limited's appeal.  Lake Shore Limited then waited until September 19, 2007, to respond in any way to the court's order to produce documents or allow inspection.  It only appears to have done so because on September 11, 2007, the court advised Lake Shore Limited that to the extent that it believed that any legal theory entitles it to withhold information, it bore the burden of affirmatively bringing any such theory to the court's attention, as opposed to waiting for the CFTC to file a motion to compel.

In Lake Shore Limited's September 19th memorandum, it contends that the Injunction Order is improper because it requires Lake Shore Limited to produce records of foreign funds and thereby violate foreign privacy and secrecy laws.  Lake Shore Limited takes issue with the fact that the court did not previously address this foreign law argument.  Given that Lake Shore Limited provided a detailed discussion of its foreign secrecy law argument to this court for the first time after the Injunction Order issued, Lake Shore's contention that the court is to blame for Lake Shore Limited's decision to withhold this argument until now is frivolous.  Indeed, it would have been more efficient to address all of the document issues at the same time.  The court will

discuss the merits of this argument below, but briefly notes for present purposes that it only relates to the SMA documents, and the court expressly declined to address production of these documents in connection with the CFTC's motion for a preliminary injunction without further briefing from the parties.

It is also important to note that for purposes of the CTA/CPO documents for the Lake Shore Alternative Financial Asset Funds, foreign secrecy laws are irrelevant because – as the court has said time and time again – requiring Lake Shore Limited to produce *its own documents* in its role as the CTA and CPO for the Lake Shore Alternative Financial Asset Funds is not the same thing as requiring it to produce fund documents. *See* Injunction Order at p. 56 ("Lake Shore Limited must allow inspection of its books and records relating to the Lake Shore Alternative Financial Asset Funds in their entirety as of the date of its CFTC registration. In the interests of staving off future disputes, the court clarifies this statement by noting that this means *all* of its books and records kept in connection with its activities as a CTA and CPO for the Lake Shore Alternative Financial Asset Funds, not just the records relating to Fund IV – U.S. and the single U.S. investor"); *CFTC v. Lake Shore Limited*, docket nos. 126 and 153. Indeed, the court specifically stated "[a]t the risk of being repetitive, the court reiterates that the fact that the Lake Shore Alternative Financial Asset Funds themselves and the vast majority of the investors are outside the U.S. is irrelevant. Lake Shore Limited's record keeping obligations flow from its activities as a CTA and CPO under the Act. The court is not ordering the funds themselves or the investors to do anything. Instead, its order is exclusively directed at Lake Shore Limited." Injunction Order at 58. The court's order could not have been any clearer, yet Lake Shore

Limited has not complied and has instead continued to characterize the court's order as requiring it to produce fund and/or SMA documents.

The same goes for Lake Shore, Inc. and the Lake Shore Group of Companies. The court found that Lake Shore Limited was a mere continuation of Lake Shore Inc., which was registered CTA and CPO until its registrations were withdrawn in February of 2007, and Lake Shore Inc. was part of the Lake Shore Group and currently consists of Lake Shore Limited. It then stated that "[t]his means that Lake Shore Limited is not expected to possess records prior to January 17, 2007, *in its capacity as Lake Shore Limited*. In contrast, it would be expected to possess records in its previous incarnation as Lake Shore Inc., as part of the Lake Shore Group common enterprise, and as the acting CTA and CPO for the Lake Shore funds. It thus must allow inspection of any CTA and CPO records predating January 17, 2007" to the extent that those records related to any Lake Shore entity's position as the CTA or CPO for the Lake Shore Alternative Financial Asset Funds. *Id*. at 61. Again, the court's order is crystal clear, yet no documents have been produced other than the Fund IV – U.S. and U.S. investor documents, which the court held was insufficient.

This is not a situation where nothing has been produced because there is nothing to produce: Mr. Rosenberg allowed access to Lake Shore Limited's records for a very short time before this access was revoked, and the CFTC/NFA were unable to review all of the records that were responsive to the document requests and this court's order during the brief window that Lake Shore Limited provided. Moreover, the current document impasse makes it impossible to order any sort of interim distribution of the known monies, given that the court needs to know, at the very least, who the investors are and how much they invested for this to occur. *See CFTC v.*

*Lake Shore*, No. 07-3070 (7th Cir. Sept. 7, 2007) (unpublished order) (noting the Seventh Circuit's assumption that this court would be receptive to applications filed by any of Lake Shore Asset Management's customers who want their funds released while litigation continues).

If Lake Shore Limited believed that any legal justification existed which supported its decision to not produce any documents or allow inspection, it bore the burden of affirmatively and promptly bringing any such justification to the court's attention. Yet, despite the court's use of the word "immediate" in the Injunction Order and the Seventh Circuit's September 7th denial of Lake Shore Limited's motion for a stay of that order pending appeal, the status of document production remains at a standstill.

So, after this long wait, what does Lake Shore Limited have to say about its failure to comply with the Injunction Order?

- Accounts of the Lake Shore Funds, with the exception of the account maintained at Lehman for which Lake Shore Limited had a power of attorney for trading, were not owned or traded by Lake Shore Limited.

  — The court previously found that the CFTC had a strong likelihood of success on its claim that Lake Shore Limited acted as the CTA and CPO for the Lake Shore Alternative Financial Asset funds. It also explicitly rejected the argument that because Lake Shore Limited does not hold fund accounts in its name or have the ability to withdraw money in its capacity as Lake Shore Limited, it can disclaim responsibility for records relating to these accounts. As the court noted, it legally cannot do these things because clients invest in a specific fund pursuant to that fund's offering documents, and these monies are deposited with a FCM in accounts which are owned by that fund and are in that fund's name. *See* Injunction Order at 71. The court subsequently characterized Lake Shore Limited's repetition of this argument as bordering on the frivolous. *CFTC v. Lake Shore Limited*, docket # 126 at 4. Yet, Lake Shore Limited trots this argument out again today without acknowledging or attempting to address the court's prior rulings. Setting this aside, the court has repeatedly distinguished between Lake Shore Limited's obligation to turn over its own CTA/CPO records and an obligation to produce fund records. The time to produce fund records may arrive sooner than Lake Shore Limited would like, but in the meantime, Lake Shore

-12-

Limited must comply with the court's Injunction Order by producing its CTA/CPO records. Similarly, as discussed in the Injunction Order, Lake Shore Group and Lake Shore Inc. must also produce any CTA/CPO records.

- The court lacks jurisdiction over the foreign activities of the Lake Shore Funds because the Commodity Exchange Act does not have extraterritorial effect.

 — The Injunction Order addressed the reach of the Commodity Exchange Act and found that Lake Shore Limited had to immediately produce certain documents. Lake Shore Limited appealed, and the Seventh Circuit denied its motion for a stay pending appeal. One would think that this would be the end of the matter and Lake Shore Limited would comply with the court's order. Regrettably, however, Lake Shore Limited's counsel has inexplicably adopted the position that it is acceptable to repeat a rejected argument and ignore the court's clear directive to his client.

- The court's finding that Lake Shore Limited is a mere continuation of Lake Shore Asset Management, Inc. and is in a common enterprise with the Lake Shore Group of Companies does not establish that Lake Shore Limited has physical possession, custody, or control of the documents of those other entities.

 — Under the "common enterprise" theory of liability, companies that operate as a common enterprise are liable for the deceptive acts and practices of the other members of the enterprise. Injunction Order at 43-44. The court found that "this case is the poster child for the transaction of business through a maze of interrelated companies" so entities in the Lake Shore common enterprise were under common control and did not operate at arms-length. *Id*. at 46. The court also found that Lake Shore Limited engaged in substantial activities as a CTA and CPO in 2007.

Lake Shore Limited's assertion that it has no way of finding out where any Lake Shore documents are located – whether they are its own documents or documents held by another Lake Shore entity that is part of the common enterprise – is unconvincing, given the overlap in principals in these entities and the fact that during the pendency of this action, Lake Shore Limited's counsel has been in consistent contact with Mr. Baker, the "Managing Partner, Lake Shore Group of Companies Inc. Ltd" and "a principal of Lake Shore Asset Management, Ltd." *See* Third Declaration of Philip Baker at ¶ 1 (submitted for the first time as an exhibit to Lake Shore's Seventh Circuit motion for stay pending appeal).

In addition, Lake Shore Limited's contention that it has virtually no documents, including any of *its own* 2007 CTA/CPO documents is untenable because (it should go without saying) an entity possesses its own documents. With respect to

other Lake Shore entities in the common enterprise, "[i]t is well-settled that a party need not have actual possession of the documents to be deemed in control of them; rather, the test is whether the party has a legal right to obtain them. This definition of control applies to persons and to corporations. For example, when the person from whom documents are sought has practical and actual managerial control over a corporate organization, then that person is said to have 'control' sufficient to order production of corporate documents." *Dexia Credit Local v. Rogan*, 231 F.R.D. 538, 542 (N.D. Ill. 2004) (internal citations and quotations omitted). Control is thus legally comparable to physical possession with respect to common enterprise documents.

•  Mr. Nissen, lead counsel for Lake Shore Limited, does not personally have any of the requested records in his possession and does not personally know where they are, so he cannot arrange for inspection of the records.

   — This argument is frivolous. If a party had to turn over only documents in the possession of its attorney, the discovery rules would be meaningless. Similarly (again it should go without saying), a lawyer is supposed to ensure that his client complies with court orders. If the lawyer lacks a vital piece of information, it is his obligation to ask his client as opposed to remaining intentionally ignorant and using this lack of knowledge as an excuse to justify the client's noncompliance.

•  Mr. Nissen claims that he does not represent the Lake Shore Group (which is part of the Lake Shore common enterprise, along with Lake Shore Limited) and asserts that he has no way of contacting Mr. Baker or the Lake Shore Group so that Lake Shore Limited can comply with the Injunction Order.

   — Mr. Baker must know where Lake Shore Limited and Lake Shore common enterprise records are located. Mr. Nissen has obtained and submitted numerous declarations from Mr. Baker, including one (the August 31st declaration) with virtually no turn-around time. He has also repeatedly offered arguments on behalf of Mr. Baker and the Lake Shore Group. When Mr. Nissen wants to contact Mr. Baker, he has been able to do so. However, when he needs to contact Mr. Baker to ensure that his client complies with court orders, his ability to contact his client mysteriously disappears. It is an "inescapable fact that an artificial entity can only act to produce its records through its individual officers or agents." *Braswell v. U.S.*, 487 U.S. 99, 116 (1988). Mr. Nissen's apparent belief that Lake Shore Limited is a bloodless entity and that he need not contact any of Lake Shore Limited's principals in response to the Injunction Order is thus flatly incorrect.

•  Lake Shore Limited need not disclose the location of *any* Lake Shore records or describe the efforts being undertaken to preserve the records.

It is impossible to imagine how Lake Shore Limited could produce documents or allow inspection pursuant to this court's order, which was not stayed by the Seventh Circuit, without divulging where those records are located. It is also eminently reasonable for the CFTC to want to know exactly what steps Lake Shore Limited is taking to ensure that all of its books and records, whether electronic or otherwise, are being preserved.

- Lake Shore Limited is only obligated to produce records generated in the course of its business as a U.S. registrant, which means it is only obligated to produce records relating to Fund IV– U.S. and the single U.S. investor.

    This argument is completely inconsistent with the Injunction Order. At the risk of sounding like a broken record, the Seventh Circuit rejected Lake Shore Limited's request to stay the order pending appeal. Lake Shore Limited thus must comply with the order now, and cannot wait for the Seventh Circuit to rule on its appeal.

In short, Lake Shore Limited and Mr. Nissen have a serious problem on their hands. The court obviously cannot say it enough: the Seventh Circuit's denial of Lake Shore Limited's motion for a stay pending appeal means that Lake Shore Limited must comply with the portions of the Injunction Order necessitating immediate production now, not later. Lake Shore Limited has, instead, unblushingly attempted to drag these proceedings out as long as possible. Mr. Nissen, who is an officer of the court and under an obligation to refrain from engaging in evasive and dilatory tactics, has been the means by which Lake Shore Limited has acted to further this goal.

With respect to the consequences flowing from Lake Shore Limited and Mr. Nissen's actions, it is well-established that courts have the power and responsibility to advance the "orderly and expeditious disposition of a case." *Link v. Wabash Railroad Co.*, 370 U.S. 626, 630-31 (1962). To achieve this goal, the court possesses the power to sua sponte issue a rule to show cause under Rule 37(b)(2), 28 U.S.C. § 1927, and the court's inherent powers. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 n.8 (1991) (the court may initiate sanctions proceedings under

the Federal Rules of Civil Procedure sua sponte); *Johnson v. Cherry*, 422 F.3d 540, 551-52 (7th Cir. 2005) (the court may impose sanctions sua sponte under § 1927 or the court's inherent powers as long as it provides notice and an opportunity to be heard); *see also Jolly Group, Ltd. v. Medline Industries, Inc.*, 435 F.3d 717, 720 (7th Cir. 2006).[7]

Under Rule 37(b)(2), "[i]f a party or an officer, director, or managing agent of a party . . . fails to obey an order to provide or permit discovery" the court may enter "such orders in regard to the failure as are just" including deeming facts established, refusing to allow the disobedient party to support or oppose designated defenses or prohibiting that party from introducing designated matters into evidence, striking pleadings, rendering a default judgment, treating the failure to obey orders as contempt of court, and/or requiring "the party failing to obey the order or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure."

Civil contempt is another means to coerce compliance with a court's order. *See, e.g., Willy v. Coastal Corp.*, 503 U.S. 131, 138-39 (1992). A party may be held in civil contempt if it violates "an order that sets forth in specific detail an unequivocal command from the court." *Tranzact Technologies, Inc. v. 1Source Worldsite*, 406 F.3d 851, 855 (7th Cir. 2005), *quoting United States v. Dowell*, 257 F.3d 694, 699 (7th Cir. 2001). The court recently "strongly suggest[ed] that Lake Shore Limited re-read the portions of the court's injunction order addressing the difference between requiring Lake Shore Limited to produce its own documents in

---

[7] Sanctions under Rule 11 may also be possible given the constant repetition of rejected arguments in connection with the non-production of documents. At this time, however, the court will not comb thorough the pleadings to locate specific representations which may have been made in contravention of this rule. *See* Fed. R. Civ. P. 11(b).

its role as the CTA and CPO for the Lake Shore Alternative Financial Asset Funds vs. requiring it to produce documents from the Funds themselves and act accordingly." *CFTC v. Lake Shore*, docket #153.

Lake Shore Limited failed to heed that warning and elected not to comply with the court's Injunction Order even after the Seventh Circuit declined to stay that order. It did so at its own peril. The court hereby directs Lake Shore Limited to show cause why it should not be held in civil contempt for its failure to comply with the document production portions of the Injunction Order and its repeated insistence that it is only obligated to produce Fund IV – U.S. documents and related documents from the single U.S. investor, despite the court's orders to the contrary. It shall also show cause why it should not be sanctioned under Rule 37(b)(2) and the court's inherent powers. *See Chambers v. NASCO, Inc.*, 501 U.S. at 43.

This brings the court to Mr. Nissen, the author of Lake Shore Limited's take-no-prisoners litigation strategy and proponent of any argument that advances Lake Shore Limited's desired result, regardless of whether the court has ruled definitively to the contrary. Zealous advocacy is laudable but at a certain point (for example, after the issuance of an explicit order, the issuance of an appellate court order denying his client's motion to stay that order, and repeated but ignored chances to comply with the order), Admiral Farragut's famous battle cry of "Damn the torpedoes! Full speed ahead!" ceases to become a viable litigation strategy.

As noted above, under Rule 37(b)(2), the court may order "the party failing to obey the order or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure." In addition, 28 U.S.C. § 1927 provides that "[a]ny attorney or other person admitted to conduct cases in any court of the United States or any

Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously

may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees

reasonably incurred because of such conduct." The Seventh Circuit directs this court to consider

the objective unreasonableness of conduct when deciding whether an attorney should be

sanctioned under § 1927. *See Claiborne v. Wisdom*, 414 F.3d 715, 721-22 (7th Cir. 2005) ("this

court has upheld § 1927 sanctions . . . [when] counsel acted recklessly, counsel raised baseless

claims despite notice of the frivolous nature of these claims, or counsel otherwise showed

indifference to statutes, rules, or court orders").

The court may also impose attorney sanctions under its inherent powers. *Chambers v.

NASCO*, Inc., 501 U.S. at 43. Based on these inherent powers, the court may sanction counsel

for "willful disobedience of a court order" or "bad faith conduct." *Schmude v. Sheahan*, 420

F.3d 645, 649-50 (7th Cir. 2005), *quoting Chambers v. NASCO*, 501 U.S. at 45-46 (internal

citations omitted). "Because these inherent powers are potent, they must be exercised with

caution and restraint." *Id*.

The exercise of restraint, however, does not mean that the court must turn a blind eye to

"irresponsible advocacy falling below minimum professional standards and deserving of

penalty." *Lepucki v. Van Wormer*, 765 F.2d 86, 87 (7th Cir. 1985) (per curiam). Thus, the

Seventh Circuit has explained that:

> Lawyers have a unique opportunity to counsel restraint or recklessness, to craft
> imaginative arguments or to press empty challenges to well-settled principles.
> Because of our reluctance to constrain the discretion of attorneys in the vigorous
> advocacy of their clients' interests, we penalize them only where they have failed
> to maintain a minimum standard of professional responsibility. But we will not
> overlook such a failure when it occurs, in part because it evidences disdain for the
> public, whose claims lie dormant because frivolous suits have diverted away

scarce judicial resources, disdain for adversaries, who must expend time and money to defend against meritless attacks, and disdain for clients, whose trust is rewarded with legal bills, dismissals, and court-imposed sanctions.

*Id.*

In this instance, Mr. Nissen's conduct has negatively affected another critically important group of individuals: the investors who gave their money to Lake Shore. Accordingly, for the reasons outlined above, the court hereby issues a rule to show cause directed at Mr. Nissen. Mr. Nissen is ordered to show cause why he should not be sanctioned pursuant to Fed. R. Civ. P. 37(b)(2), § 1927, and/or the court's inherent powers for the conduct discussed above, including his role in assisting Lake Shore Limited to flout the Injunction Order's requirements regarding document production.

## C. Foreign Secrecy Laws

Lake Shore Limited asserts that the court should not order it to produce SMA and fund documents because the CFTC can request these documents under the Hague Convention. Alternatively, it contends that all Lake Shore SMA and fund records are protected by foreign privacy laws in force in Switzerland, Turks and Caicos, and the British Virgin Islands ("BVI") and that it should not be forced to disclose this information because doing so could expose it to civil or criminal actions in these locations. For the following reasons, the SMA documents are relevant and subject to disclosure and Lake Shore Limited's positions about the Hague Convention and foreign law are incorrect.

### 1. Relevancy

Rule 26(b)(1) provides that "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party, including the existence,

description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter . . . . Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."

Lake Shore Limited made representations about the amount of money in the SMAs when acting as a CTA and CPO on behalf of the Lake Shore Alternative Financial Asset Funds. Information from the funds themselves and for the SMAs will provide additional necessary insight as to the activities of Lake Shore Limited and the other Lake Shore entities that form part of the common enterprise. In other words, without full information about Lake Shore's assets and the flow of monies, it is impossible to understand what happened and formulate a comprehensive plan which gives the investors the greatest possible redress.

This is why Lake Shore Limited's suggestion that each country with a connection to Lake Shore's activities pursue its own legal separate proceedings is unworkable.[8] Limiting inquiries to individual jurisdictions prevents those jurisdictions from seeing the full picture of the Lake Shore entities' financial affairs. This knowledge is necessary to trace the flow of monies between the various entities and ascertain the precise relationship between the entities and what happened to

---

[8] Another reason is that there are already three cases in three countries seeking to control overlapping assets (this case brought by the CFTC on behalf of investors, the Canadian case brought by what appears to be a customer, and the British case brought by members of the Lake Shore common enterprise and Hanford). More cases will only lead to more delay as the courts try to sort out competing claims to the same money.

the investors' money. Indeed, Lake Shore Limited has acknowledged as much, since it has repeatedly argued that a full audit cannot be conducted without full records.[9]

Moreover, Lake Shore Limited's emphasis on foreign law ignores the strong interest of the U.S. in getting to the bottom of an apparent international scheme to engage in commodity trading fraud where Lake Shore Limited had an office in Chicago, substantial trading occurred on U.S. exchanges, Lake Shore Limited stressed its CFTC registration and NFA membership when soliciting investors, and Lake Shore Limited agreed to abide by the CFTC and the NFA's rules and regulations. In doing so, it offered the amount under management in the SMAs as assurance that it was on the up and up and financially stable. Having used the SMAs to benefit itself in this way, it cannot now cry foul and claim that these documents are outside the liberal scope of discovery. Thus, the court rejects Lake Shore Limited's position that the SMA records are irrelevant to the issues before this court.

The court notes that in ordering production of these records, it is not announcing an intent to order any actions relating to the SMAs themselves. Instead, it is ordering production because the SMAs fall well within the liberal scope of discovery under the Federal Rules of Civil Procedure. This court has jurisdiction to resolve the claims in this case and, contrary to Lake Shore Limited's suggestion, the creation of numerous offshore companies by Lake Shore Limited principals does not automatically insulate it from discovery. In addition, despite Lake Shore

---

[9] A full audit must be distinguished from the court's task when considering the CFTC's motion for a preliminary injunction. There, the court focused on records from the FCMs relating to the Lake Shore Alternative Financial Asset Funds. This analysis revealed numerous troubling issues, but necessarily was not a 100% complete analysis of all of Lake Shore's books. As noted in the CFTC's motion for an appointment of a receiver, such an analysis would require all of Lake Shore's records as well as, at the very least, review by a forensic accountant.

Limited's adherence to its belief that it may withhold documents in its sole discretion, the court

has already rejected Lake Shore Limited's attempt to withhold the SMA documents without

review by someone other than itself.[10] Despite their location outside the U.S., the SMA

documents are thus sufficiently connected to this case to be relevant and producible.

## 2. The Hague Convention

As noted above, Lake Shore Limited (or more precisely, various Lake Shore entities

which Mr. Nissen denies that he represents) contends very briefly and without any discussion or

citation to authority that considerations of international comity require the CFTC to request the

desired documents under the Hague Convention. The Supreme Court, however, has held that the

Hague Convention is neither "the exclusive means for conducting discovery on a foreign entity

. . . nor must it be the means of first resort." *First American Bank Corporation v. Price*

*Waterhouse LLP*, 988 F.Supp. 353, 364 (S.D.N.Y. 1997), *citing Societe Nationale Industrielle*

*Aerospatiale v. United States District Court*, 482 U.S. 522, 539-42 (1987).

In so holding, the Supreme Court explained that the Hague "Convention was intended as

a permissive supplement, not a pre-emptive replacement, for other means of obtaining evidence

located abroad." *Société Nationale Industrielle Aérospatiale v. United States District Court*, 482

---

[10] Specifically, the court held that it "declines to blindly accept Lake Shore Limited's statement that the SMA records are not subject to production. If Lake Shore Limited does not produce the records, the CFTC and the court have no way of knowing if Lake Shore Limited's position regarding non-production of these records is well-founded and the interests of justice cannot be served." Injunction Order at 58-59. Thus, it stated that relying on Lake Shore Limited's assertions with no means of review is off the table and offered Lake Shore Limited an opportunity to propose ways in which the basis for withholding the documents could be reviewed. Lake Shore Limited then chose to maintain its position that it could withhold the documents with no means of review.

U.S. at 536. As such, the CFTC is not required to proceed under the Hague Convention before it can pursue discovery via other means.

### 3. Foreign Blocking Laws

#### a. Swiss, BVI & Turks and Caicos Secrecy Laws

Lake Shore Limited has invoked secrecy laws from Switzerland, BVI, and the Turks and Caicos as justification for withholding the SMA documents. With respect to Switzerland, Lake Shore Limited contends that some SMA accounts are located there, and that no information about these accounts is available under Swiss law. However, the 1977 Treaty between the United States and the Swiss Confederation on Mutual Assistance in Criminal Matters was expanded in 1993 "to expand the coverage of the Treaty involving violations of the laws and regulations governing the offer, purchase, or sale of securities, futures or options." *See* Doc. 57, Ex. 1 (Nov. 3, 1993, diplomatic notes regarding the Treaty). This specifically includes suits by the CFTC "in a court of the United States seeking permanent or preliminary injunctions or temporary restraining orders" that seek "a freeze of assets or the disgorgement of profits gained (or losses avoided) as a result of violative conduct." *Id.* The Treaty further provides that an investigation by the CFTC is "to be considered an investigation for which assistance can be furnished . . . as long as the investigation relates to conduct which might be dealt with by the criminal courts of the United States." *Id.* Accordingly, under the Treaty, the evidence adduced during the preliminary injunction hearing shows that if Swiss secrecy laws were at issue, they would not bar production of the information requested by the CFTC.

With respect to the Turks and Caicos, Lake Shore Limited submits a legal opinion from Brian Trowbridge, a Director of Corporate Directors Ltd. The record shows that Corporate

Directors Ltd is the Director of Lake Shore Alternative Financial Asset Ltd, Lake Shore Alternative Financial Asset I Ltd, and Lake Shore Alternative Financial Asset II Ltd. Mr. Trowbridge's opinion is thus not even arguably neutral.

It also does not support Lake Shore Limited's position, as according to Mr. Trowbridge, Part VIII of the Turks and Caicos' Companies Ordinance 1981 allows disclosure of confidential information to any professional person acting in the normal course of business. *See* Doc. # 151, Ex. 2 (summarizing the Ordinance). The normal course of business includes "compliance with such laws and legal process as arises out of and in connection therewith." *Id.* It also allows disclosure of information with the express or implied consent of the investor whose information is at issue. Both of these provisions apply to this case given the pendency of this litigation and the existence of implied consent discussed above in connection with Mr. Recabarren's affidavit.

Finally, the opinion about the impact of BVI law that was submitted by Lake Shore Limited states that a duty of confidentiality can be imposed at common law or by contract. *Id.* at Ex. 3. The duty of care under common law depends on the relationship between the parties and may be outweighed by a public interest supporting disclosure. *Id.* Moreover, as with Switzerland and the Turks and Caicos, an investor may give permission to reveal information. *Id.* In addition, confidentiality does not extend to "the manner in which a BVI investment vehicle carried out its business, its methodology and its operating and compliance procedures." *Id.*

There are also a number of additional exceptions, which Lake Shore Limited's BVI lawyer lists but does not quote, attach, or discuss.[11]  Notably, the legal opinion does not conclude that the requested information cannot be disclosed.  Thus, Lake Shore Limited's arguments about BVI law are unconvincing.  In any event, as discussed below, even if Swiss, Turks and Caicos, and BVI laws were consistent with Lake Shore Limited's arguments, the SMA documents would still be subject to production.

> **b.**     **Good Faith**

> **i.**     **SMA Documents**

"The fact that foreign law may subject a person to criminal sanctions in the foreign country if he produces certain information does not automatically bar a domestic court from compelling production."  *United States v. First Nat'l Bank of Chicago*, 699 F.2d 341, 345 (7th Cir. 1983).  To determine if an order compelling production is warranted, the court must engage in a "sensitive balancing of the competing interests at stake."  *Reinsurance Co. of America, Inc. v. Administratia Asigurarilor de Stat (Admin. of State Ins.)*, 902 F.2d 1275, 1282 (7th Cir. 1990).  One of those interests is whether Lake Shore Limited (or, more precisely, Lake Shore Limited and the other members of the Lake Shore common enterprise) have acted in good faith.  The

---

[11]  The court has been able to locate several of the listed BVI statutes.  Lake Shore Limited's BVI counsel states that, among other statutes, the Financial Services (International Co-operation) Act (No. 18 of 2000), as amended, contains exceptions to the common law duty of confidentiality.  This statute was in fact repealed via amendments to the Financial Services Commission Act, 2001.  Part IV of the Financial Services Commission Act, as amended, contains detailed provisions relating to the authority of the BVI's Financial Services Commission to facilitate cooperation with foreign regulatory authorities.  Under the statute, the Financial Services Commission must take whatever steps it deems appropriate to cooperate with foreign regulatory authorities in connection with, among other things, misconduct in, or misuse of information relating to, financial markets.

answer to this question will be no surprise to anyone who has read this far, or read the Injunction Order.

The importance of good faith has long been recognized. The seminal case of *Societe Internationale v. Rogers*, 357 U.S. 197 (1958), is instructive. In that case, the Supreme Court held that the good faith of the party resisting discovery is a key factor when determining if that party should be sanctioned for failure to comply with discovery requests when foreign law prohibits the requested discovery. A party resisting discovery based on a blocking law acts in good faith when it "make[s] all . . . efforts to the maximum of [its] ability" to comply and has not "deliberately courted legal impediments" to the production of the documents. *Id*. at 208-09, 211-12.

With respect to Lake Shore Limited's efforts to comply, the secrecy privilege belongs to investors and thus may be waived by them. *See Securities and Exchange Commission v. Banca Della Svizzera Italiana*, 92 F.R.D. at 118 (customers may waive confidentiality under Swiss law because they are the "master of the secret" since the blocking law was enacted to protect their privacy rights). The Seventh Circuit has held that a showing of an effort to seek a waiver of a blocking law is necessary if it is possible to obtain such a waiver. *U.S. v. First Nat. Bank of Chicago*, 699 F.2d 341, 346 (7th Cir. 1983) (relying on the requirement, now codified in § 442 of the Restatement (Third) Foreign Relations Law of the United States (1987), that the court may require the party resisting discovery to make a good faith effort to secure a waiver of the secrecy law); *cf. Reinsurance Co. of America, Inc. v. Administratia Asigurarilor de Stat (Admin. of State Ins.)*, 902 F.2d at 1282 (remand to allow district court to address good faith was unnecessary in

case seeking disclosure to enforce a judgment because there was no way to obtain a waiver of the secrecy law).

There is no evidence that any Lake Shore entity asked its investors to waive the privilege and they refused. Thus, Lake Shore Limited has failed to show that it has made any efforts to obtain a waiver, let alone all efforts to the maximum of its ability. *See Societe Internationale v. Rogers*, 357 U.S. at 208-09. Lake Shore Limited, however, had at least one opportunity to ask for a waiver (the South American investor), and as discussed above, there is no reason to think that it cannot seek waivers from additional investors since Mr. Baker, a principal with Lake Shore Limited, has their contact information. Nevertheless, the only evidence about Mr. Baker's efforts to contact investors is that he called a South American investor very recently and raised the specter of delay in the context of an attempt to get the investor to work with Mr. Baker rather than cooperate with the CFTC. This made the investor suspicious and he retained independent counsel.

The record also does not indicate that the vast majority of investors have any knowledge of the fraud allegations and the Injunction Order. Besides the South American investor, the only investors who appear to know about the fraud situation – Mr. Rebacarren's twenty Chilean investors – have opposed releasing any funds to any Lake Shore entity or related person, and clearly would consent to disclose information if asked to do so in connection with efforts to get their money back.

It is true that these investors are in Chile and thus are not covered by Swiss, BVI, or Turks and Caicos blocking laws. There is no reason, however, to suspect that their views are unique. In sum, given the amount of the minimum buy-in ($1M) and the seriousness of the

evidence produced to date, the court declines to accept the position that any investors would, so to speak, agree to turn the keys to the blood bank over to what appears to be a group of vampires. Thus, Lake Shore Limited's invocation of blocking laws in support of its efforts to shield discovery relating to Lake Shore's financial situation rings hollow.

### ii. Other Documents

In the interests of completeness, the court will also consider the potential that Lake Shore common enterprise records in connection with activities as a CFTC-registered CTA and CPO and NFA member contain information which might be subject to foreign blocking laws.[12]  The intentional use of foreign nondisclosure laws to avoid obligations arising under U.S. law is an action which deliberately courts a legal impediment.  *See Securities and Exchange Commission v. Banca Della Svizzera Italiana*, 92 F.R.D. 111, 117 (S.D.N.Y. 1981) (entity opposing disclosure acted in bad faith by relying on "Swiss nondisclosure law to evade in a commercial transaction for profit to it, the strictures of American securities law . . . . [That entity] invaded American securities markets and profited in some measure thereby.  It cannot rely on Swiss nondisclosure law to shield this activity"); *General Atomic Co. v. Exxon Nuclear Co.*, 90 F.R.D. 290, 296-99 (S.D. Cal. 1981) (decision to store documents in Canada to use Canadian law to prevent disclosure in potential U.S. litigation constitutes courting of legal impediments); *Securities and Exchange Commission v. Banca Della Svizzera Italiana*, 92 F.R.D. at 112 (discovery was necessary "to preserve our vital national interest in maintaining the integrity of

---

[12]  The court reaches this argument in the interests of addressing all possible arguments so that disclosure can proceed apace, given that Lake Shore Limited has consistently argued that the blocking laws only cover the SMAs, but frequently changes its arguments mid-stream.

the securities markets against violations committed and/or aided and assisted by parties located abroad").

In this regard, the decision in *Minpeco, S.A. v. Conticommodity Services, Inc.*, 116 F.R.D. 517 (S.D.N.Y. 1987), is instructive.  In that case, a bank entered the U.S. silver futures market knowing that it was subject to reporting requirements under the Commodity Exchange Act but did not ask its brokerage customers to consent to disclosure of information covered by Switzerland's blocking law.  *Id*. at 529.  It then argued that the blocking law excused its failure to comply with discovery in a case seeking relief under, among other things, the Commodity Exchange Act.  The court rejected this argument and quoted an administrative law judge's findings in a case brought by the CFTC against the bank based on the same documents:

> The Banque knew it was subject to the reporting requirements under the [Commodities Exchange] Act before it entered the futures market.  It could have prepared itself to fulfill those requirements within the strictures of Swiss privacy laws by obtaining consent to disclosure from its brokerage customers. Instead, the Banque chose to pursue a course of conduct certain to subject it to conflicting legal requirements and plead that as a defense to [Commodities Futures Trading] Commission sanctions . . . . Recordkeeping and submission in accordance with the Act and Commission regulations are prerequisite to lawful participation in a contract market.  The Banque did not make a good faith attempt to comply with these provisions. Rather than planning for compliance when it entered the market, it created difficulty that need not have occurred.

*Id*. at 528-29.  The court then concluded that the bank had "made use of U.S. commodities markets . . . . fully expecting to use foreign law to shield it from the reach of [U.S.] laws" and thus had to produce the requested documents.  *Id*. at 529.

Here, to the extent that Lake Shore Limited is relying on foreign blocking laws in connection with any CTA/CPO documents, it "deliberately courted legal impediments" to the production of the documents.  *See id.*; *Societe Internationale v. Rogers*, 357 U.S. at 208-09.

Moreover, it was able to register with the NFA because it executed NFA Form 7-R and represented that it was not subject to any blocking, privacy, or secrecy laws that would interfere with inspection of its books and records.[13]  For all of these reasons, Lake Shore Limited's attempt to rely on those blocking laws in connection with the SMA documents is not supported by the record and any invocation of these laws in connection with the CTA/CPO documents would be unavailing.

### D.    Appointment of a Receiver

The court may appoint a receiver under Section 6c of the Commodity Exchange Act.  *See* 7 U.S.C. § 13a-1; *Commodity Futures Trading Com'n v. Co Petro Marketing Group, Inc.*, 680 F.2d 573, 582-83 (9th Cir. 1982) (§ 6c authorizes the appointment of a receiver, an order giving the receiver access to the firm's books and records, and an order for an accounting); *see also Matter of McGaughey*, 24 F.3d 904, 907 (7th Cir. 1994) ("[f]ederal courts have an inherent equitable power to appoint a receiver to manage a defendant's assets during the pendency of litigation").[14]

---

[13]  The court repeats two prior holdings in this regard.  First, Lake Shore Limited's argument that Form 7-R is irrelevant because it is being required to produce records for unrelated entities is not supported by the evidence given the court's findings about Lake Shore Limited's participation in a common enterprise.  This argument is also completely inapposite to the extent that Lake Shore Limited is relying on it to oppose production of its own records.  Second, the court has said time and time again that Lake Shore Limited's contention that documents produced in connection with its activities as a U.S. registrant are limited to Fund IV – U.S. and the single U.S. investor is incorrect.  Moreover, Lake Shore Limited did not even produce documents consistent with its unduly narrow reading of its obligations as the record does not contain complete financial records for the U.S. investor.  *See* Injunction Order at 74.

[14]  The court may appoint a receiver during the pendency of these proceedings.  Nevertheless, Lake Shore Limited contends that it is improper for the receiver to take any actions to disturb the status quo prior to a final judgment.  In support, it directs the court's attention to *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981), which holds that "it is generally

"The appointment of a receiver is considered to be an extraordinary remedy that should be employed with the utmost caution and granted only in cases of clear necessity to protect plaintiff's interests in the property." Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus, 12 *Federal Practice and Procedure: Civil 2d* § 2983 (2d ed. 1997). When determining if the court's discretion should be exercised in favor of this "extraordinary remedy," courts have considered: "fraudulent conduct on the part of defendant; the imminent danger of the property being lost, concealed, injured, diminished in value, or squandered; the inadequacy of the available legal remedies; the probability that harm to plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment; and, in more general terms, plaintiff's probable success in the action and the possibility of irreparable injury to his interests in the property." *Id.*; *see also Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316-17 (8th Cir. 1993); *Consolidated Rail Corp. v. Fore River Ry. Co.*, 861 F.2d 322, 326-27 (1st Cir. 1988). In addition, when a defendant is willfully opposing discovery or refusing "to answer questions relating to relevant business operations" and evidence sufficient to support the issuance of a preliminary injunction based on fraud and "an immediate threat that the property may be lost, hidden, harmed, squandered, or diminished in value" exists, appointment of a receiver may be warranted. *See* Robert L. Haig, 2 *Business and Commercial Litigation in Federal Courts* § 14:67 at 126 (2d ed. 2005).

---

inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits." The court does not read this case as eliminating the right to appoint an interim receiver, in appropriate circumstances.

### 1.    Balancing of Factors

The court finds, in the exercise of its discretion, that all of these factors strongly tilt in favor of the appointment of a receiver.  First, the court's 86-page preliminary injunction order granting the CFTC's motion for a preliminary injunction describes the extensive evidence supporting the court's finding that the CFTC had a strong likelihood of success regarding its claims of fraud and the concomitant need to protect investors.

Second, in contravention of the investors' interests, members of the Lake Shore common enterprise are currently trying to get assets within the scope of the Injunction Order (the accounts at the London FCMs) released to themselves in England.  It is clear beyond peradventure, however, that the assets in question belong to customers, not Lake Shore Limited, any other Lake Shore entity, or any principal in a Lake Shore entity.  If any Lake Shore entity wanted to repay its customers, it could have readily obtained this court's permission to set up a mechanism by which the assets could have been refunded to customers without first being released to a Lake Shore entity.[15]  This did not occur.  Instead, a variety of Lake Shore entities controlled by Philip Baker are seeking a transfer of money to themselves and an injunction restraining the London FCMs from complying with orders from this court or the NFA, without an opportunity for the investors to have a voice.

In addition, the receiver in the Canadian action has an interest in monies in Lake Shore accounts.  Thus, despite the entry of the Injunction Order, without a receiver, a substantial portion of the assets in this case may be permanently diminished in value or entirely lost.

---

[15]  Based on the NFA's willingness to consider requests for permission to move assets, it appears that the NFA would also look favorably on any such request.

Third, Mr. Baker is attempting to convince persons holding Lake Shore documents to return them to him and calling investors in an effort to get them to work with him. Lake Shore's London and Hong Kong offices have closed, and Mr. Baker removed computers and documents from the London office in a way that made the landlord believe Lake Shore had been robbed. The court has also issued a rule to show cause directed at not only Lake Shore Limited but also its counsel with respect to serious document production issues. The court thus harbors very strong concerns about the preservation of evidence and the adequacy of any future relief. These are not allayed by counsel's assurance that his client is not destroying documents, especially because Lake Shore Limited has refused to detail what measures, if any, it has taken to preserve relevant Lake Shore records.

Fourth, based on the filing of the British case, his failure to disclose information ordered by the court, and his affirmative efforts to block the CFTC's investigation, Mr. Baker appears to be acting in furtherance of his own and Lake Shore's interests with respect to the accounts, which contain customer funds. Moreover, as discussed above, vital discovery has been virtually nonexistent due to Lake Shore Limited's failure to comply with the Injunction Order. Thwarting an interim distribution of assets while they are still available is not in the investors' interest, and the continued passage of time will not help matters. *See S.E.C. v. Universal Express, Inc.*, No. 04 CIV. 2322 (GEL), 2007 WL 2469452 at *11-12 (S.D.N.Y. Aug. 31, 2007) (when defendants "appear[ed] incapable of complying with federal securities laws and this Court's orders," continued to press arguments that had been rejected, and demonstrated that they were unwilling or unable to manage the company in the best interests of the investors, the extraordinary remedy

of appointing a receiver "to determine [the company's] actual financial state, to collect and conserve what assets the company has, and to report its findings to the Court" was appropriate).

Fifth, the court has afforded Lake Shore Limited ample opportunities to comply with the Injunction Order to no avail.  It thus has brought the current situation (and, indeed, this lawsuit) upon itself and cannot use the harm to itself flowing from appointment of a receiver as an excuse to continue its current course of conduct and hinder distribution of money to investors.  It also cannot be stressed strongly enough that the money at issue does not belong to Lake Shore Limited:  it belongs to the investors.  Absent the asset freezes by this court and the NFA, Lake Shore Limited would not have a legal basis to refuse to allow investors to withdraw their money.

Sixth, the court allowed the parties to submit briefs discussing options to address the current impasse.  The CFTC responded by suggesting that the court appoint a receiver.  In contrast, Lake Shore Limited suggested that the court vacate the portions of the Injunction Order (which the Seventh Circuit declined to stay) holding that the CFTC had a strong likelihood of success of conclusively establishing that Lake Shore Limited is part of a common enterprise and that the Commodity Exchange Act governs its activities.  This argument is outrageous.  This court thus finds that other remedies are inadequate.

In sum, "[a]ppointing a receiver is an extraordinary remedy, but this is an extraordinary situation."  *Id*.  The Seventh Circuit directed this court to be receptive to applications to release investor funds and declined to stay the Injunction Order.  Since the issuance of the Seventh Circuit's order denying a stay pending appeal, Lake Shore Limited has continued to be obdurate by refusing to comply with the Injunction Order's terms; Lake Shore entities controlled by Mr. Baker are trying to get the London FCM money; a receiver was appointed in Canada on behalf of

what appears to be another Lake Shore customer who has an interest in some of the money at issue in this case; Mr. Baker's activities (*e.g.*, the office move and his attempts to gather records and convince customers that they should be unreceptive to the CFTC's efforts to advance their interests) continue to be suspicious; and customers who have found out about this action have expressed a strong desire to have a receiver appointed.

After careful consideration, and against the background of the extensive amount of attention this court has devoted to this very complex case, it concludes, in the exercise of its discretion, that the CFTC has a strong likelihood of success on the merits of its claims and the probability of harm to the investors by denial of the appointment far exceeds any harm to Lake Shore Limited occasioned by requiring it to produce its books and records, not continuing its prior course of conduct, and having the investors' money returned to them. Thus, for all of the reasons discussed above and in the Injunction Order, the court finds that the extreme remedy of immediate appointment of a receiver is warranted.

### 2.     Lake Shore Limited's Objections

Lake Shore Limited's arguments in opposition to the CFTC's motion do not affect this balance. Its contention that appointment of a receiver is improper because this would moot its pending appeal from the Injunction Order and the NFA's order is incorrect as it can seek immediate review of an order appointing a receiver. *See* 28 U.S.C. § 1292(a)(2) (orders appointing receivers are immediately appealable).

Lake Shore Limited also contends that a receiver would be too costly. There is already one in place advancing the Canadian plaintiff's position, and not appointing one here would prejudice the rest of the customers, so this is a necessary evil if the investors are to get any of

-35-

their money back.  In addition, it is hypocritical for Lake Shore Limited to voice a concern about cost, given that Lake Shore Limited is vigorously litigating this case and Lake Shore entities belonging to the common enterprise and Mr. Baker are willing to spend money in England in an attempt to collaterally attack the Injunction Order.  The receiver will also not act with unfettered discretion, as the court will closely monitor its activities and the CFTC and NFA are in a position to offer expertise and staff.  *See Commodity Futures Trading Com'n v. Eustace*, No. 05-2973, 2005 WL 3725003, *1-2 (E.D. Pa. Dec. 29, 2005) (discussing coordination between CFTC staff and the receiver to conserve costs yet ensure that investors receive the maximum amount of money as quickly as possible).

Next, Lake Shore Limited contends that appointing a receiver is pointless because one would not be recognized in England.  The CFTC has secured an opposing legal opinion so the court declines to accept Lake Shore Limited's position and prevent the British court from addressing this issue on the merits without any input from someone representing the investors' interests (which are not parallel with the interests of the FCM respondents).  On a related note, Lake Shore Limited states that the Sentinel bankruptcy militates against a receiver because those assets are not available for distribution.  Sentinel's bankruptcy, however, has no impact on the ability to marshal other assets and conduct discovery relating to the activities of the Lake Shore common enterprise.

Lake Shore Limited also argues that appointment of a receiver is premature because the Injunction Order maintains the status quo.  The true status quo, however, is that Lake Shore entities controlled by Mr. Baker are doing their utmost to get the London FCM accounts turned over to themselves, Lake Shore Limited has failed to comply with the document turnover

provisions in the Injunction Order, and another entity (via the Canadian receiver) is trying to reach assets that would otherwise be available for the investors in this case. The court declines to accept Lake Shore Limited's invitation to maintain this status quo.

Finally, Lake Shore Limited very briefly contends that appointing a receiver would prevent Lake Shore entities from pursuing the British action and thus is an improper antisuit injunction. Contrary to Lake Shore Limited's suggestion, however, an order is not per se invalid if it enjoins foreign proceedings. *See Allendale Mut. Ins. Co. v. Bull Data Systems, Inc.*, 10 F.3d 425, 431 (7th Cir. 1993). When considering whether to issue an international antisuit injunction, courts do not use the traditional four-part test for preliminary injunctions. *Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*, 361 F.3d 11, 19-20 (1st Cir. 2004). Instead, the circuits are split and employ two approaches: the "strict" or conservative approach (followed by the First, Second, Third, Sixth, and District of Columbia Circuits) and the "lax" or liberal approach (followed by the Fifth, Seventh, and Ninth Circuits). *Goss Intern. Corp. v. Man Roland Druckmaschinen Aktiengesellschaft*, 491 F.3d 355, 359-60 (8th Cir. 2007).[16]

The Seventh Circuit has clarified that:

[t]he difference between the two lines of cases has to do with the inferences to be drawn in the absence of information. The strict cases presume a threat to international comity whenever an injunction is sought against litigating in a foreign court. The lax cases want to see some empirical flesh on the theoretical skeleton. They do not deny that comity could be impaired by such an injunction but they demand evidence (in a loose sense – it needn't be evidence admissible under the Federal Rules of Evidence) that comity is likely to be impaired in this case. When every practical consideration supports the injunction, it is reasonable to ask the opponent for some indication that the issuance of an injunction really

---

[16] The court notes that Lake Shore Limited relies exclusively on cases from Circuits following the conservative approach and does not mention the approach followed by the Seventh Circuit.

would throw a monkey wrench, however small, into the foreign relations of the
United States.

*Allendale Mut. Ins. Co. v. Bull Data Systems, Inc.*, 10 F.3d at 431.  The Seventh Circuit thus

requires the party opposing the order to provide some proof that issuance of the order will impair

foreign relations.  Lake Shore Limited has failed to meet this burden.

In any event, its arguments about antisuit injunctions are not persuasive.  To the extent

that the order appointing a receiver acts as a foreign antisuit injunction, the court must consider

domestic judicial interests, including the prevention of vexatious or oppressive litigation and the

need to protect the court's jurisdiction, and concerns of international comity.  *See, e.g., Karaha*

*Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas*, 335 F.3d 357, 366 (5th Cir.

2003).  When considering if foreign proceedings are vexatious or oppressive, courts following

the liberal approach "look[] for the presence of several interrelated factors, including (1)

"inequitable hardship" resulting from the foreign suit; (2) the foreign suit's ability to frustrate and

delay the speedy and efficient determination of the cause; and (3) the extent to which the foreign

suit is duplicitous of the litigation in the United States."  *Id.* (internal citations and quotations

omitted).

Here, Lake Shore Limited contends that a receiver will prevent it from pursuing its

English suit and thereby impair international comity.  This argument incorrectly assumes that

Lake Shore Limited is entitled to proceed with defensive actions in foreign jurisdictions in an

effort to collaterally attack this court's orders and frustrate this court's ability to provide

meaningful relief.  The court, however, has the power to protect its jurisdiction.  *Kaepa, Inc. v.*

*Achilles Corp.*, 76 F.3d 624, 632 (5th Cir 1996) ("[w]here the concurrent proceeding effectively

threatens to paralyze the jurisdiction of the court, or where the foreign court is attempting to carve out exclusive jurisdiction over the action, an antisuit injunction may legitimately be necessary to protect the court's jurisdiction").  Moreover, if a foreign action is "interdictory rather than parallel, the issuance of an antisuit injunction is primarily a defensive action not inconsistent with the principles of international comity."  *Id*. at 633.

The English action is clearly an attempt to make an end-run around this court and the NFA's orders preserving the assets of the Lake Shore Alternative Financial Asset Funds for the benefit of the investors.  In considering the effectiveness of this gambit, the court finds the decision of the District of Columbia in *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909 (D.C. Cir. 1984) to be extremely helpful.[17]  In that case, two defendants filed writs in the High Court of Justice in England (the same court where the Lake Shore entities and Hanford filed suit) in an attempt to block the district court from proceeding with an antitrust case.  *See id*. at 930.  The district court enjoined the defendants from participating in the English proceeding.  The defendants appealed, arguing that this order was an abuse of discretion because it "trample[d] Britain's rights to regulate the access of its nationals to judicial remedies" and "contravene[d] the principles of international comity which ordinarily compel deference to

---

[17]  As noted above, the District of Columbia Circuit follows the conservative approach urged by Lake Shore Limited, as opposed to the Seventh Circuit's more liberal approach.  The court finds it especially telling that a court following a more restrictive approach than that employed by the Seventh Circuit rejected arguments that are eerily similar to the arguments raised by Lake Shore in this case.  In considering Lake Shore Limited's extremely short and undeveloped antisuit injunction argument, this court also found the *Laker Airway* court's thoughtful discussion of the difficult comity and policy issues relating to antisuit injunctions to be of use.  *See Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d at 937-55.

foreign judgments and which virtually always proscribe any interference with foreign judicial proceedings." *Id*. at 916.

The appellate court held that generally, because the U.S. and England could exercise concurrent jurisdiction, a litigant could defend a U.S. case and simultaneously proceed with litigation in England. *Id*. It then found that this general principle did not help the appellants "because the foreign action they seek to join [was] interdictory and not parallel" and "was instituted . . . for the sole purpose of terminating the United States claim. The only conceivable benefit that [appellants] would reap if the district court's injunction [enjoining the English case] were overturned would be the right to attack the pending United States action in a foreign court. This would permit the appellants to avoid potential liability under the United States laws to which their business operations and treaty obligations have long subjected them. In these circumstances there is ample precedent justifying the defensive use of an antisuit injunction." *Id*.

This is precisely the situation before the court. The court will not repeat the holdings in the Injunction Order here, except to note that the evidence presented showed that Lake Shore Alternative Financial Asset Funds traded on U.S. exchanges and Lake Shore Limited and Lake Shore Inc. used their status as CFTC registrants and NFA members to solicit investors, and the court made extensive findings about the CFTC's likelihood of succeeding on its claims regarding the interrelationship among various Lake Shore entities. Lake Shore cannot take advantage of U.S. laws and exchanges and then shield itself from any liability for its actions simply by holding fund assets outside the U.S. and filing its own case in a foreign jurisdiction.

In this regard, the court cannot put it any better than the *Laker Airways* court did:

Limitations on the application of comity dating from the origins of the doctrine recognize that a domestic forum is not compelled to acquiesce in pre- or postjudgment conduct by litigants which frustrates the significant policies of the domestic forum. Accession to a demand for comity predicated on the coercive effects of a foreign judgment usurping legitimately concurrent prescriptive jurisdiction is unlikely to foster the processes of accommodation and cooperation which form the basis for a genuine system of international comity. Similarly, the mere fact of [the appellants'] British juridical status simply does not erase all other legitimate bases of concurrent jurisdiction, as appellants suggest. Thus, the appellants' arguments that the district court abused its discretion fall well short of their mark.

*Id*. at 915-16.

The *Laker Airways* court then concluded that the district court was faced with a "stark choice of either protecting or relinquishing [its] jurisdiction" and was entitled to take necessary actions to prevent the defendants from eliminating the district court's ability to exercise jurisdiction over [the plaintiff's] facially valid claim," especially where "the tensions between the parties" made the threat of this occurring "worsen[] every day." *Id*. at 930-31. This is precisely the situation before the court. Time is of the essence if this court is to preserve its ability to protect its jurisdiction and provide meaningful relief to the investors. The Lake Shore entities' efforts to subvert this court's orders and block the court from affording meaningful relief to the investors cannot be tolerated. Therefore, the court rejects Lake Shore Limited's attempt to limit the receiver's powers based on general principles – which are inapplicable given the facts of this case – regarding antisuit injunctions.

To sum up, the court has balanced the benefits and harms flowing from the appointment of a receiver and they tilt dramatically in favor of appointment. The CFTC has proposed a group of candidates and Lake Shore Limited has elected not to comment on their qualifications. After

considering the applications and proposed staffing, costs, approach, and expertise, the court appoints Robb Evans & Associates LLC to act as a receiver for Lake Shore Limited in this case. The court will enter a separate order contemporaneously with this memorandum that addresses the receiver's authority and responsibilities.

## III.     Conclusion

A rule to show cause why it should not be held in civil contempt and sanctioned pursuant to Fed. R. Civ. P. Rule 37(b)(2) and the court's inherent powers is issued against Lake Shore Limited, and a rule to show cause why he should not be sanctioned under Fed. R. Civ. P. 37(b)(2), 28 U.S.C. § 1927, and the court's inherent powers is issued against Mr. Nissen. Responsive memoranda from Lake Shore Limited and Mr. Nissen are due on October 19, 2007. Next, the court finds that the SMA documents requested by the CFTC are discoverable under the Federal Rules and thus denies Lake Shore Limited's motion for a protective order relating to these documents [#151]. Finally, the CFTC's motion for appointment of a receiver [#135] is granted. The court will enter a separate order contemporaneously with this memorandum that addresses the receiver's authority and responsibilities.

DATE:   October 4, 2007

Blanche M. Manning
United States District Judge