**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES COMMODITY** | ) | |
| **FUTURES TRADING COMMISSION,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **07 C 3598** |
| | ) | |
| **LAKE SHORE ASSET MANAGEMENT** | ) | |
| **LIMITED, et al.,** | ) | |
| **Defendants.** | ) | |

## MEMORANDUM AND ORDER

The CFTC's motion for default judgment and entry of a permanent injunction as to the following defendants is before the court: (1) Lake Shore Group of Companies Inc., Ltd.; (2) Lake Shore Alternative Financial Asset Account Limited a/k/a Lake Shore Alternative Financial Asset Ltd.; (3) Lake Shore Alternative Financial Asset Fund Limited; (4) Lake Shore Alternative Financial Asset Account I Limited; (5) Lake Shore Alternative Financial Asset Account II Limited; (6) Lake Shore Alternative Financial Asset Fund II Limited; (7) Lake Shore Alternative Financial Asset Account III Limited; (8) Lake Shore Alternative Financial Asset Fund III Limited; (9) Lake Shore Alternative Financial Asset Fund IV Limited, currently known as Geneva Corporation Funds World Limited and/or Genevacorp Funds World Ltd.; (10) Lake Shore Alternative Financial Asset Fund IV U.S., LLC; (11) Lake Shore Alternative Financial Asset Yen Fund I; (12) Lake Shore Alternative Financial Asset Yen Fund Limited Class II; (13) Lake Shore Alternative Financial Asset Yen Fund Limited Class III; and (14) Hanford

Investments Ltd.[1]  For the following reasons, the CFTC's motion is granted and the court enters a

permanent injunction against these defendants as specified below.

## I.     Background

The court assumes familiarity with its prior decisions and will thus provide only a brief

recap.

### A.     Procedural History

On June 26, 2007, the CFTC filed a one-count complaint directed at Lake Shore Asset

Management Limited ("Lake Shore Limited").  The CFTC alleged that Lake Shore Limited was a

registered commodity trading advisor ("CTA") and commodity pool operator ("CPO") and had

improperly refused to make its books and records available for inspection or to provide

information about its commodity pool participants and trading activity as required by the

Commodity Exchange Act, as amended (the "Act").

On June 27, 2007, this court entered an ex parte statutory restraining order against Lake

Shore Limited which, among other things, froze Lake Shore Limited's assets and granted the

Commission immediate access to all of Lake Shore Limited's books and records.  Lake Shore

Limited appealed and the Seventh Circuit held that the time limits in Rule 65 applied to statutory

injunctions entered under the Act.  *Commodity Futures Trading Com'n v. Lake Shore Asset*

*Management Ltd.*, 496 F.3d 769 (7th Cir. 2007).  It thus vacated the statutory restraining order

because it lasted more than the twenty day period specified in Rule 65.  *Id.*

---

[1]  The court notes that it will write out the full names of the numerous Lake Shore entities
at issue, as it finds that using the confusingly similar full names is easier to follow than adding
even more confusingly similar Lake Shore entity names, this time abbreviated, to the mix.

The CFTC then amended its complaint to add Lake Shore Group of Companies Inc., Ltd. and Philip Baker, who controlled a wide variety of entities associated with Lake Shore Limited. The amended complaint repeated the allegations about the Lake Shore entities' failure to comply with the Act's recordkeeping requirements. It also alleged that Lake Shore Limited was part of a common enterprise, which included a long list of Lake Shore entities associated with Mr. Baker, and that Lake Shore Limited, Lake Shore Group, and Mr. Baker had violated the Act by defrauding pool participants in at least four commodity pools (Lake Shore Alternative Financial Asset Funds I, II, III, and IV).[2]

Shortly after it filed its amended complaint, the CFTC filed a motion for a preliminary injunction. On August 28, 2007, after conducting a three-day hearing, this court entered an 86-page order granting the motion in part and denying it in part. The court found that Lake Shore Limited, the Lake Shore Group and Lake Shore Asset Management Inc. (Lake Shore Limited's predecessor company), and the other Lake Shore entities controlled by Philip Baker operated as a common enterprise and were essentially all the same, explaining that "this case is the poster child for the transaction of business through a maze of interrelated companies" because "all of the evidence presented to the court indicates that all of the Lake Shore companies . . . were under common control and did not operate at arms-length." Docket No. 118, at 46. Next, the court made extensive findings regarding Lake Shore Limited's control of pool assets (held in the name of Lake Shore Alternative Financial Asset Ltd., Lake Shore Alternative Financial Asset Account I Ltd., Lake Shore Alternative Financial Asset Account II Ltd., Lake Shore Alternative Financial

---

[2] The CFTC's pleadings were actually less specific than this, as the CFTC's preliminary injunction pleading largely referred to Lake Shore Funds I, II, III, and IV, as opposed to the relevant individual funds.

Asset Account III Ltd., and Lake Shore Alternative Financial Asset Fund IV Limited, currently known as Geneva Corporation Funds World Limited and/or Genevacorp Funds World Ltd.). In addition, the court found that the CFTC had established a likelihood of success on its claim that Lake Shore Limited fraudulently solicited pool participants, provided false information to existing participants, and otherwise defrauded pool participants. The court also held that Lake Shore Limited was bound by the Act and was required to comply with, among other things, the Act's requirements regarding recordkeeping and production. Based on the entire record, the court then found that an asset freeze was necessary to protect customer funds.

Lake Shore Limited moved to stay the preliminary injunction order pending the disposition of its appeal from that order. On September 7, 2007, the Seventh Circuit denied Lake Shore Limited's motion for a stay pending appeal. On September 21, 2007, four of the Lake Shore pools and Hanford Investments (another Baker-controlled entity) filed a claim in the High Court in London seeking to compel the British futures commission merchants ("FCMs") to release the customer funds to them, despite the asset freeze in effect and the Seventh Circuit's denial of Lake Shore Limited's stay motion.

On October 4, 2007, this court entered a 42-page order that, among other things, detailed Lake Shore Limited's efforts to avoid complying with the Act, its discovery obligations, and the preliminary injunction order. *See* Docket No. 191. The court then appointed Robb Evans & Associates as receiver and entered an order outlining the duties and powers of the receiver. Since its appointment, the receiver has made numerous unsuccessful demands on various Lake Shore entities and the London FCMs requesting turnover of the frozen Lake Shore funds held by the London FCMs.

Moreover, the receiver has participated in bankruptcy proceedings relating to Sentinel (an Illinois FCM that was the cash manager and the sub-custodian for the Lake Shore funds), as Lake Shore is one of Sentinel's largest creditors. *See In re Sentinel Management Group*, No. 07-14987 (Bankr. N.D. Ill.). From October of 2007 to January of 2008, the court also entered numerous orders relating to Lake Shore Limited's failure to comply with the court's orders, found that Lake Shore Limited was in civil contempt of court, and referred this case to the United States Attorney for investigation and possible prosecution of criminal contempt charges against Lake Shore Limited and Mr. Baker personally. *See* Docket Nos. 191, 299, 322, 347, 363 & 402.

On December 28, 2007, the Seventh Circuit issued an opinion affirming the preliminary injunction as to Lake Shore Limited. *Lake Shore Asset Management Limited v. Commodity Futures Trading Com'n*, 511 F.3d 762 (7th Cir. 2007). The Seventh Circuit left the asset freeze in place and rejected Lake Shore Limited's claim that the CFTC was improperly trying to regulate acts outside the United States and control assets held in foreign countries that had been invested by individuals and entities outside the United States. The Seventh Circuit then found that the preliminary injunction bound all other members of the corporate group under Rule 65(d) to the extent that they were acting in concert with Lake Shore Limited.

It also held, however, that this court could not directly enjoin the entities that make up the Lake Shore common enterprise unless they were first named as defendants, served with process and given an opportunity to defend. *Id*. at 766-67 (entities comprising the Lake Shore common enterprise must be served with process and allowed to present evidence before they may be enjoined). In other words, the Lake Shore entities who had not been named as defendants had to

have a chance to challenge the court's factual findings before the court could directly enjoin them.[3]

Once the mandate issued, on January 16, 2008, this court amended the preliminary injunction order to only directly bind Lake Shore Limited. *See* Docket No. 390. The CFTC then amended its complaint to name all of the Lake Shore entities as defendants and Hanford and Anglo International (who had both received money from Lake Shore funds) as relief defendants. The CFTC's second amended complaint, filed on February 19, 2008, alleged that the newly added Lake Shore defendants were controlled by Mr. Baker and operated in concert with Lake Shore Limited, Lake Shore Inc., and Lake Shore Group as a common enterprise. The allegations in the second amended complaint are consistent with the extensive evidence about the Lake Shore pools that was presented at the previous preliminary injunction hearing.

## II.   Discussion

For the following reasons, the court finds that the newly added defendants were properly served and are in default. It also concludes that it may exercise personal jurisdiction over these defendants and that venue is proper in this district. Finally, it enters a default judgment and permanent injunction as specified below.

---

[3] In its appeal from the preliminary injunction order, Lake Shore Limited did not challenge any of the court's findings of fact relating to fraud or the interrelationship of the various Lake Shore entities. Accordingly, at this point in the proceedings, it cannot challenge these findings and has not attempted to do so. Lake Shore Limited has also declined to take any position on the CFTC's motion for default judgment or to file an opposition to the CFTC's motion to amend the receivership order, which is based on the CFTC's position (adopted in this order) that defendants added in the second amended complaint were properly served, are in default, and should be subject to a permanent injunction.

### A.    Service of Process

In January of 2008, the receiver arranged for personal service of certain orders entered in this case to ensure that the various Lake Shore entities holding receivership assets had notice of key decisions issued by this court and the Seventh Circuit.  See Docket No. 534.[4]  Service of these documents was effected by persons authorized under the law of the local jurisdictions to serve judicial documents, and in accordance with the laws of those jurisdictions.

Next, on February 19, 2008, the CFTC amended its complaint to add more Lake Shore entities.  *See* Docket No. 431.  The receiver and the CFTC coordinated efforts and each served a group of Lake Shore entities with the second amended complaint.  In support of the CFTC's motion for a default judgment, the receiver submitted an affidavit regarding service of process from Emma Jane Sparshott, who is a solicitor of the Supreme Court of England and Wales and is admitted to practice as a solicitor in the East Caribbean Supreme Court in the Territory of the British Virgin Islands.  This affidavit contains detailed information regarding personal service of the second amended complaint against certain Lake Shore entities located in London, the British Virgin Islands, the Turks & Caicos Islands, and the Isle of Man.[5]  *See* Docket No. 534 at Ex. 3.

---

[4]  Receivership assets are held by five Turks and Caicos Island entities (Lake Shore Alternative Financial Asset Ltd., Lake Shore Alternative Financial Asset Account I Ltd., Lake Shore Alternative Financial Asset Account II Ltd., Lake Shore Alternative Financial Asset Account III Ltd., and Hanford Investments Limited) and one British Virgin Island entity (Lake Shore Alternative Financial Asset Fund IV Limited, currently known as Geneva Corporation Funds World Limited and/or Genevacorp Funds World Ltd.).

[5]  The London entity is Anglo International Associates Limited.  The British Virgin Islands entity is Lake Shore Alternative Financial Asset Fund IV Limited, currently known as Geneva Corporation Funds World Limited and/or Genevacorp Funds World Ltd.  The Turks & Caicos Islands entities are Lake Shore Alternative Financial Asset Account I Limited, Lake Shore Alternative Financial Asset Account II Limited, Lake Shore Alternative Financial Asset Account III Limited, Lake Shore Alternative Financial Asset Account Limited a/k/a Lake Shore

Ms. Sparshott's affidavit summarizes the laws governing service of process in each of these jurisdictions and confirms that service was effected by persons authorized under the law of the local jurisdictions to serve judicial documents, and in accordance with the laws of those jurisdictions.

The CFTC caused additional Lake Shore entities located in the British Virgin Islands to be personally served by persons authorized by British Virgin Islands law to serve judicial documents, and in accordance with the laws of that jurisdiction.[6]  Finally, the CFTC caused the registered agent for Lake Shore Alternative Financial Asset Fund IV U.S., LLC, an Illinois limited liability company, to be personally served in Chicago.  *See* Docket No. 502.

The time for all of these entities to answer or otherwise plead has passed.  Only one defendant – the elusive Mr. Baker – has not been served as he has thwarted all attempts to locate him following his hasty departure from London last summer.   For the purposes of this opinion, the court will refer to the defendants who have been served but who have failed to appear collectively as the "default defendants" (with the exception of Anglo, as the CFTC does not seek a default judgment as to this defendant).

---

Alternative Financial Asset Ltd., and Hanford Investments Ltd.  The Isle of Man entity is Lake Shore Group of Companies Inc., Ltd.

[6] These entities are: Lake Shore Alternative Financial Asset Fund Limited (Docket No. 479), Lake Shore Alternative Financial Asset Fund II Limited (Docket No. 482), Lake Shore Alternative Financial Asset Fund III Limited (Docket No. 481), Lake Shore Alternative Financial Asset Fund IV Limited, currently known as Geneva Corporation Funds World Limited and/or Genevacorp Funds World Ltd. (Docket No. 483), Lake Shore Alternative Financial Asset Yen Fund I (Docket No. 478), Lake Shore Alternative Financial Asset Yen Fund Limited Class II (Docket No. 480), and Lake Shore Alternative Financial Asset Yen Fund Limited Class III (Docket No. 498).  The court notes that Lake Shore Alternative Financial Asset Fund IV Limited appears to have been served with the second amended complaint twice, as the receiver also effected personal service of the second amended complaint on this Lake Shore entity.

### B.   The Hague Convention

Under Rule 4(f)(1), service of process upon entities in foreign countries may be effected "by any internationally agreed means reasonably calculated to give notice, such as those authorized by the Hague Convention."  *See* Fed. R. Civ. P. 4(f)(1); Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361, T.I.A.S. No. 6638 (appended to Fed. R. Civ. P. 4) ("Hague Convention").  "[C]ompliance with the [Hague] Convention is mandatory in all cases to which it applies."  *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 705 (1988).

Both the United States and the United Kingdom are signatories to the Hague Convention. *See International Controls Corp v. Vesco*, 593 F.2d 166, 179 nn.14-15 (2nd Cir. 1979) (listing countries).  Moreover, the Hague Convention extends throughout the United Kingdom to the Isle of Man (a self-governing Crown dependency of the United Kingdom), the British Virgin Islands, and the Turks & Caicos Islands (in the British West Indies).  *See id*.  The default defendants are foreign corporations located in London, the British Virgin Islands, the Turks & Caicos Islands, and the Isle of Man.  Therefore, service on the default defendants is governed by the Hague Convention.

Articles 10(c) and 19 of the Hague Convention contain relevant provisions.  Article 10 allows direct service on a foreign defendant through judicial officers, officials or other competent persons if the receiving country does not object.[7]  In turn, Article 19 expressly permits service of

---

[7]  Article 10 states:

> Provided the State of destination does not object, the present Convention shall not interfere with—

process by any method of service allowed by the "internal law of the contracting State." Under

Article 19, any method of service is effective if nothing in the foreign nation's law suggests that

the method violates a deep-rooted policy of the nation involved.

The court finds that the CFTC and the receiver have established that service on the

default defendants (other than Lake Shore Alternative Financial Asset Fund IV U.S., which was

served in accordance with the federal rules) was proper under Articles 10(c) and 19 of the Hague

Convention because it was effected pursuant to the laws of the various jurisdictions at issue and

was done by persons authorized under the laws of those jurisdictions to serve process.[8] Service

---

[a]    the freedom to send judicial documents by postal channels, directly to persons abroad,

[b]    the freedom of judicial officers, officials or other competent persons of the State of origin to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination.

[c]    the freedom of any person interested in a judicial proceeding to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination.

Hague Convention Article 10; *see also Koehler v. Dodwell*, 152 F.3d 304 (4th Cir. 1998) (personal service by a private Bermuda process server on a defendant in Bermuda was valid under Article 10(c) of the Hague Convention); September 11, 1980 letter from the United Kingdom to the Permanent Bureau of the Hague Convention ("any person in another Contracting State who is interested in a judicial proceeding (including his lawyer)" may effect "service in the United Kingdom 'directly' through a competent person other than a judicial officer or official, *e.g.*, a solicitor"); Notes of April 1989 Special Commission meeting (expressing the United Kingdom's preference for the use of direct service through English solicitors on residents in England and Wales); Notes of the 2003 Special Commission meeting) (reaffirming preference for direct service via solicitors).

    [8]    *See* Docket No. 534 at Ex. 3 (Affidavit of Emma Jane Sparshott detailing how service was effected on Anglo International Associates Limited, Lake Shore Alternative Financial Asset Fund IV Limited, currently known as Geneva Corporation Funds World Limited and/or Genevacorp Funds World Ltd., Lake Shore Alternative Financial Asset Account I Limited, Lake Shore Alternative Financial Asset Account II Limited, Lake Shore Alternative Financial Asset Account III Limited, Lake Shore Alternative Financial Asset Account Limited a/k/a Lake Shore Alternative Financial Asset Ltd., Hanford Investments Ltd, and Lake Shore Group of Companies

on Lake Shore Alternative Financial Asset Fund IV U.S., an Illinois limited liability company, is a far simpler proposition. The CFTC personally served this entity's registered agent, who is located in Chicago, with process in conformance with Fed. R. Civ. P 4(c). Accordingly, all of the default defendants were properly served.

### C.   Personal Jurisdiction & Venue

Under the Act, "[a]ny action under this section may be brought in the district wherein the defendant is found or is an inhabitant or transacts business or in the district where the act or practice occurred, is occurring, or is about to occur, and process in such cases may be served in any district in which the defendant is an inhabitant or wherever the defendant may be found." 7 U.S.C. § 13a-1(e). Under this statute, which authorizes nationwide and worldwide service, "due process requires only that each party have sufficient contacts with the United States as a whole rather than any particular state or other geographic area." *U.S. v. De Ortiz*, 910 F.2d 376, 382 (7th Cir. 1990); *see also Waeltz v. Delta Pilots Retirement Plan*, 301 F.3d 804, 808 n.3 (7th Cir. 2002) (where a federal statute provides for nationwide service of process, a district court may exercise personal jurisdiction over a foreign defendant if that defendant "has sufficient contacts with the United States as a whole"); C. Wright & A. Miller, 4 Federal Practice and Procedure: Civil 3d § 1081.1 (3d ed. 2002).

---

Inc., Ltd.); Docket Nos. 479, 482, 481, 478, 480, and 498 (detailing how service was effected on Lake Shore Alternative Financial Asset Fund Limited, Lake Shore Alternative Financial Asset Fund II Limited, Lake Shore Alternative Financial Asset Fund III Limited, Lake Shore Alternative Financial Asset Yen Fund I, Lake Shore Alternative Financial Asset Yen Fund Limited Class II, and Lake Shore Alternative Financial Asset Yen Fund Limited Class III, respectively).

Here, the court has found, and the default defendants have not challenged, that the Lake Shore entities were all acting as a common enterprise, were under common control, and did not operate at arms-length. The court also found that the Lake Shore entities holding pool funds were controlled by Lake Shore Limited and Mr. Baker and were inextricably intertwined with Lake Shore Limited. These entities existed because Lake Shore Limited could not hold pool funds in its own name. In addition, Lake Shore Limited (and its predecessor, Lake Shore Inc.) controlled the Lake Shore entities holding pool funds and had offices in Chicago. The Lake Shore Group represented that it, too, had offices in Chicago. Lake Shore Limited/Lake Shore Group's management personnel, administrative/IT/operations staff, and execution staff were also located in Chicago.

Moreover, Lake Shore Limited's promotional materials prominently touted its status as a CFTC registrant and NFA member to induce individuals and entities to invest in the Lake Shore funds. These materials, as well as account statements from London FCMs Man Financial Limited (now known as MF Global), Lehman Brothers International Europe, and Fimat International Banque SA UK Branch, (now known as Newedge Group-UK Group), show that the Lake Shore funds traded at least in part on U.S. exchanges. Specifically, Lake Shore funds – held in the name of certain default defendants[9] – traded on U.S. exchanges, including the Chicago Mercantile Exchange, the Chicago Board of Trade, and the New York Mercantile Exchange. In addition, Lake Shore's fact sheets and confidential explanatory memoranda identify the Bank of New York as the custodian for investor funds and Sentinel (an FCM in

---

[9] Specifically, these defendants are Lake Shore Alternative Financial Asset Ltd., Lake Shore Alternative Financial Asset Account I Ltd., Lake Shore Alternative Financial Asset Account II Ltd. and Lake Shore Alternative Financial Asset Fund IV Ltd.

Illinois) as the sub-custodian, and a substantial amount of losses at Man, Fimat and Lehman (the only three trading accounts for the Lake Shore Alternative Financial Asset Funds) occurred as the result of trading on U.S. futures exchanges.

The receiver's filings detail the path of investor funds from their initial deposit into Lake Shore's operating accounts at Sentinel through the Bank of New York to Sentinel's trading account to the London FCMs. *See* Docket No. 334 (Receiver's Report from October 15, 2007, through November 30, 2007); *see also* Docket No. 490 (Receiver's Second Report of Significant Developments). Moreover, at the time that the CFTC's and the NFA's asset freezes went into effect on June 27, 2007, approximately $150 million of investor funds were frozen in the Sentinel accounts located in Illinois. Based on these facts, the court finds that the default defendants have sufficient national contacts to allow this court to exercise personal jurisdiction over them and that venue is proper in this district under 7 U.S.C. § 13a-1(e). The court thus turns to the CFTC's motion for entry of default judgment against the default defendants.

### D. The CFTC's Motion for Default Judgment

#### 1. Entry of Default

The court previously entered default against twelve entities.[10]  At that time, the docket did not reflect returns of service for Lake Shore Alternative Financial Asset Fund IV U.S., LLC, or Lake Shore Alternative Financial Asset Yen Fund Limited Class III.  These entities were served pursuant to the laws of the United States and the British Virgin Islands, respectively.  *See* Docket Nos. 483 & 498.  The time for these entities to answer or otherwise plead has passed, so the court enters default against them.  *See* Fed. R. Civ. P. 55(a).

The court also notes that it previously entered default against Lake Shore Group based on service of the amended complaint on Lawrence Rosenberg in Chicago.  *See* Docket No. 198.  This Lake Shore entity has recently been served with the second amended complaint in the Isle of Man and the time to answer or otherwise plead has passed.  *See* Docket No. 506.  Thus, under either method of service, Lake Shore Group remains in default.

#### 2. Default Judgment

Because the default defendants have not appeared, the CFTC was not required to serve its motion for a default judgment on the default defendants.  See Fed. R. Civ. P. 55(b)(2); *North*

---

[10] These entities are:  (1) Anglo International Associates Ltd.; (2) Lake Shore Alternative Financial Asset Yen Fund I; (3) Lake Shore Alternative Financial Asset Fund Limited; (4) Lake Shore Alternative Financial Asset Yen Fund Limited Class II; (5) Lake Shore Alternative Financial Asset Fund III Limited; (6) Lake Shore Alternative Financial Asset Fund II Limited; (7) Lake Shore Alternative Financial Asset Fund IV Limited; currently known as Geneva Corporation Funds World Limited and/or Genevacorp Funds World Ltd.; (8) Lake Shore Alternative Financial Asset Account III Limited; (9) Lake Shore Alternative Financial Asset Account I Limited; (10) Lake Shore Alternative Financial Asset Account II Limited; (11) Hanford Investments Ltd.; and (12) Lake Shore Alternative Financial Asset Account Limited a/k/a Lake Shore Alternative Financial Asset Ltd.

*Cent. Illinois Laborers' Dist. Council v. S.J. Groves & Sons Co., Inc.*, 842 F.2d 164, 168-69 (7th Cir. 1988) (if defendant takes no action, formal or informal, from the time the suit is filed until the time the default judgment is entered, it has not "appeared" so as to require service of the motion for default judgment); C. Wright, A. Miller & M. Kane, 10A Federal Practice and Procedure: Civil 3d § 2687 (1998) (a defaulting party who has failed to appear and has not manifested an intent to defend is not entitled to notice of an application for a default judgment).[11]

With respect to liability, the Seventh Circuit previously noted that this court "evidently was confident that other members of the Lake Shore Group of Companies [*i.e.*, entities other than Lake Shore Limited] are 'in active concert or participation with' Lake Shore Asset Management, and that may well be true. But so far none of these entities has been served with process and given an opportunity to present evidence. That is essential before any enforcement action may be taken against a non-litigant." *Lake Shore Asset Management Limited v. Commodity Futures Trading Com'n*, 511 F.3d at 767. At this point, these other Lake Shore entities have been added as defendants, been served with process in conformance with the Hague Convention, the laws of the relevant jurisdictions, and the Federal Rules, and been afforded an opportunity to defend. They have declined to do so and are currently in default.

"[I]n the case of a default, this circuit follows the rule that the well-pleaded allegations of the complaint relating to liability are taken as true." *Merrill Lynch Mortg. Corp. v. Narayan*, 908 F.2d 246, 253 (7th Cir. 1990) (internal quotations omitted). The 39-page second amended

---

[11]   These entities have actual notice of the motion for default judgment and all of the proceedings in this case as Lake Shore Limited is participating in this action. Mr. Baker, who controls Lake Shore Limited and is its only remaining corporate officer, controls the other Lake Shore entities, as discussed in this order and numerous other orders.

complaint contains extensive well-pleaded factual allegations regarding the liability of the default defendants under the Act. The court's preliminary injunction order contains even more details and factual findings.

In turn, the receiver's first report (Docket No. 334) analyzes Sentinel and Bank of New York records, trading reports from the three London FCMs, and documents from investors relating to the Lake Shore funds. The receiver's analysis showed, among other things, extensive comingling of pool assets, substantial trading losses, and a variety of potentially improper transfers that all related to assets held by certain of the default defendants. The court will assume familiarity with these documents and evidence, which the default defendants do not challenge due to their decision not to defend. The court also notes that the default defendants do not challenge any of the court's findings relating to the existence of the Lake Shore common enterprise.

The CFTC's motion for default judgment also summarizes a variety of interesting evidence obtained by conducting discovery directed at investors. The court must note that it has rarely seen deponents who were so pleased to have been deposed. *See* Docket No. 538 at Attachment 6.[12] This discovery provides further support for the court's findings of liability.

---

[12] The following exchange is illustrative:

Q:     Are you here voluntarily today?
A:     Yes.
Q:     Let me ask you a couple of other questions.
A:     Not only voluntarily. I mean thank you very much for having me here. It's an opportunity to tell you the truth and also to say that one of the good things that have this financial system is a possibility to give us another country to make sure our money is secure, and this is not working to maintain that image in the world.
Q:     You know a receiver has been appointed in this case.
A:     Yes.

However, because the record already contains ample evidence supporting a finding of liability, the court will not summarize the new evidence at this point. Instead, it turns to the specific provisions of the Act cited by the CFTC.

The Act prohibits cheating and defrauding, attempting to cheat or defraud, or willfully deceiving or attempting to deceive other persons in connection with commodity futures trading for or on behalf of such persons. 7 U.S.C. § 6b(a)(2)(i)-(iii). For example, misappropriation of investor funds violates the Act. *Commodity Futures Trading Com'n v. FxTrade Financial, LLC*, 2:04cv2181-D/An, 2007 WL 4790811, at \*4 (W.D. Tenn. Apr. 24, 2007) ("misappropriating investor funds violates Section 4b(a)(2)(i) and (iii)"); *Commodity Futures Trading Com'n v. Noble Wealth Data Info. Servs., Inc.,* 90 F.Supp. 2d 676, 687 (D. Md. 2000) (defendants violated § 4b(a)(2)(i) and (iii) of the Act by diverting investor funds for operating expenses and personal use)*, aff'd in relevant part, vacated in part sub nom. Commodity Futures Trading Com'n v. Baragosh,* 278 F.3d 319 (4th Cir. 2002); *Commodity Futures Trading Com'n ex rel. Kelly v. Skorupskas*, 605 F.Supp. 923, 932 (E.D. Mich. 1985) (misappropriation of customer funds which had been entrusted for trading purposes violates §§ 4b(a) and 4o(1)). Moreover, misrepresentations or omissions about experience, historical success, and profitability are material and may constitute fraud. *See Commodity Futures Trading Com'n v. White Pine Trust*

---

Q:      Do you support the receiver's efforts to get the money back from brokerage houses in London for the purpose of distributing that money to the customers?
A:      Please, do it. I mean I don't want anything else related to Lake Shore and Baker and Rosenberg. I want my money back and if the receiver is appointed by the government even better.
Q:      Okay.
A:      As soon as possible.

Docket No. 538 at Attachment 6 (Deposition of Giuliano Morini).

*Corp.*, No. 04CV2093 J(NLS), 2007 WL 1121249, at *9 (S.D. Cal. Apr. 11, 2007)

("Misrepresentations regarding the experience or profitability of a firm or account manager are

material because historical success and experience would be considered extremely important

factors to a reasonable investor when deciding to invest"); *Commodity Futures Trading Com'n v.*

*Valko*, No. 06-60001-CIV, 2006 WL 2582970, at *4 n.1 (S.D. Fla. Aug. 16, 2006) (false reports

of profitability with respect to commodity futures trading accounts constitute a violation of 7

U.S.C § 6b(a)(2)(ii)); *Commodity Futures Trading Com'n v. Noble Wealth Data Info. Serv., Inc.*,

90 F.Supp. 2d at 686 (defendant's profit claims constituted false reports and fraud within the

meaning of the Act); *Commodity Futures Trading Com'n ex rel. Kelley v. Skorupskas*, 605

F.Supp. at 932-33 (defendants violated § 4b(a) and § 4o(1)of the Act by issuing false monthly

statements to customers).  Extensive evidence, which is uncontroverted by the default defendants

and detailed below, shows that the default defendants, operating as a common enterprise,

defrauded investors and misappropriated investor funds.

      Moreover, the Act prohibits CTAs and CPOs from defrauding any client or pool

participant or prospective client or pool participant by use of the mails or any means or

instrumentality of interstate commerce, 7 U.S.C. § 6o(1)(A), and from engaging in any

transaction, practice or course of business that operates as a fraud or deceit upon any client or

participant or prospective client or participant by use of the mails, 7 U.S.C. § 6o(1)(B).  These

sections apply to all CTAs and CPOs whether registered, required to be registered, or exempted

from registration.  *See* CFTC Regulation 4.15, 17 C.F.R. § 4.15; *Commodity Futures Trading*

*Com'n v. Equity Financial Group, LLC*, No. 04-1512 (RBK), 2006 WL 3751911, at *6 (D. N.J.

Dec. 18, 2006) ("actual registration as a CPO or an [associated person] with [the] CFTC is not

required to fall within the ambit of this provision"), *citing Commodity Futures Trading Com'n v. Savage*, 611 F.2d 270, 282 (9th Cir. 1980).

Lake Shore Inc. acted as CPO for the Lake Shore funds until Lake Shore Limited took over in January of 2007 and acted as the CPO and the CTA for the Lake Shore funds. As detailed in this order, the preliminary injunction order, and the second amended complaint's well-pleaded factual allegations, Lake Shore Group, followed by Lake Shore Inc. and Lake Shore Limited, and acting in concert with the other Lake Shore entities, violated the Act by: (1) misappropriating pool participants' funds; (2) distributing or causing to be distributed false documents to prospective and actual pool participants and clients, (3) misrepresenting and failing to disclose material facts to prospective and actual pool participants and clients; (4) misrepresenting the profits and losses and balances of the funds received from pool participants; and (5) distributing or causing to be distributed documents containing false information on Lake Shore's website, all in violation of 7 U.S.C. §§ 6o(1)(A) & (B).

Finally, Lake Shore Limited's efforts to thwart efforts to conduct an audit of the Lake Shore common enterprise's records by refusing to produce the books and Lake Shore's server for inspection is well-documented. Lake Shore Limited has books and records relating to the Lake Shore funds and has steadfastly refused to comply with the Act's requirements. Instead, it has sent the records and Lake Shore's server to a variety of international locations (most recently Switzerland, where they are currently hidden under the aegis of Alexandre Schwab, a lawyer for Mr. Baker).

To sum up, the default defendants carried out business in the United States by, among other things, acting as part of a common enterprise headed by Lake Shore Inc. and then its

successor, Lake Shore Limited, in Chicago, causing the Lake Shore Funds to be held by the Bank of New York as the custodian and by Sentinel, an FCM in Illinois, as the sub-custodian, and causing Lake Shore funds to be traded on U.S. exchanges. These actions took place over a significant period of time, as the Lake Shore Group and associated companies have been operating businesses since 1994. The court thus concludes that, for the reasons discussed above, it can properly exercise jurisdiction over the default defendants and that the default defendants are liable under the Act.

The CFTC's motion for a default judgment [#537] is, therefore, granted. This default judgment is against (1) Lake Shore Group of Companies Inc., Ltd.; (2) Lake Shore Alternative Financial Asset Account Limited a/k/a Lake Shore Alternative Financial Asset Ltd.; (3) Lake Shore Alternative Financial Asset Fund Limited; (4) Lake Shore Alternative Financial Asset Account I Limited; (5) Lake Shore Alternative Financial Asset Account II Limited; (6) Lake Shore Alternative Financial Asset Fund II Limited; (7) Lake Shore Alternative Financial Asset Account III Limited; (8) Lake Shore Alternative Financial Asset Fund III Limited; (9) Lake Shore Alternative Financial Asset Fund IV Limited, currently known as Geneva Corporation Funds World Limited and/or Genevacorp Funds World Ltd.; (10) Lake Shore Alternative Financial Asset Fund IV U.S., LLC; (11) Lake Shore Alternative Financial Asset Yen Fund I; (12) Lake Shore Alternative Financial Asset Yen Fund Limited Class II; (13) Lake Shore Alternative Financial Asset Yen Fund Limited Class III; and (14) Hanford Investments Ltd. Details of the judgment are discussed in the next section of this order.

**E.      The CFTC's Motion for a Permanent Injunction**

Every order granting an injunction must "(A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail – and not by referring to the complaint or other document – the act or acts restrained or required."  Fed. R. Civ. P. 65(d)(A)-(C).  The court has considered the CFTC's second amended complaint; declarations, exhibits, and evidence from the hearing on the preliminary injunction; the CFTC's brief in support of the motion for entry of default judgment against the default defendants and associated declarations, exhibits, and evidence; filings by the receiver, and the record.  *See* C. Wright, A. Miller & M. Kane, 10A Federal Practice and Procedure: Civil 3d § 2688 ("[e]ven after default, however, it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action").  The court, accordingly, makes the following findings of fact and conclusions of law.

### *Background*

1.    The court has jurisdiction over this action pursuant to § 6c of the Act, 7 U.S.C. § 13a-1, which authorizes the CFTC to seek injunctive relief against any person whenever it shall appear to the CFTC that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation or order thereunder.

2.    Venue properly lies with this court pursuant to § 6c of the Act, 7 U.S.C. § 13a-1(e), in that the default defendants transacted business in this district as discussed above.  Acts and practices that violate the Act have also occurred, are occurring, or are about to occur within this district.

3.	As outlined above, service was properly effected upon the default defendants pursuant to Fed. R. Civ. P. 4, the Hague Convention, and the laws of the respective jurisdictions of the default defendants.

4.	The default defendants have failed to timely answer or otherwise defend the second amended complaint within the time permitted by Fed. R. Civ. P. 12. Default has been entered against all of the default defendants pursuant to Fed. R. Civ. P. 55(a) except Anglo International, as the CFTC has not sought a default judgment as to this defendant.

## Findings of Fact

### *The Plaintiff*

5.	Plaintiff *Commodity Futures Trading Commission* is an independent federal regulatory agency that is charged with administering and enforcing the Act, 7 U.S.C. §§ 1, *et seq*., and the regulations promulgated thereunder, 17 C.F.R. §§ 1.1, *et seq*.

### *Defendant Philip Baker*

6.	*Philip J. Baker* is a Canadian citizen. Mr. Baker's whereabouts are unknown so he has not yet been served with process. Mr. Baker is a controlling person of the Lake Shore common enterprise. For example, Mr. Baker is the Managing Director, Principal and President of Lake Shore Limited, the co-founder and managing partner of the Lake Shore Group of Companies, and the President and Secretary of Lake Shore Alternative Financial Account I. The court previously referred the issue of possible prosecution for criminal contempt against Mr. Baker based on his refusal to comply with this court's orders as required by Fed. R. Civ. P. 65(d) to the United States Attorneys' Office. This matter is currently pending.

## *The Corporate Defendants*

7.    *Lake Shore Asset Management Limited* has an office at 875 N. Michigan Ave., Suite 1562, Chicago, Illinois 60611-7449.  Lake Shore Limited is a reorganization and continuation of Lake Shore Inc.

8.    Lake Shore Limited was incorporated in Bermuda in September 2006.  Mr. Baker is Lake Shore Limited's President and Managing Director.  During the relevant period, Nicholas Eveleigh was Vice President of Operations and Laurence Rosenberg was a Director and Vice President.

9.    Lake Shore Limited has been registered with the CFTC as both a CPO and CTA since January 2007 pursuant to § 4m of the Act, 7 U.S.C. § 6m, and held itself out as a CFTC registrant.  Lake Shore Limited is also a member of the National Futures Association ("NFA") and held itself out as a NFA member.  NFA records list Mr. Baker and Rosenberg as principals with greater than 10% ownership of Lake Shore Limited.

10.    Lake Shore Limited acted as the CTA and CPO for the Lake Shore funds.  It is the asset and investment manager of the commodity pools offered by the Lake Shore Group of Companies Inc., Ltd.

11.    *Lake Shore Group of Companies Inc., Ltd.* is registered in the Isle of Man.  It is an umbrella organization that, among other things, offers investment products including several commodity pools.  Mr. Baker is Lake Shore Group's managing partner.  Lake Shore Limited is Lake Shore Group's investment manager and investment advisor.  The Lake Shore Group of Companies Inc., Ltd. trades commodity futures on U.S. exchanges through at least three FCMs (Man, Lehman, and Fimat) for all of the commodity pools.

## *Other Defendant Entities*

12.  *Lake Shore Alternative Financial Asset Ltd.* was incorporated in the Turks and Caicos Islands, British West Indies in July of 2001. Its registered office is located at Tropicana Plaza, P.O. Box 656, Providenciales, Turk and Caicos Islands, British West Indies. It was referred to or did business as Lake Shore Alternative Financial Asset Account Ltd. and held itself out as having been incorporated prior to June 28, 2001. Corporate Directors Ltd. is a nominee Director of Lake Shore Alternative Financial Asset Account Ltd. a/k/a Lake Shore Alternative Financial Asset Ltd. and Mr. Baker is its President and Secretary.

13.  *Lake Shore Alternative Financial Asset Account I Ltd.* has a registered office at Tropicana Plaza, P.O. 656, Leeward Highway, Providenciales, Turks and Caicos Islands, British West Indies. It was incorporated in the Turks and Caicos Islands in September of 2005. Corporate Directors is a nominee director of Lake Shore Alternative Financial Asset Account I.

14.  *Lake Shore Alternative Financial Asset Account II Ltd.*, has a registered office at Tropicana Plaza, P.O. 656, Leeward Highway, Providenciales, Turks and Caicos Islands, British West Indies. It was incorporated in the Turks and Caicos Islands in September of 2005. Corporate Directors is a nominee Director of Lake Shore Alternative Financial Asset Account II.

15.  *Lake Shore Alternative Financial Asset Account III Ltd.* operated out of the Turks and Caicos Islands. It does not appear to have any customer funds and may be a d/b/a for Lake Shore Alternative Financial Asset Fund III.

16.    *Lake Shore Alternative Financial Asset Fund Limited* was incorporated in the British Virgin Islands in March 2005.  Mr. Rosenberg was a Director.

17.    *Lake Shore Alternative Financial Asset Fund II Ltd.* was incorporated in the British Virgin Islands in December of 2005.  Mr. Rosenberg was a Director.

18.    *Lake Shore Alternative Financial Asset Fund III Ltd.* was incorporated in the British Virgin Islands.  Mr. Rosenberg was a Director.

19.    *Lake Shore Alternative Financial Asset Fund IV Limited* has a registered office at Craigmuir Chambers, P.O. Box 71, Road Town, Tortola, British Virgin Islands.  It was incorporated in the British Virgin Islands in January of 2007.  Mr. Baker and Mr. Rosenberg are Directors.  The defendants subsequently changed the name of Lake Shore Alternative Financial Asset Fund IV to Geneva Corporation Funds World Limited and/or Genevacorp Funds World Ltd.

20.    *Lake Shore Alternative Financial Asset Fund IV U.S., LLC,* was formed on April 17, 2007, as an Illinois limited liability company.  Lake Shore Limited is its managing member.  Lake Shore Alternative Financial Asset Fund IV U.S. was an entity created to collect funds from U.S. participants for investment in Lake Shore Alternative Financial Asset Fund IV.

21.    *Yen Funds 1, 2 and 3* (Lake Shore Alternative Financial Asset Yen Fund 1, Lake Shore Alternative Financial Asset Yen Fund Limited Class II, and Lake Shore Alternative Financial Asset Yen Fund Limited Class III) were incorporated in the British Virgin Islands in December 2006.  Mr. Rosenberg was a director of Yen Fund 1.

22. Participant funds invested in Yen Fund 1, Yen Fund 2 and Yen Fund 3 were transferred to Lake Shore Alternative Financial Asset Fund, Lake Shore Alternative Financial Asset Fund II, and Lake Shore Alternative Financial Asset Fund III respectively. Funds invested in Lake Shore Alternative Financial Asset Fund, Lake Shore Alternative Financial Asset Fund II, and Lake Shore Alternative Financial Asset Fund III were transferred to Lake Shore Alternative Financial Asset Account, Lake Shore Alternative Financial Asset Account I, and Lake Shore Alternative Financial Asset Account II, respectively. Funds invested in Lake Shore Alternative Financial Asset Fund IV-Class E and Lake Shore Alternative Financial Asset Fund IV U.S. were transferred to Lake Shore Alternative Financial Asset Fund IV.

23. *Hanford Investments Ltd.* was incorporated in the Turks and Caicos Islands in December of 2000. Hanford's registered office is at P.O. Box 656, Leeward Highway, Providenciales, Turk and Caicos. Hanford acted as introducing broker for the Lake Shore Group of Companies Inc., Ltd. and received funds for its services. It also received approximately $10.2M earned as income on accounts in the same of several Lake Shore pools. Mr. Baker is Hanford's Managing Partner.

### ***Other Non-Party Entities***

24. *Lake Shore Asset Management Inc.* is Lake Shore Limited's predecessor. It is a defunct Illinois corporation that maintained an office located at 875 N. Michigan Ave., Suite 1562, Chicago, Illinois. Lake Shore Inc. was registered with the CFTC as a CPO and as a CTA from January 4, 1997 and March 30, 1999, respectively, until February of 2007. Lake Shore Inc. was also a member of the NFA. Lake Shore Inc. operated as an

investment manager and investment advisor and advised pool participants regarding trading through the Lake Shore common enterprise. Lake Shore Inc. is part of the Lake Shore common enterprise.

25. *Lake Shore Alternative Financial Corporation Ltd.* was incorporated in the British Virgin Islands in November of 2005. Similarly, *Lake Shore Alternative Financial Asset Corporation 2006 Ltd.* was incorporated in the British Virgin Islands in December of 2006. Mr. Baker is the president of both companies. Mr. Rosenberg was a director of both companies. Lake Shore Inc. was the investment manager for both companies. On September 13, 2007, the Ontario Superior Court of Justice in Canada (No. 07 CL-7168) appointed a receiver for both companies. Counsel for the Canadian receiver has appeared in this action.

### *Relief Defendant*

26. *Anglo International Associates, Ltd.*, has a registered office in London, United Kingdom. Anglo International performed administrative functions for other Lake Shore entities including payment of its salaries, commissions, attorneys' fees and other expenses. Transfers of more than $1 million of pool participant funds were made to Anglo International. In addition, Anglo International received payments for the benefit of Hanford from one or more of the FCMs carrying the Lake Shore pools' accounts.

### *Other Relevant Individuals and Corporations*

27. *Laurence Mehl Rosenberg* resides in Chicago, Illinois. He has been registered with the CFTC in various capacities since at least 1982. Mr. Rosenberg has been registered with the CFTC as the sole associated person of Lake Shore Limited since January 2007. He is

a director and principal with greater than 10% ownership of Lake Shore Limited. Rosenberg is also an NFA member. He was a director of Lake Shore Funds I, II, III and IV until August 2007. During the relevant time, he was a managing member of the Lake Shore Group of Companies.

28. *Nicholas Eveleigh* was the Vice President of Operations and the compliance contact for Lake Shore until the summer of 2007. Mr. Eveleigh signed an introducing broker agreement on behalf of Hanford with one of the FCMs through which the Lake Shore pools traded.

### *The Common Enterprise*

29. All of the Lake Shore entities were under common control, were inextricably interrelated to each other, and did not operate at arms-length. For example: (1) offering memoranda for the Lake Shore pools show Lake Shore Inc. and Lake Shore Limited at various times as their investment manager, Roth Mosey & Partners as their administrator, and KPMG as their auditor; (2) all of the Lake Shore pools use the same NFA identification number; (3) Lake Shore promotional materials refer to "Lake Shore," the Lake Shore Group of Companies, Lake Shore Inc., and Lake Shore Limited interchangeably; (4) Lake Shore's Sales Pitch PowerPoint described the Lake Shore Group as consisting of multiple Lake Shore entities, pools and funds, and represented that Lake Shore Limited provided or managed all of the Lake Shore Group's products, including Lake Shore Alternative Asset Account I, Lake Shore Alternative Asset Account II, Lake Shore Alternative Financial Asset Funds I, II, III and IV and Lake Shore Financial Asset Yen Funds; (5) Lake Shore Limited and Lake Shore Inc.'s fact sheets relating to Lake Shore's funds were on the Lake

Shore Group stationery and featured the Lake Shore Group's logo; (6) the fact sheets for each pool state that they are managed by Lake Shore Limited, a CTA and CPO registered with the CFTC; (7) information and purported performance results for all of the Lake Shore pools and funds were available on the Lake Shore Group's website, www.lakeshorefunds.com; and (8) Lake Shore Limited's January 29, 2007, press release, which touted Lake Shore Limited's launch of Fund IV and the 13-year history of Lake Shore Limited, was on Lake Shore letterhead and did not distinguish between Lake Shore Group and Lake Shore Limited.

30.     Lake Shore Limited's qualitative firm evaluation and due diligence report represented that its legal name is Lake Shore Group of Companies Inc. Limited and its brokerage accounts are maintained at Man Investments London, Lehman Brothers London and Fimat London.  Mr. Rosenberg, who was Lake Shore Limited's chairman and a director of all of Lake Shore's Funds, told NFA auditors that the Lake Shore Group was the same as Lake Shore Limited.

31.     All of the Lake Shore entities, pools and funds have the same controlling person, namely, Mr. Baker, who is: (1) the Managing Director, Principal and President of Lake Shore Limited; (2) the co-founder and managing partner of the Lake Shore Group and Lake Shore Institutional and Dealer relations; (3) the contact person for Lake Shore Limited listed on its Due Diligence; (4) the Managing Partner of Lake Shore Inc.; and (5) the person with primary responsibility for managing Lake Shore Limited and the Lake Shore Group's overall international business development, operations, sales and marketing.

The various Lake Shore entities were also operated and managed by the same people under the umbrella of the Lake Shore Group.

32. Investments for each of the funds were solicited by the same sales representatives using Lake Shore Group documents and brochures with the Lake Shore Group logo. All of the offering memoranda and fact sheets were virtually identical, used the same formatting, and listed the same account managers, administrators, auditors, custodian, sub-custodian, NFA identification number and "Head Rep Office."

33. Additionally, Lake Shore's fund administrator, Roth Mosey & Partners, performed administrative and accounting services for all of the Lake Shore entities, funds and pools, under the umbrella of the Lake Shore Group.

34. Since at least January of 2002 to the present, Lake Shore Group of Companies and the other Lake Shore entities named as defendants, through their employees, agents and officers, including Mr. Baker, fraudulently solicited and accepted or caused to be accepted at least $300 million from at least 700 individuals and entities worldwide for the purpose of trading in, among other things, exchange traded futures contracts on equity indices, U.S. Treasury Notes and currencies traded on U.S. exchanges.

35. At least some of the contracts given to potential investors stated they would be governed by Illinois law, the Commodities Exchange Act, and any other federal laws applicable in Illinois, and provided that they could only be modified in writing.

36. Lake Shore operated at least twelve commodity pools.[13]  Eight of these pools acted as feeder pools that fed into the remaining four pools.  The eight feeder pools were: (1) Lake Shore Alternative Financial Asset Yen Fund I; (2) Lake Shore Alternative Financial Asset Yen Fund Limited Class II; (3) Lake Shore Alternative Financial Asset Yen Fund Limited Class III; (4) Lake Shore Alternative Financial Asset Fund; (5) Lake Shore Alternative Financial Asset Fund II; (6) Lake Shore Alternative Financial Asset Fund III; (7) Lake Shore Alternative Financial Asset Fund IV Limited–Class E; and (8) Lake Shore Alternative Financial Asset Fund IV U.S.  These eight pools fed into the following four pools:  (1) Lake Shore Alternative Financial Asset Account; (2) Lake Shore Alternative Financial Asset Account I; (3) Lake Shore Alternative Financial Asset Account II; and (4) Lake Shore Alternative Financial Asset Fund IV.

37. Regarding the organizational structure of the commodity pools, it is undisputed that the pools share common officers and common addresses.  During the relevant time:  (1) Mr. Rosenberg was a director of all of the entities incorporated in the British Virgin Islands (including Lake Shore Alternative Financial Asset Fund, Lake Shore Alternative Financial Asset Fund II, Lake Shore Alternative Financial Asset Fund III, Lake Shore Alternative Financial Asset Fund IV, and the three Yen Funds); (2) the Turks and Caicos entities (including Lake Shore Alternative Financial Asset Account, Lake Shore Alternative Financial Asset Account I, Lake Shore Alternative Financial Asset Account

---

[13]  Exhibit 1 to the preliminary injunction order (Docket No. 118) depicts the structure of the pools, as represented by Lake Shore.  Recent evidence casts doubt on the separately managed accounts ("SMA") portion of the chart, but the summary chart accurately depicts the pools according to Lake Shore's promotional materials.

II, and Hanford) had a common nominee director and the same address; (3) the Fact Sheets for all of the Funds represent that the "Head Rep. Office" is located in London; and (4) documents filed on April 17, 2007, with the Illinois Secretary of State for Lake Shore Alternative Financial Asset Fund IV U.S. represent that Lake Shore Limited is its managing member.

38.   The evidence (including forensic accounting performed by the receiver appointed by this court) shows that funds of each of the Lake Shore entities were improperly commingled. In addition, approximately $10.2 million earned as income on accounts in the name of several of the Lake Shore pools was paid to an account owned by Hanford, a Baker controlled entity, and commingled in that account as well. Similarly, from May 11, 2007 to June 20, 2007, approximately $1.1 million was wired from the Sentinel accounts to Anglo, for the payment of Lake Shore Limited's administrative expenses.

39.   A review of transfers into Lake Shore Limited's Fund IV account at Sentinel further shows that the Lake Shore funds are inextricably interconnected. The affidavit of Heather N. Johnson, a supervisor in the compliance department of the NFA, establishes that during June of 2007, four different Lake Shore accounts maintained at Sentinel (Lake Shore Fund I Trading, Lake Shore Fund III Trading, Lake Shore Fund III Operating and Lake Shore Fund I Operating, made monetary transfers into LSAM Fund IV Trading. The June 2007 transfers from the four different Lake Shore accounts into Fund IV Trading totaled $2,107,532.96. These inter-account transfers from various Lake Shore accounts into Fund IV Trading establish that Lake Shore Limited did not treat Fund IV

Trading as being independent of its other accounts. More recently, the receiver has detailed millions of dollars of additional improper inter-fund transfers in its report.

40. The Confidential Explanatory Memorandum for Lake Shore Alternative Financial Asset Fund IV states:

> Lake Shore Alternative Financial Asset Fund IV Limited, a British Virgin Islands limited company (the "Fund"), seeks to maximize returns whilst preserving capital by investing in three assets, Lake Shore Alternative Financial Asset Fund Ltd., (LSAFA I), Lake Shore Alternative Financial Asset Fund II Ltd., (LSAFA II), Lake Shore Alternative Financial Asset Fund III Ltd., (LSAFA III).

The Memo further states that Lake Shore Alternative Financial Asset Fund Ltd., Lake Shore Alternative Financial Asset Fund II, Lake Shore Alternative Financial Asset Fund III each invest in a portfolio of exchange traded financial derivatives traded on a stock or futures exchange and utilize the proprietary trading program developed and operated by Lake Shore Limited.

41. Sentinel account documents show that as early as June of 2001, Mr. Baker along with others, was authorized to transfer funds among all of the Lake Shore accounts at Sentinel.

42. Lake Shore pool accounts and funds were traded at three FCMs in London: Man Financial Limited (now known as MF Global), Lehman Brothers International Europe, and Fimat International Banque SA UK Branch (now known as Newedge Group-UK Group). The pools also have accounts with Sentinel, which was the sub-custodian for the funds (Bank of New York was the custodian).

43. All of the corporations and entities identified above were controlled by Mr. Baker and operated in concert with each other as a common enterprise.

*Lake Shore's Solicitations*

44.     During the relevant period, Lake Shore Group fraudulently solicited and accepted funds

to invest in the pools for trading in, among other things, exchange traded futures contracts

on equity indices, U.S. Treasury Notes and currencies traded on U.S. exchanges.

45.     Lake Shore Group solicited prospective participants to invest in the pools in various ways

including, but not limited to, a web of sales representatives throughout the world, and at

least one website, www. lakeshorefunds.com.  Lake Shore Group provided potential

participants with, among other things, a form entitled "Qualitative Firm Evaluation and

Due Diligence," confidential explanatory memoranda, and a subscription agreement for

the various pools.  The explanatory memoranda for several pools were also available on

the Lake Shore Group website.

46.     Each pool's explanatory memoranda represented that Lake Shore Limited was the

investment manager and investment advisor of the funds and touted the fact that Lake

Shore Limited was a CFTC-registered CTA and CPO and NFA member.  Earlier versions

of the memoranda represent that Lake Shore Inc. is the investment manager and

investment advisor for the Lake Shore funds and touts its status as a CFTC-registered

CTA.

*The Defendants Misrepresented the Performance of*
*the Pools & Issued False Statements to Pool Participants*

47.     Mr. Baker and the Lake Shore entities named as defendants misrepresented the profits

and losses incurred by the pools and provided pool participants and prospective pool

participants with false performance tables that misrepresented the pools' individual and collective track records.

48.     Performance tables for Lake Shore Alternative Financial Asset Fund were provided to pool participants through the defendants' website. They represented the following as the total annual returns:

|  |  |
|---|---|
| for 2003 | 22.48% |
| for 2004 | 29.81% |
| for 2005 | 18.95% |
| for 2006 | 5.73% |
| for 2007 | 2.82%. (January 2007 to March 2007) |

These performance results are false. The only trading accounts open during 2003 and 2004 were at Man and were unprofitable in those calendar years. Instead of being profitable between January 2003 and May 2007, the Lake Shore account at Man lost at least $22 million.

49.     The performance table dated December 31, 2006 for Lake Shore Alternative Financial Asset Fund IV shows returns as follows:

|  |  |
|---|---|
| for 2002 | 55.50% |
| for 2003 | 37.02% |
| for 2004 | 33.80% |
| for 2005 | 40.30% |
| for 2006 | 21.40%. |

This performance table consists of an average of the returns of Funds I through IV. In computing the average of returns, Lake Shore used hypothetical results for Lake Shore Alternative Financial Asset Fund showing a 55.50% profit for 2002, when the actual trading for 2002 resulted in a loss of $1.4 million.

50.    Lake Shore Group admits in its due diligence publications that its largest drawdown was in July 2002 when it experienced a "– 48.56% drawdown." However, in preparing the performance table included in printed materials and on the Lake Shore website, as described above, Lake Shore used simulated performance results for 2002 to show profits instead of the actual unprofitable performance.

51.    During 2006 and 2007, the Lake Shore common enterprise reported to its pool participants that Lake Shore Alternative Financial Asset Fund IV had profited by 21.40% and 8.58%, respectively. These purported performance results are false because: (1) the trading accounts at Lehman for accounts entitled Lake Shore Alternative Financial Asset Fund IV from October 2006 through June 2007 had trading losses totaling approximately $4.4 million; (2) the trading accounts at Fimat for accounts entitled Lake Shore Alternative Financial Asset Fund IV were first funded in May 2007 and lost approximately $260,000 during May 2007; and (3) there were no trading accounts for Lake Shore Alternative Financial Asset Fund IV at Man (the third of the three FCMs with trading accounts).

52.    The performance tables that Lake Shore Group published on its website for its prospective and actual pool participants show profits. These tables are false because the Lake Shore common enterprise trading accounts at Man, Lehman and Fimat for the relevant time period indicate that the accounts experienced significant losses. From February 2002 through June 2007, Lake Shore's accounts at Man, Lehman and Fimat, in the aggregate, lost more than $35 million.

53.     Each week, on its password protected portion of its website, the Lake Shore common

        enterprise posted the account value for each of its pool participants.  Participants in Lake

        Shore's pools could access this information to determine how their investment was

        ostensibly performing.  The reported account values were consistent with the false

        statements made in the performance tables published on the Lake Shore website.

        Consequently, the Lake Shore common enterprise distributed or caused to be distributed

        false account statements to pool participants because the statements showed that they

        were earning substantial profits when the trading accounts in the names of the pools had

        lost at least $35 million.

54.     Prior to March of 2007, the Lake Shore common enterprise also issued false statements to

        some of its clients in hard copy form.  Like the alleged results reported on Lake Shore's

        website, these statements were also false.

### *Misrepresentation of the Amount Under Management*

55.     As recently as June 11, 2007, Lake Shore's website represented that the Lake Shore pools

        contained $293.5 million in participants' funds and that the Lake Shore Group had $1.05

        billion in assets under management.  During the preliminary injunction hearing, the

        CFTC argued that these figures misrepresented the total amount under management.  In

        its preliminary injunction order, this court declined to consider whether Lake Shore's

        representations about the total amount under management were accurate because Lake

        Shore Limited asserted that a significant amount of money was held in SMAs, as well as

        Man, Lehman, Fimat and Sentinel, and the court lacked information about the alleged

SMAs.  *See* Docket No. 118 at Ex. 1 (chart depicting the structure of the pools, as represented in Lake Shore documents).

56.     As of June 27, 2007, the total pool funds at the four FCMs holding Lake Shore monies (Man, Lehman, Fimat and Sentinel) totaled approximately $230 million.  Lake Shore investors whose money was allegedly invested in Lake Shore's SMAs testified that their money was in fact invested in Lake Shore's pools.  The pools correspond to the records produced by the FCMs.  If the money was actually in the Lake Shore pools, it would have been reflected in the documents produced by the four FCMs.  The evidence thus indicates that there is a very significant shortfall in the amount of funds under management.

57.     The alleged amount of funds under management, as represented by members of the Lake Shore common enterprise, was a material fact considered by several pool participants, who would not have invested in the Lake Shore funds if they had known the true amount of funds being managed by the Lake Shore common enterprise at the time of their initial investment.

### *Facts Establishing Misappropriation of Investor Funds*

### *Incentive Fees*

58.     The Lake Shore common enterprise told its investors that it would be compensated through an incentive fee of 25% of the net new appreciation for each fund.  Lake Shore promotional materials specifically stated that "No performance Fee will be payable until prior losses are recouped."  Incentive fees were, therefore, only payable when the funds were profitable.

59.     The court has reviewed Lake Shore Group statements sent to one Lake Shore customer
        identified as Customer A.  Customer A had accounts in Lake Shore Alternative Financial
        Asset Fund IV and Lake Shore Alternative Financial Asset Fund III.  In May of 2007,
        Lake Shore Alternative Financial Asset Fund IV's trading accounts at Fimat and Lehman
        lost money.  However, Customer A's statement for May of 2007 reported profits for this
        fund and show that the account was charged an incentive fee.

60.     Customer A's statements for his investment in Lake Shore Alternative Financial Asset
        Fund III show a similar improper incentive fee in April of 2007.  According to the
        receiver's report, Lake Shore Alternative Financial Asset Fund III invested in Lake Shore
        Alternative Financial Asset Account II.  Consequently, the profits and losses in Lake
        Shore Alternative Financial Asset Fund III should reflect trading in Lake Shore
        Alternative Financial Asset Account II.  Customer A's account statement for Lake Shore
        Alternative Financial Asset Fund III reports profits in April 2007 and state that this fund
        had reached a new account value high.  Consequently, Lake Shore deducted an incentive
        fee.  However, the evidence shows that Lake Shore Alternative Financial Asset Account
        II lost more than $1.7 million in March of 2007 and the $173,000 profit in April was not
        sufficient to cover the March losses.  Hence, no incentive fee was due.

61.     Customer A's statements for his investment in Lake Shore Alternative Financial Asset
        Fund III show a similar improper incentive fee for June of 2007.  In June of 2007,
        Customer A's account was charged an incentive fee.  However, in May of 2007, the Lake
        Shore Alternative Financial Asset Account II trading account lost $3.4 million;
        consequently the June profits of $1.8 million were not sufficient to recoup the losses.

Thus, no incentive fee was due. All customer money paid to the defendants as incentive fees in excess of the amounts authorized by the clients were misappropriated.

### *Unauthorized Transfers to Hanford*

62.    Hanford, a company controlled by Mr. Baker, received all of the interest income generated by the Lake Shore accounts at Sentinel (approximately $10.2 million). In the pool offering memoranda, Lake Shore Group represented that Lake Shore Alternative Financial Asset Account, Lake Shore Alternative Financial Asset Account I, and Lake Shore Alternative Financial Asset Account II "will not pay the Fund any interest on cash balances or funds held by the Custodian." The custodian is defined as Bank of New York. This disclosure says that the investors will not receive any bank interest on their funds. It does not say that they will not receive the income earned through trading by the sub-custodian Sentinel Management Group, nor does it authorize Lake Shore to pay the trading profits earned at Sentinel to an undisclosed Baker-owned entity.

63.    The Lake Shore pool participants did not authorize the transfers of the income at Sentinel to Hanford. Therefore, the default defendants, operating as the Lake Shore common enterprise, misappropriated $10.2 million in customer funds by transferring them to Hanford.

### *Unauthorized Transfers to Anglo International*

64.    The pools' offering memoranda state "[t]he Investment Manager renders the services set forth in the Investment Management Agreement at its own expense, including fees to the Investment Advisor, the salaries of employees necessary to render such services, all

general overhead expenses attributable to its offices and employees and other expenses incident to the rendering of such services."

65.     Between May 11, 2007 and June 20, 2007, the default defendants, operating as the Lake Shore common enterprise, transferred $ 1.1 million from the Pool accounts at Sentinel to Anglo, for administrative expenses. These transfers contravene the disclosures in the offering memoranda. Therefore, these funds were misappropriated.

### *The Common Enterprises' Separate Managed Accounts*

66.     The Lake Shore common enterprise's sales representative for the Colombian region was Jose Fernando Hurtado. All but four of his clients invested in Lake Shore SMAs. The contract that Mr. Hurtado and his clients signed with Lake Shore Inc. states that Lake Shore Inc. is headquartered in Chicago, is registered with the CFTC, and is a member of the NFA.

67.     In particular, the contract states that the custody of client's assets will be held by Sentinel, a qualified brokerage firm in the United States, and that all account statements will be made by Lake Shore Alternative Financial Asset Limited. Additionally, as noted above, the contract stated that it would be governed according to the laws of Illinois and United States federal law, including the Commodity Exchange Act, and that the contract could only be changed by written modification.

68.     After the CFTC filed its complaint against Lake Shore Limited, Mr. Hurtado had two telephone conversations with Mr. Baker. In the first phone conversation, on the morning of July 5, 2007, Mr. Baker told Mr. Hurtado that the CFTC lawsuit was the result of a

mistake by a former lawyer and that Lake Shore was hiring a new lawyer to correct the problem.

69.     Mr. Baker also told Mr. Hurtado that he had a "Day After Plan" pursuant to which Lake Shore's business would move from the U.S. to Europe if Lake Shore's assets were unfrozen. Mr. Baker related that under the "Day After Plan," Lake Shore would replace Roth Mosey (Lake Shore's fund administrator in Canada) with a new fund administrator in Switzerland.

70.     In addition, Mr. Baker told Mr. Hurtado (who had clients who had invested in Lake Shore's SMAs and knew that this money was not held separately from the Lake Shore pools) that Lake Shore had $1 billion under management. Mr. Baker explained that Lake Shore had a total of $250 million in SMAs and funds, and also had $750 million in direct managed accounts ("DMAs"). This directly contradicts Lake Shore Limited's arguments (which were unsupported by any financial records, as Lake Shore Limited refused to produce these documents) that it had a total of $1.05 billion under management consisting of accounts at the FCMs plus separate accounts associated with Lake Shore's alleged SMAs. It also contradicts the representations about the amount allegedly in SMAs made in Lake Shore's due diligence questionnaires.

71.     The information about the DMAs was "completely new, completely new" to Mr. Furtado. Furtado Dep. at 67:15. Mr. Baker told Mr. Hurtado that the DMAs used the same model as the SMAs, so the accounts would be held at a brokerage firm in the name of each client and Lake Shore Limited would have trading authorization and manage the account.

According to Mr. Baker, there was "a big confusion about the numbers" but he assured Mr. Furtado that Lake Shore had $1 billion under management. *Id*. at 67:24.

72.     Mr. Hurtado's second phone conversation with Mr. Baker was on August 3, 2007. During that conversation, Mr. Baker told Mr. Hurtado he was happy because the appellate court ruled that the funds could be moved, so he could implement the "Day After Plan." Mr. Baker also explained to Mr. Hurtado that the new company in Switzerland would be called Geneva Corp. and would replace Lake Shore's Funds I through IV. Geneva Corp. appears to be the successor of Lake Shore Funds I through IV. In addition, Lake Shore also changed the name of Lake Shore Alternative Financial Asset Fund IV to Geneva Corporation Funds World Limited and/or Genevacorp Funds World Ltd.

73.     With respect to Geneva Corporation, evidence shows that at as early as June of 2007 (after the CFTC filed this suit), Mr. Baker was contemplating changing the manager for the accounts at Man to Geneva Asset Management in Switzerland, which is controlled by Mr. Schwab (a Swiss lawyer representing Mr. Baker and Lake Shore Limited). The reader may recall that Lake Shore Limited maintained records for the Lake Shore common enterprise. Evidence also shows that in September of 2007, Mr. Schwab caused these records as well as Lake Shore's computer server to be sent to him in Switzerland, where they are currently hidden. Based on Lake Shore Limited's failure to produce records, this court issued substantial civil contempt sanctions and referred the issue of a possible criminal contempt prosecution against Lake Shore Limited and Mr. Baker to the United States Attorney.

## **Conclusions of Law**

74.     The record does not show that there is any legitimate, meaningful distinction between the Lake Shore Group, the Lake Shore funds (which operated as commodity pools), and the array of accounts and their various spin-off titles. Where one or more corporate entities operate in a common enterprise, each may be held liable for the deceptive acts and practices of the other.

75.     From at least 2002 to the present, the default defendants, operating as a common enterprise, by and through their employees and officers, cheated or defrauded or attempted to cheat or defraud and willfully deceived or attempted to deceive pool participants by misrepresenting the profits and losses of Lake Shore's pools, failing to disclose trading losses and other material facts relating to the pools, and misappropriating pool participant funds in violation of §§ 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. § 6b(a)(2)(i) and (iii).

76.     The default defendants, by and through their employees and officers, also willfully made or caused to be made false reports to the pool participants who invested money with the defendants to trade commodity futures contracts in violation of § 4b(a)(2)(ii) of the Act, 7 U.S.C. § 6b(a)(2)(ii).

77.     Since at least 2002, the Lake Shore Group, by and through its employees and officers, and under the names of various Lake Shore entities, acted as a CPO in that it engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise and in connection therewith, solicited, accepted or received funds, securities or

property from others for the purpose of trading in any commodity for future delivery on or subject to the rules of any contract market or derivatives transaction execution facility.

78.     During the relevant period, the Lake Shore Group, by and through its employees and officers, while acting as a CPO under the name of various Lake Shore entities, violated § 4o(1)(A) and (B) of the Act, 7 U.S.C § 6o(1)(A) and (B), in that it directly or indirectly employed or is employing a device, scheme, or artifice to defraud pool participants or prospective pool participants, or engaged or is engaging in transactions, practices or a course of business that operated as fraud or deceit upon pool participants or prospective pool participants by means of the acts and practices described in the above paragraphs.

79.     In connection with such conduct, Lake Shore used or is using the mails or other means or instrumentalities of interstate commerce, directly or indirectly, to engage in business as a CPO.

80.     During the relevant period, each member of the Lake Shore common enterprise participated in the Lake Shore common enterprise and facilitated the fraudulent acts of the Lake Shore Group and, thus are jointly and severally liable for the violations of § 4o(1)(A) and (B) of the Act, 7 U.S.C § 6o(1)(A) and (B), committed by Lake Shore Group and other members of the Lake Shore common enterprise.

81.     The CFTC has made a showing that the default defendants, operating as a common enterprise, have engaged, are engaging, and are about to engage in acts and practices in violation of the Act and CFTC regulations.  The totality of the circumstances establish that, notwithstanding their decision not to participate in this action, there is a reasonable likelihood that the default defendants will continue to engage in the acts and practices

alleged in the second amended complaint, and in similar acts and practices that violate the Act, unless restrained and enjoined by this court.[14]

82.     Because the issues of necessary equitable relief regarding appropriate restitution for defrauded pool participants, disgorgement and a civil monetary penalty for the defendants are still unresolved, the court reserves those issues for further proceedings.

## Order of Permanent Injunction

Pursuant to Rule 65, and for the above reasons:

1.     IT IS HEREBY ORDERED that the default defendants, their officers, agents, servants, employees, attorneys and all other persons who are in active concert with them are permanently restrained, enjoined and prohibited from directly or indirectly:

    a.     Cheating or defrauding or attempting to cheat or defraud other persons and willfully deceiving or attempting to deceive other persons by making false, deceptive or misleading representations of material facts, by failing to disclose materials facts, or by misappropriating customer funds in or in connection with orders to make, or the making of, contracts of sale of commodities for future

---

[14] In light of the fact that the default defendants are controlled by Mr. Baker, who is the subject of civil contempt sanctions as well as possible criminal contempt sanctions arising out of his defiance of the preliminary injunction and other court orders, the imposition of an injunction directed at the default defendants may prove to be an exercise in futility. In this regard, the court notes that certain Lake Shore entities are currently trying to obtain control of the monies held by the London FCMs and have filed proofs of claim in the Sentinel bankruptcy. As the court has previously noted, these activities are suspicious, as if Lake Shore wanted to return the investors' money to its rightful owners, it would not be contesting the receiver's efforts to do just that. Nevertheless, the likelihood that a party will defy the court's orders is not a reason to let that party do as it wishes. The court will thus forge on and deal with any future problems with compliance if and when they arise.

delivery, made or to be made for or on behalf of any other person, in violation of §§ 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. §6b(a)(2)(i) and (iii);

b.      Willfully making false reports or statements or causing false reports or statements to be made to other persons, in or in connection with orders to make, or the making of, contracts of sale of commodities for future delivery, made or to be made for or on behalf of any other person, in violations of § 4b(a)(2)(ii) of the Act, 7 U.S.C. §6b(a)(2)(ii);

c.      While acting as a CPO, to use the mails or any means or instrumentality of interstate commerce, directly or indirectly to employ any device, scheme or artifice to defraud any prospective or actual pool participant or to engage in any transaction, practice or course of business which operates as a fraud or deceit upon any prospective or actual pool participant by making false, deceptive or misleading statements of material facts, by failing to disclose material facts, or by misappropriating customer funds, in violation of § 4o(1)(A) and (B) of the Act, 7 U.S.C. §6o(1)(A) and (B).

2.      IT IS FURTHER ORDERED  that the default defendants are permanently enjoined from engaging, directly or indirectly, in any activity related to trading in any commodity interest, as that term is defined in § 1a(4) of the Act, 7 U.S.C. § 1a(4) ("commodity interest"), including but not limited to, the following:

a.      trading on or subject to the rules of any registered entity, at that term is defined in § 1a(29) of the Act, 7 U.S.C. § 1a(29);

b.      engaging in, controlling or directing the trading for any commodity interest

account for or on behalf of any other person or entity, whether by power of

attorney or otherwise;

c.      soliciting or accepting any funds from any person in connection with the purchase

or sale of any commodity interest;

d.      giving advice, price quotations, or other information in connection with the

purchase or sale of commodity futures and options contracts for themselves and

others;

e.      entering into any commodity interest transactions for their own personal account,

for any account in which they have a direct or indirect interest and/or having any

commodity interests traded on their behalf;

f.      applying for registration or claiming exemption from registration with the

Commission in any capacity, and engaging in any activity requiring such

registration or exemption from registration with the Commission, except as

provided for in Regulation 4.14 (a)(9), 17 C.F.R. § 4.14(a)(9), or acting as a

principal, agent or any other officer or employee of any person registered,

exempted from registration or required to be registered with the Commission,

except as provided for in Regulation 4.14 (a)(9), 17 C.F.R. § 4.14(a)(9); and

g.      engaging in any business activities related to commodity interest trading.

3.      IT IS FURTHER ORDERED THAT the default defendants, their officers, agents,

servants, employees, attorneys and all other persons who are in active concert with them

are permanently enjoined from directly or indirectly destroying, mutilating, concealing,

altering, or disposing of any of the books, records, documents, correspondence, brochures, manuals, electronically stored data, tape recordings, or other property of the default defendants, wherever such materials may be situated, that refer or relate in any manner to any transaction or matter described in the second amended complaint in this case;

4.     IT IS FURTHER ORDERED that the default defendants and any successors thereof, shall immediately identify and provide an accounting for all assets and property that they currently maintain inside or outside the United States, including, but not limited to, all funds on deposit in any financial institution, futures commission merchant, bank, or savings and loan accounts held by, under the control of, or in the name of Lake Shore Asset Management Limited, Lake Shore Group of Companies and/or any of the names of the entities that comprise the Lake Shore common enterprise whether jointly or otherwise.

5.     IT IS FURTHER ORDERED that the default defendants, their officers, agents, servants, employees, attorneys and all other persons who are in active concert with them grant the receiver appointed by this court and the CFTC or its representatives immediate access to all of their books, records and other documents, wherever such materials may be situated, for purposes of inspecting and copying such materials;

6.     IT IS FURTHER ORDERED that the funds on deposit at MF Global UK Limited, Newedge Group SA (formerly Fimat International Banque SA), and Lehman Brothers International Europe, are customer funds which shall be transferred to the receiver for the benefit of the Lake Shore clients to be distributed to the clients through the receivership estate pursuant to further orders of this court.  The funds on deposit at Sentinel

Management Group are also customer funds. As soon as possible given Sentinel's pending bankruptcy case, the Sentinel funds shall be transferred to the receiver for the benefit of the Lake Shore clients to be distributed to the clients through the receivership estate pursuant to further orders of this court;

7. IT IS FURTHER ORDERED that the default defendants and any successors thereof, all persons acting in the capacity of their agents, servants, successors, employees, assigns, and attorneys, and all persons acting in active concert or participation with them who receive actual notice of such order by personal service or otherwise, are enjoined from directly or indirectly withdrawing, transferring, removing, dissipating, concealing, or disposing of, in any manner, any funds, or other property, wherever situated, including but not limited to, all funds, personal property, money or securities held in safes, safety deposit boxes, and all funds on deposit in any financial institution, bank or savings and loan account held by, under the control of, or in the name of the default defendants;

8. IT IS FURTHER ORDERED that the default defendants immediately repatriate and transfer to the receivership estate all funds, documents and assets outside of the United States;

9. IT IS FURTHER ORDERED that because the issues of necessary equitable relief regarding appropriate restitution for defrauded pool participants, disgorgement and a civil monetary penalty for the default defendants are still unresolved, they are hereby reserved for further proceedings before this court.

### III.    Conclusion

For the above reasons, the CFTC's motion for entry of default judgment and for a permanent injunction [#537] is granted.  The following defendants are the subject of the default judgment and permanent injunction (which is detailed above):  (1) Lake Shore Group of Companies Inc., Ltd.; (2) Lake Shore Alternative Financial Asset Account Limited a/k/a Lake Shore Alternative Financial Asset Ltd.; (3) Lake Shore Alternative Financial Asset Fund Limited; (4) Lake Shore Alternative Financial Asset Account I Limited; (5) Lake Shore Alternative Financial Asset Account II Limited; (6) Lake Shore Alternative Financial Asset Fund II Limited; (7) Lake Shore Alternative Financial Asset Account III Limited; (8) Lake Shore Alternative Financial Asset Fund III Limited; (9) Lake Shore Alternative Financial Asset Fund IV Limited, currently known as Geneva Corporation Funds World Limited and/or Genevacorp Funds World Ltd.; (10) Lake Shore Alternative Financial Asset Fund IV U.S., LLC; (11) Lake Shore Alternative Financial Asset Yen Fund I; (12) Lake Shore Alternative Financial Asset Yen Fund Limited Class II; (13) Lake Shore Alternative Financial Asset Yen Fund Limited Class III; and (14) Hanford Investments Ltd.


DATE:   April 24, 2008

Blanche M. Manning
United States District Judge