**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES COMMODITY | ) | |
| FUTURES TRADING COMMISSION, | ) | |
|     Plaintiff, | ) | |
| | ) | |
|     v. | ) | 07 C 3598 |
| | ) | |
| LAKE SHORE ASSET MANAGEMENT | ) | |
| LIMITED, et al., | ) | |
|     Defendants. | ) | |

<u>**MEMORANDUM AND ORDER**</u>

The Commodity Futures Trading Commission ("CFTC") has filed a motion seeking entry of a default judgment as to defendant Phillip J. Baker. For the following reasons, the CFTC's motion is granted and the court enters a permanent injunction against Mr. Baker as specified below.

**I.     Background**

The court assumes familiarity with its prior orders and thus provides a brief summary of the procedural posture of this action. On June 26, 2007, the CFTC filed a one-count complaint directed at Lake Shore Asset Management Limited ("Lake Shore Limited"). The CFTC alleged that Lake Shore Limited was a registered commodity trading advisor ("CTA") and commodity pool operator ("CPO") and had improperly refused to make its books and records available for inspection or to provide information about its commodity pool participants and trading activity as required by the Commodity Exchange Act, as amended (the "Act").

The CFTC subsequently amended its complaint to add Lake Shore Group of Companies Inc., Ltd. and Philip Baker, who controlled a wide variety of entities associated with Lake Shore Limited, as defendants. The amended complaint repeated the allegations about the Lake Shore

entities' failure to comply with the Act's recordkeeping requirements. It also alleged that Lake Shore Limited was part of a common enterprise, which included a long list of Lake Shore entities associated with Mr. Baker, and that Lake Shore Limited, Lake Shore Group, and Mr. Baker had violated the Act by defrauding pool participants in at least four commodity pools (Lake Shore Alternative Financial Asset Funds I, II, III, and IV).

Shortly after it filed its amended complaint, the CFTC filed a motion for a preliminary injunction. On August 28, 2007, after conducting a three-day hearing, this court entered an 86-page order granting the motion in part and denying it in part. The court found that Lake Shore Limited, the Lake Shore Group and Lake Shore Asset Management Inc. (Lake Shore Limited's predecessor company), and the other Lake Shore entities controlled by Philip Baker operated as a common enterprise and were essentially all the same, explaining that "this case is the poster child for the transaction of business through a maze of interrelated companies" because "all of the evidence presented to the court indicates that all of the Lake Shore companies . . . were under common control and did not operate at arms-length." Docket No. 118, at 46.

Next, the court made extensive findings regarding Lake Shore Limited's control of pool assets (held in the name of Lake Shore Alternative Financial Asset Ltd., Lake Shore Alternative Financial Asset Account I Ltd., Lake Shore Alternative Financial Asset Account II Ltd., Lake Shore Alternative Financial Asset Account III Ltd., and Lake Shore Alternative Financial Asset Fund IV Limited, currently known as Geneva Corporation Funds World Limited and/or Genevacorp Funds World Ltd.). In addition, the court found that the CFTC had established a likelihood of success on its claim that Lake Shore Limited fraudulently solicited pool participants, provided false information to existing participants, and otherwise defrauded pool participants. The court also held that Lake Shore Limited was bound by the Act and was

-2-

required to comply with, among other things, the Act's requirements regarding recordkeeping and production. Based on the entire record, the court then found that an asset freeze was necessary to protect customer funds.

Lake Shore Limited moved to stay the preliminary injunction order pending the disposition of its appeal from that order. On September 7, 2007, the Seventh Circuit denied Lake Shore Limited's motion for a stay pending appeal. On September 21, 2007, four of the Lake Shore pools and Hanford Investments (another Baker-controlled entity) filed a claim in the High Court in London seeking to compel the British futures commission merchants ("FCMs") to release the customer funds to them, despite the asset freeze in effect and the Seventh Circuit's denial of Lake Shore Limited's stay motion.

On October 4, 2007, this court entered a 42-page order that, among other things, detailed Lake Shore Limited's efforts to avoid complying with the Act, its discovery obligations, and the preliminary injunction order. *See* Docket No. 191. The court then appointed Robb Evans & Associates as receiver and entered an order outlining the duties and powers of the receiver. Since its appointment, the receiver has made numerous unsuccessful demands on various Lake Shore entities and the London FCMs requesting turnover of the frozen Lake Shore funds held by the London FCMs, and is presently pursing litigation in London to attempt to secure the funds so they can be distributed to the investors, who are the rightful owners of these monies. Entities controlled by Mr. Baker are opposing these efforts, despite the fact that the investors' money indisputably belongs to the investors.

The receiver has also participated in bankruptcy proceedings relating to Sentinel (an Illinois FCM that was the cash manager and the sub-custodian for the Lake Shore funds), as Lake Shore is one of Sentinel's largest creditors. *See In re Sentinel Management Group*, No.

07-14987 (Bankr. N.D. Ill.). Both the receiver and Baker-controlled entities filed competing proofs of claim in the Sentinel bankruptcy, and on July 21, 2008, the bankruptcy court disallowed and expunged the proofs of claims filed by the Baker-controlled entities.[1]

From October of 2007 to January of 2008, the court also entered numerous orders relating to Lake Shore Limited's failure to comply with the court's orders, found that Lake Shore Limited was in civil contempt of court, and referred this case to the United States Attorney for investigation and possible prosecution of criminal contempt charges against Lake Shore Limited and Mr. Baker personally. *See* Docket Nos. 191, 299, 322, 347, 363 & 402.

On December 28, 2007, the Seventh Circuit issued an opinion affirming the preliminary injunction as to Lake Shore Limited. *Lake Shore Asset Management Limited v. Commodity Futures Trading Com'n* , 511 F.3d 762 (7th Cir. 2007). The Seventh Circuit left the asset freeze in place and rejected Lake Shore Limited's claim that the CFTC was improperly trying to regulate acts outside the United States and control assets held in foreign countries that had been invested by individuals and entities outside the United States. The Seventh Circuit then found that the preliminary injunction bound all other members of the corporate group under Rule 65(d) to the extent that they were acting in concert with Lake Shore Limited.

---

[1] In the receiver's most recent report of significant developments, the receiver noted that Alexandre Schwab, counsel for Mr. Baker and numerous Lake Shore entities, attempted to sell the Lake Shore claims in the Sentinel case shortly before the bankruptcy court struck the proofs of claim filed by the Lake Shore entities in light of the receiver's competing claim to the same money. Mr. Schwab discussed price and terms with the potential purchaser, but did not reveal that a receiver had been appointed by this court or that the receiver had filed competing proofs of claim. The potential purchaser declined to consummate the deal after its counsel contacted the Official Committee of Unsecured Creditors in the Sentinel bankruptcy case and found out about the receiver. *See* Docket No. 593.

It also held, however, that this court could not directly enjoin the entities that make up the Lake Shore common enterprise unless they were first named as defendants, served with process and given an opportunity to defend. *Id*. at 766-67 (entities comprising the Lake Shore common enterprise must be served with process and allowed to present evidence before they may be enjoined). In other words, according to the Seventh Circuit, the Lake Shore entities who had not been named as defendants had to have a chance to challenge the court's factual findings before the court could directly enjoin them despite this court's finding that they were all interrelated sham entities created to defraud investors.

Once the mandate issued, on January 16, 2008, this court amended the preliminary injunction order to only directly bind Lake Shore Limited. *See* Docket No. 390. The CFTC then amended its complaint to allege the existence of a common enterprise controlled by Mr. Baker which included Lake Shore Limited and the Lake Shore Group of Companies, Inc. Ltd. ("Lake Shore Group"). The First Amended Complaint alleged that Mr. Baker, Lake Shore Limited and the Lake Shore Group violated the anti-fraud provisions of the Act when they defrauded commodity pool participants in at least four commodity pools by misrepresenting the performance of the pools and issuing false account statements.

The CFTC subsequently amended its complaint again to add numerous other Lake Shore entities. In the second amended complaint, the CFTC asserted that the newly added Lake Shore defendants were controlled by Mr. Baker and operated in concert with Lake Shore Limited, Lake Shore Inc., and Lake Shore Group as a common enterprise. The allegations in the second amended complaint were consistent with the extensive evidence about the Lake Shore pools that was presented at the previous preliminary injunction hearing.

On April 24, 2008, the court granted the CFTC's motion for entry of a default judgment and entered a permanent injunction order against the newly added defendants.[2]  *See* Docket No. 552.  It also entered an amended receivership order to address developments in this action.  *See* Docket No. 554.  On June 10, 2008, the court granted the CFTC's request to sanction Lake Shore Limited based on Lake Shore Limited's long history of failure of flouting the court's orders and its disregard of its obligations under the Federal Rules of Civil Procedure, and entered a partial default judgment and permanent injunction order as to Lake Shore Limited.  *See* Docket No. 578.

At this point, the receiver's efforts on behalf of the investors are continuing.  In addition, the CFTC still has pending claims for additional relief against all of the Lake Shore defendants, including claims for restitution for defrauded pool participants.  The CFTC's claims against Mr. Baker also remain pending.  This order addresses certain of the CFTC's claims against Mr. Baker, who has failed to answer or otherwise plead.

## II.    Service of Process

As detailed in prior orders, Mr. Baker has had actual notice of all of the proceedings in this case.  *See* Docket No. 403 (criminal contempt referral for Lake Shore Limited and Mr. Baker personally). Nevertheless, after his dead-of-night flight from London immediately

---

[2]  Specifically, the court entered an order of permanent injunction against: (1) Lake Shore Group of Companies; (2) Lake Shore Alternative Financial Asset Account Limited; (3) Lake Shore Alternative Financial Asset Fund; (4) Lake Shore Alternative Financial Asset Account I; (5) Lake Shore Alternative Financial Asset Account II; (6) Lake Shore Alternative Financial Asset Fund II; (7) Lake Shore Alternative Financial Asset Account III; (8) Lake Shore Alternative Financial Asset Fund III; (9) Lake Shore Alternative Financial Asset Fund IV; (10) Lake Shore Alternative Financial Asset Fund IV U.S.; (11) Lake Shore Alternative Financial Asset Yen Fund I; (12) Lake Shore Alternative Financial Asset Yen Fund Limited Class II; (13) Lake Shore Alternative Financial Asset Yen Fund Limited Class III; and (14) Hanford Investments.

following the court's entry of a preliminary injunction and asset freeze, Mr. Baker successfully

managed to thwart the CFTC's efforts to locate and serve him with process. His present

whereabouts remain unknown, but he remains involved in the London legal proceedings. He

also is the Managing Director, Principal and President of Lake Shore Limited, which is

represented by counsel in this action, and thus has received notice of the orders entered in this

action in this capacity.

The CFTC attempted to serve Mr. Baker via means approved by the Hague Convention

at an address in Germany provided by one of Lake Shore Limited's lawyers, to no avail.

Because the German address proved to be incorrect and the CFTC could not find Mr. Baker, the

Hague Convention – assuming that Mr. Baker is living in a country that is a signatory – does not

govern the CFTC's efforts to serve Mr. Baker. *See BP Products North America, Inc. v. Dagra*,

232 F.R.D. 263, 264 (E.D. Va. 2005), *quoting* 20 U.S.T. 361 (U.S.T.1969) ("the Hague

Convention contains an explicit exemption where the address of the foreign party to be served is

unknown: 'This Convention shall not apply where the address of the person to be served with the

document is not known'").

The CFTC thus moved for leave to serve Mr. Baker via publication pursuant to Fed. R.

Civ. P. 4(f)(3). This rule allows service to be made on an individual in a foreign country by any

means "not prohibited by international agreement, as the court orders," Fed. R. Civ. P. 4(f)(3), as

long as the chosen method of service "comport[s] with constitutional notions of due process," *In

re LDK Solar Securities Litigation*, No. C 07-05182 WHA, 2008 WL 2415186 *4 (N.D. Cal.

Jun. 12, 2008). Magistrate Judge Mason approved service of process via publication in the

International Herald Tribune newspaper once a week for four consecutive weeks (specifically,

on April 17, 24, 30 and May 8, 2008). *See* Docket No. 566.

Since Mr. Baker has concealed his whereabouts, the court cannot definitively ascertain if any international agreement applicable to the location where Mr. Baker is hiding prohibits service via publication. Clearly, however, service by publication coupled with actual notice of this action is "reasonably calculated, under all the circumstances, to apprise [Mr. Baker] of the pendency of the action and afford [him] an opportunity" to defend. *Rio Properties, Inc. v. Rio Intern. Interlink*, 284 F.3d 1007, 1016 (9th Cir. 2002); *see also BP Products North America, Inc. v. Dagra*, 236 F.R.D. 270, 272-1 (E.D. Va. 2006) ("service by publication to a defendant in a foreign country is an acceptable alternative means under 4(f)(3), so long as diligent attempts have been made to locate the defendant and serve process by traditional means, and the publication is one that likely would reach the defendant" especially when "the defendant possess[es] some knowledge that he might be subject to a suit"). Thus, the court finds that Magistrate Judge Mason properly authorized service via publication and that the CFTC properly served Mr. Baker via publication.

## III.    Personal Jurisdiction

The CFTC failed to address personal jurisdiction, despite the fact that the court's opinion addressing the CFTC's motion for a default judgment against the other Lake Shore defendants specifically addressed this critical issue. Specific jurisdiction applies when the court is asserting jurisdiction over a defendant in a suit "arising out of or related to the defendant's contacts with the forum." *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d at 1277, *citing Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. at 416. On the other hand, general jurisdiction is applicable when the lawsuit neither arose nor was related to the defendant's contacts with the forum state. *Id*. Such jurisdiction is permitted only where the defendant has "continuous and systematic general business contacts" with the state. *Id*.

-8-

Specific jurisdiction fits well with the facts of this case, as Lake Shore Limited was controlled by Mr. Baker, who was its Managing Director, Principal and President. Lake Shore Limited targeted Chicago and touted its status as a CFTC-registrant and NFA member, as discussed at length in the court's prior orders, to cloak Lake Shore Limited and the Lake Shore funds in a mantle of apparent propriety. The court may exercise specific jurisdiction over Mr. Baker if he "purposefully established minimum contacts within the forum state" and those contacts "make personal jurisdiction fair and reasonable under the circumstances." *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1277 (7th Cir. 1997), *quoting Burger King v. Rudzewicz*, 471 U.S. 462, 476-77 (1985). Clearly, both Mr. Baker and Lake Shore Limited purposefully took numerous actions directed at Chicago in connection with Lake Shore Limited's actions as a trading advisor and pool operator for the Lake Shore Funds. *See* Docket No. 118, *rev'd in part on other grounds by Lake Shore Asset Management Ltd. v. Commodity Futures Trading Com'n*, 511 F.3d 762 (7th Cir. 2007).

The court anticipates that Mr. Baker would take the position that he nevertheless cannot be liable personally based on the actions of Lake Shore entities. Under Illinois law, however, an individual may be liable for the acts of a corporation if: "(1) there exists such unity of interest and ownership that the separate personalities of the individual and the corporation no longer exist; and (2) . . . there exist circumstances such that an adherence to the fiction of separate corporate existence would likely produce an unjust or inequitable result." *APS Sports Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624, 631 (7th Cir. 2002). This standard is easily met in this case, for the reasons discussed at length in the court's preliminary injunction order. *See* Docket No. 118 ("this case is the poster child for the transaction of business through a maze of interrelated companies, and all of the evidence presented to the court indicates that all of the

-9-

Lake Shore companies . . . were under common control and did not operate at arms-length"); *see also In re Teknek, L.L.C.*, 354 B.R. 181, 196 n.5 (Bankr. N.D.Ill. 2006) ("The exception permits the individual corporate defendant to be roped in with personal jurisdiction if the plaintiff makes a prima facie showing . . . that the corporate form is a shell or sham rather than a real, separate entity").

Mr. Baker might also contend that the fiduciary shield doctrine prevents this court from exercising personal jurisdiction over him. Under the fiduciary shield doctrine, a court may not exercise jurisdiction over a non-resident corporate official when the only contacts that individual has with Illinois were made in his or her corporate capacity. *Rollins v. Ellwood*, 141 Ill.2d 244, 279 (Ill. 1990) (where an individual defendant's conduct in Illinois "was a product of, and was motivated by, his employment situation and not his personal interests, . . . it would be unfair to use this conduct to assert personal jurisdiction over him as an individual"); *see also Rice v. Nova Biomedical Corp.*, 38 F.3d 909, 912 (7th Cir.1994) (Illinois recognizes the fiduciary shield doctrine, which "denies personal jurisdiction over an individual whose presence and activity in the state in which the suit is brought were solely on behalf of his employer or other principal").

However, it is well-established that the fiduciary shield doctrine is inapplicable if a defendant's actions were taken to further his or her personal interests. *See, e.g., Vasilj v. Duzich*, No. 07 C 5462, 2008 WL 2062371, at *3-4 (N.D. Ill. May 13, 2008). In determining whether the personal interest exception applies, courts focus on whether the individual at issue "has a direct financial stake in the company's health." *United Financial Mortg. Corp. v. Bayshores Funding Corp.*, 245 F.Supp.2d 884, 885 (N.D. Ill. 2002). Accordingly, "in reviewing the personal interest exception, the critical factor is the individual's status as a corporate shareholder, not merely

-10-

whether he is an officer or director." *Plastic Film Corp., Inc. v. Unipac*, Inc., 128 F.Supp.2d 1143, 1147 (N.D. Ill. 2001).

Thus, the fiduciary shield doctrine does not protect high-ranking company officers or shareholders with "a direct financial stake in the company's health." *Vasilj v. Duzich*, 2008 WL 2062371, at *4 (collecting cases). Mr. Baker indisputably had a direct financial stake in the health of Lake Shore Limited and all of the other Lake Shore entities he controlled. Indeed, he admitted that the asset freeze imposed by this court and the National Futures Association led to his precipitous flight from Lake Shore's now-shuttered London offices. *See* Docket No. 192 at 2 n.2 (discussing declaration submitted by Mr. Baker in this case). The court thus finds that the fiduciary shield doctrine is inapplicable and that Mr. Baker's decision to base Lake Shore Limited, and thus the heart of his fraudulent scheme, in Chicago means that the court can exercise personal jurisdiction over him.

## IV. Findings of Fact and Conclusions of Law

Having satisfied itself that the CFTC properly served Mr. Baker and that the exercise of personal jurisdiction over him is proper, the court turns to the merits of the CFTC's motion for a default judgment against Mr. Baker. Mr. Baker has failed to timely answer or otherwise defend this action. As Mr. Baker declined to respond within the time specified by the court, the court will proceed without the benefit of his views.

### A. Findings of Fact

1. This court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, which authorizes the CFTC to seek injunctive relief against any person whenever it shall appear to the CFTC that such person has engaged, is engaging, or is about to

engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation or order thereunder.

2.      Venue is proper pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1(e), because Mr. Baker, individually and as a controlling person of the Lake Shore Common Enterprise ("LS Common Enterprise"), transacted business in this district, and the acts and practices in violation of the Act have occurred, are occurring, or are about to occur within this district.

3.      Service was properly effected upon Mr. Baker pursuant to Fed. R. Civ. P. 4(f)(3), by publication of the summons in the International Herald Tribune newspaper along with directions to the computer link posted on the Commission's website once a week for four consecutive weeks *i.e.*, on April 17, 24, 30 and May 8, 2008.

4.      Mr. Baker has failed to timely answer or otherwise defend the CFTC's second amended complaint within the time permitted by Fed. R. Civ. P. 12.

5.      The allegations of the second amended complaint are well-pleaded and hereby taken as true.  This order is supported by the following facts.

*Plaintiff*

6.      Plaintiff Commodity Futures Trading Commission is an independent federal regulatory agency that is charged with administering and enforcing the Act, 7 U.S.C. §§ 1 et seq. (2002), and the Commission Regulations promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq*. (2008).

*Defendant Philip J. Baker*

7.      Philip J. Baker is a Canadian citizen who resided in London, UK until August 2007.  Mr. Baker's last reported residence was in Hamburg, Germany.  Mr. Baker's current whereabouts are unknown.  Mr. Baker is the Managing Director, Principal and President of Lake

Shore Limited and the Managing Partner of Hanford; the co-founder and managing partner of the Lake Shore Group; the President and Secretary of Lake Shore Alternative Financial Asset Account Ltd. a/k/a Lake Shore Alternative Financial Asset Ltd; and a controlling person of the LS Common Enterprise.

*LS Common Enterprise Defendants*

8.    The LS Common Enterprise, which is controlled by Mr. Baker, is composed of: Lake Shore Limited; the Lake Shore Group; Lake Shore Alternative Financial Asset Account Ltd. a/k/a Lake Shore Alternative Financial Asset Ltd. ("LS Acct" or "LS Asset"); Lake Shore Alternative Financial Asset Account 1 Ltd.; ("LS Acct 1"); Lake Shore Alternative Financial Asset Account II Ltd.; ("LS Acct 2"); Lake Shore Alternative Financial Asset Account III Ltd. ("LS Acct 3"); Lake Shore Alternative Financial Asset Fund Ltd. ("LS Fund 1"); Lake Shore Alternative Financial Asset Fund II Ltd. ("LS Fund 2"); Lake Shore Alternative Financial Asset Fund III Ltd. ("LS Fund 3"); Lake Shore Alternative Financial Asset Fund IV Ltd., currently known as Geneva Corporation Funds World Ltd. ("LS Fund 4"); Lake Shore Alternative Financial Asset Fund IV US, LLC ("LS Fund 4 -US"); Lake Shore Alternative Financial Asset Yen Fund 1 ("Yen Fund 1"); Lake Shore Alternative Financial Asset Yen Fund Limited Class II ("Yen Fund 2"); Lake Shore Alternative Financial Asset Yen Fund Limited Class III ("Yen Fund 3"); Hanford; (collectively "LS Common Enterprise").  All of the entities that make up the LS Common Enterprise were under the control of Mr. Baker, were inextricably interrelated to each other, and did not operate at arms-length.

9.    Offering memoranda for the LS Common Enterprise's commodity pools show Lake Shore Asset Management Inc. ("LSAM Inc.") and Lake Shore Limited at various times as their investment manager; Roth Mosey & Partners ("Roth Mosey") as their administrator; and

KPMG as their auditor. Moreover, all of the commodity pools use the same NFA identification number. All of the LS Common Enterprise's funds reported their purported performance on the same website. All of the commodity pools used fact sheets on Lake Shore Group letterhead to promote the pools. The fact sheets for each of the pools state that the pools are managed by Lake Shore Limited, a CTA and CPO registered with the CFTC. All of the commodity pools were marketed by the same sales representatives. Finally, pool participant funds were commingled.

10.     LS Common Enterprise promotional materials refer to "Lake Shore", the Lake Shore Group, LSAM Inc., and Lake Shore Limited interchangeably.

*Background*

11.     All of the corporations and entities identified above operated in concert with each other as a common enterprise, and were controlled by Mr. Baker.

12.     Since at least January 2002 to the present ("relevant period"), Mr. Baker and the other LS Common Enterprise Defendants fraudulently solicited and accepted or caused to be accepted at least $300 million from at least 700 individuals and entities worldwide for the purpose of, among other things, trading commodity futures contracts in several commodity pools.

13.     During the relevant period, Lake Shore Limited, operating as part of the LS Common Enterprise, through its employees, agents and officers including Mr. Baker, refused, upon request of the CFTC, to make available for inspection its books and records or the books and records of its predecessor corporation LSAM Inc., including records that would show the actual performance of the commodity pools, and refused to furnish the name and address of each client, subscriber or participant, and submit samples or copies of all reports, letters, circulars,

-14-

memorandums, publications, writings, or other literature or advice distributed to clients, subscribers, or participants, or prospective clients, subscribers or participants to the CFTC upon its request.

14.     The LS Common Enterprise operated at least twelve commodity pools; eight of these commodity pools acted as feeder pools that fed into the remaining four commodity pools. The eight feeder pools were Yen Fund 1, Yen Fund 2 and Yen Fund 3 (collectively the "Yen Funds"), LS Fund 1, LS Fund 2, LS Fund 3, Lake Shore Alternative Financial Asset Fund IV Limited –Class E ("LS Fund 4-E") and LS Fund 4-US.  These eight pools fed into the following four pools: LS-Acct, LS Acct-1, LS Acct-2, and LS Fund 4.  These twelve pools will be referred to collectively as the "Pools."

*LS Common Enterprise's Operation*

15.     During the relevant period, Mr. Baker and the LS Common Enterprise fraudulently solicited and accepted funds to invest in the Pools for trading in, among other things, exchange traded futures contracts on equity indices, US Treasury Notes and currencies traded on U.S. exchanges.  At least some of the contracts given to prospective pool participants stated that they would be governed by Illinois law, the Commodities Exchange Act, and any other federal laws applicable in Illinois, and provided that they could only be modified in writing.

16.     All of the Lake Shore entities were under common control and did not operate at arms-length.  The Lake Shore entities operated as a common enterprise in which the entities were inextricably interrelated to each other.  Lake Shore's promotional materials, private placement memos and organizational charts demonstrate that the pools and funds are not

operated as separate and distinct entities, but instead, are controlled by Mr. Baker and the same individuals who operate and manage them under the umbrella of the Lake Shore Group.

17.     Mr. Baker controlled all the Lake Shore entities, pools and funds.  Mr. Baker was: the Managing Director, Principal and President of Lake Shore Limited; 2) the co-founder and managing partner of the Lake Shore Group and Lake Shore Institutional and Dealer relations; 3) the contact person for Lake Shore Limited listed on its Due Diligence; 4) the Managing Partner of LSAM Inc.; 5) the Managing Partner of Hanford; and 6) the person with primary responsibility for managing Lake Shore Limited and the Lake Shore Group's overall international business development, operations, sales and marketing.

18.     The evidence (including forensic accounting performed by the Receiver appointed by this court) shows that the LS Common Enterprise misappropriated customer funds. Approximately $10.2 million earned as income on accounts in the name of several of the Pools was paid to an account owned by Hanford, a Baker-controlled entity.  Similarly, from May 11, 2007 to June 20, 2007, approximately $1.1 million was wired from the Sentinel Management Group, Inc. ("Sentinel") accounts to Anglo International Associates Ltd. ("Anglo"), for the payment of Lake Shore Limited's administrative expenses, even though the offering memoranda stated that "[t]he Investment Manager renders the services set forth in the Investment Management Agreement at its own expense, including fees to the Investment Advisor, the salaries of employees necessary to render such services, all general overhead expenses attributable to its offices and employees and other expenses incident to the rendering of such services."

19.     Sentinel account documents show that as early as June 2001, Mr. Baker, along with others, was authorized to transfer funds among all Lake Shore accounts at Sentinel during the relevant time.

20.     The Pool accounts and funds were traded at Man Financial Limited, now known as MF Global, London, England ("Man"), Lehman Brothers International Europe in London, England ("Lehman"), and Fimat International Banque SA UK Branch, London, England, now known as Newedge Group-UK Group ("Fimat").  The Pools also have accounts with Sentinel, which was the sub-custodian of the funds (Bank of New York was the custodian).

*LS Common Enterprise's Solicitations*

21.     The LS Common Enterprise, under Mr. Baker's direction, solicited prospective participants to invest in the Pools in various ways including, but not limited to, a web of sales representatives throughout the world, and at least one website, www. lakeshorefunds.com.  The LS Common Enterprise provided to potential participants, among other things, a form entitled "Qualitative Firm Evaluation and Due Diligence", confidential explanatory memoranda ("explanatory memoranda") and a subscription agreement for the various pools.  The explanatory memoranda for several pools were also available on the LS Common Enterprise's website.

22.     Each pool's explanatory memoranda represented that Lake Shore Limited is the investment manager and investment advisor of the funds and touted Lake Shore Limited's registration as a CTA and CPO, and as a member of the NFA.  Earlier versions represented that LSAM Inc. was the investment manager and investment advisor of the funds and touted its registration as a CTA.

-17-

*Mr. Baker and the LS Common Enterprise Defendants Misrepresented the Performance of the Pools*

23.     When soliciting prospective sales representatives, Mr. Baker misrepresented the performance of Lake Shore's Funds in order to persuade them to represent the Lake Shore Funds.  While Mr. Baker told prospective sales representatives that Lake Shore's Funds were very profitable during the relevant period, the LS Common Enterprise accounts at Man, Lehmann, and Fimat, in the aggregate, lost more than $35 million during that period.

24.     Mr. Baker and the Lake Shore Common Enterprise misrepresented the profits and losses incurred by the Pools and provided pool participants and prospective pool participants with false performance tables that misrepresent the Pools' respective and collective track records.

25.     Performance tables for LS Fund 1, which were provided to pool participants through the LS Common Enterprise Defendants' website, represented the following as the total annual returns:

|  |  |
|---|---|
| for 2003 | 22.48% |
| for 2004 | 29.81% |
| for 2005 | 18.95% |
| for 2006 | 5.73% |
| for 2007 | 2.82%. (January 2007 to March 2007) |

These performance results were false.  The only trading accounts open during 2003 and 2004 were at Man and were unprofitable in those calendar years.  Instead of being profitable between January 2003 and May 2007, the LS Asset account at Man lost at least $22 million.

26.     The performance table dated December 31, 2006 for LS Fund 4 shows returns as follows:

|  |  |
|---|---|
| for 2002 | 55.50% |
| for 2003 | 37.02% |

| | |
|---|---|
| for 2004 | 33.80% |
| for 2005 | 40.30% |
| for 2006 | 21.40%. |

This performance table consists of an average of the returns of Funds 1 through 4. In computing the average of returns, LS Common Enterprise used hypothetical results for LS Fund 1 showing a 55.50% profit for 2002, when the actual trading for 2002 resulted in a loss of $1.4 million.

27.     The LS Common Enterprise admits in its due diligence publications that its largest drawdown was in July 2002 when it experienced a "– 48.56% drawdown." However, in preparing the performance table included in printed materials and on the Lake Shore website, as described above, Lake Shore used simulated performance results for 2002 to show profits instead of the actual unprofitable performance. In fact, in the performance table for the month of July 2002, the LS Common Enterprise represents the monthly return to be +7.62% and omitted the material fact that it had actual losses of 47% during one month.

28.     During 2006 and 2007, the LS Common Enterprise reported to its pool participants that LS Fund 4 had profited by 21.40% and 8.58%, respectively. These purported performance results are false because the trading accounts at Lehman for accounts entitled LS Fund 4 from October 2006 through June 2007 had trading losses totaling about $4.4 million. Also, the trading accounts at Fimat for accounts entitled LS Fund 4, were first funded in May 2007 and lost approximately $260,000 during May 2007. There were no trading accounts for LS Fund 4 at Man.

29.     The performance tables that the LS Common Enterprise published on its websites for its prospective and actual pool participants were false because they showed profits when, in fact, the LS Common Enterprise commodity futures trading accounts at Man, Lehman and Fimat indicated that the accounts had experienced significant losses trading commodity futures. From

February 2002 through June 2007, the LS Common Enterprise accounts at Man, Lehman and Fimat, in the aggregate, lost more than $35 million.

*Mr. Baker and the LS Common Enterprise Defendants Issued False Statements to Investors*

30.     Each week, on its password protected portion of its website, the LS Common Enterprise posted what was described as the account value for each of its pool participants. Participants in the Pools could access this information to determine how their investment was performing.  The reported account values were consistent with the false statements made in the performance tables published on the Lake Shore website.  Consequently, the LS Common Enterprise distributed or caused to be distributed false account statements to pool participants because the statements showed that they were earning substantial profits when the trading accounts in the names of the pools lost approximately $35 million overall.

31.     Roth Mosey, the accounting firm retained by Mr. Baker that prepared investors' account statements, computed the net asset value of Lake Shore's Pools and participants' individual shares in the Pools by using valuations provided by Mr. Baker, instead of obtaining the Pools' account statements directly from the three FCMs and computing net asset value from the FCMs' account statements.  By this arrangement, Mr. Baker was able to cause account statements to be distributed to investors showing substantial profits, when the trading accounts in the names of the pools lost over $35 million overall.

32.     Prior to March 2007, the LS Common Enterprise also issued false statements to some of its clients that were transmitted in hard copy.  These statements were also false.

*LS Common Enterprise Defendants Misrepresented the Amount of Funds Under Management*

33.     The LS Common Enterprise claimed that it managed over $1 billion in assets, but this claim was false.  Specifically, the LS Common Enterprise Defendants represented on their

website as recently as June 11, 2007, that the Pools contained $293.5 million in participants' funds and that the Lake Shore Group had $1.05 billion in assets under management. In fact, as of June 27, 2007, the total Pools' funds at Man, Lehman, Fimat and Sentinel were approximately $230 million. The LS Common Enterprise has failed to adequately explain this discrepancy. Although the LS Common Enterprise has claimed that the shortfall is accounted for by the undisclosed amount of investor funds on deposit in separately managed accounts ("SMAs"), the evidence shows that the SMA funds were actually deposited in the Pools. Similarly, Lake Shore Limited previously asserted, with no evidentiary support, that some of the Lake Shore Funds were trading using accounts in the name of FTG. This fails to explain the discrepancy because even if this was allowed, it would have to have been disclosed, and no such disclosures were made.

34. The amount of funds under management was a material fact considered by several of the participants, who would not have invested in the Lake Shore Funds if they had known the true amount of funds being managed by the LS Common Enterprise at the time of their initial investment.

*Misappropriation of Investor Funds – Incentive Fees*

35. The LS Common Enterprise told its investors that it would be compensated through an incentive fee of 25% of the net new appreciation for each fund. Lake Shore promotional materials specifically stated that "No performance Fee will be payable until prior losses are recouped." These incentive fees were thus only payable when the funds were profitable.

36. The statements that the LS Common Enterprise issued to one of its Customers ("Customer A") illustrate this misappropriation. The court has reviewed Lake Shore Group

statements sent to one Lake Shore Customer identified as Customer A.  Customer A had

accounts in LS Fund 4 and LS Fund 3.  In May of 2007, LS Fund 4's trading accounts at Fimat

and Lehman lost money, but Customer A's May 2007 statement reported profits and showed that

the account was charged an incentive fee.

37.     Customer A's statements for his investment in LS Fund 3 show that he was

improperly charged an incentive fee in April and June 2007.  According to the Receiver's

Report, LS Fund 3 invested in LS Acct 2.  Consequently, the profits and losses in LS Fund 3

would reflect the trading in LS Acct 2.  Customer A's account statement for LS Fund 3 reported

profits in April 2007 and stated that the Fund had reached a new account value high.

Consequently, Lake Shore deducted an incentive fee from the customer's account.  However, the

LS Acct 2 trading account lost more than $1.7 million in March 2007 and the $173,000 profit in

April was not sufficient to cover the March losses.  Hence, no incentive fee was due.  This was

not an isolated incident.  In June 2007, Customer A's account was again charged an incentive

fee.  However, in May 2007, the LS Acct 2 trading account lost $3.4 million; consequently the

June profits of $1.8 million were not sufficient to recoup the losses.  Again, no incentive fee was

due.  All customer money paid to the LS Common Enterprise Defendants as incentive fees in

excess of the amounts authorized by the clients were misappropriated.

*Unauthorized Transfers to Hanford*

38.     Hanford, a company controlled by Mr. Baker, received all of the income

generated by the Lake Shore accounts at Sentinel—approximately $10.2 million.  In the Pool

Offering Memoranda, the LS Common Enterprise represents that LS Acct, LS Acct 1 and LS

Acct 2 "will not pay the Fund any interest on cash balances or funds held by the Custodian."

The Custodian is defined as Bank of New York.  This disclosure says that the investors will not

receive any bank interest on their funds. It does not say that they will not receive the income earned through trading by the sub-custodian Sentinel Management Group, nor does it authorize Lake Shore to pay all of the trading profits earned at Sentinel to an undisclosed entity controlled by Mr. Baker.

39.     The Lake Shore pool participants did not authorize the transfers of the income at Sentinel to Hanford. Therefore, the Defendants, operating as the LS Common Enterprise, misappropriated $10.2 million of customer funds by transferring them to Hanford.

*Unauthorized Transfers to Anglo-International*

40.     The Pools' offering memoranda state "The Investment Manager renders the services set forth in the Investment Management Agreement at its own expense, including fees to the Investment Advisor, the salaries of employees necessary to render such services, all general overhead expenses attributable to its offices and employees and other expenses incident to the rendering of such services."

41.     Between May 11, 2007 and June 20, 2007, the LS Common Enterprise transferred $ 1.1 million from the Pool accounts at Sentinel to Anglo, for administrative expenses. These transfers were in direct contradiction to the disclosures contained in the offering memorandum. Therefore, these funds were misappropriated.

*The Common Enterprises' Separate Managed Accounts*

42.     The LS Common Enterprise's sales representative for the Colombian region was Jose Fernando Hurtado. All but four of his clients invested in so-called SMAs, which were actually deposited in the Pools. The contract that Mr. Hurtado and his clients signed with LSAM Inc. states that LSAM Inc., headquartered in Chicago, is registered with the CFTC and is a member of the NFA. In particular, the contract states that the custody of client's assets will be

held by Sentinel, a qualified brokerage firm in the United States, and that all account statements will be made by Lake Shore Alternative Financial Asset Limited.

43.     Additionally, the contract stated that it would be governed according to the laws of Illinois, including the U.S. Commodity Exchange Act and that the contract could only be changed by written modification.

*Lake Shore Funds I through IV Become the Geneva Corporation*

44.     After CFTC filed its complaint against Lake Shore, Mr. Hurtado had two telephone conversations with Mr. Baker.  In the first phone conversation, on the morning of July 5, 2007, Mr. Baker told Mr. Hurtado that the CFTC lawsuit was the result of a mistake by a former lawyer and that Lake Shore was hiring a new lawyer to correct the problem.  Mr. Baker also told Mr. Hurtado that he had a "Day After Plan," which was the movement of Lake Shore's business from the U.S. to Europe.

45.     Mr. Baker related that Lake Shore would have a new fund administrator located in Switzerland to replace Roth Mosey in Canada.  Mr. Baker also told Mr. Hurtado that Lake Shore had $1 billion under management – $250 million in SMAs and funds and $750 million in direct managed accounts ("DMAs").  Mr. Baker explained that the new DMAs would be in the name of each client and that Lake Shore Limited would have trading authorization and manage these accounts.

46.     Mr. Hurtado's second phone conversation with Mr. Baker was on August 3, 2007.  During that conversation, Mr. Baker told Mr. Hurtado he was happy because the appellate court ruled that the funds could be moved and he could implement the Day After Plan.  Mr. Baker also explained to Mr. Hurtado that the new company would be called Geneva Corp. and would

replace Lake Shore's Funds 1 through IV.  Geneva Corp. appears to be the successor of Lake Shore Funds 1 through 4.

**B.** C**onclusions of Law**

47.     From at least 2002 to the present, Mr. Baker cheated or defrauded or attempted to cheat or defraud and willfully deceived or attempted to deceive pool participants by misrepresenting the profits and losses of the Pools, failing to disclose trading losses and other material facts relating to the Pools, and misappropriating pool participant funds in violation of Sections 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. § 6b(a)(2)(i) and (iii).

48.     Mr. Baker also willfully made or caused to be made false reports to the pool participants who invested money with the defendants to trade commodity futures contracts, in violation of Section 4b(a)(2)(ii) of the Act, 7 U.S.C. §6b(a)(2)(ii).

49.     Mr. Baker controlled the LS Common Enterprise, and did not act in good faith or knowingly induced, directly or indirectly, the LS Common Enterprise's violations of Section 4b(a)(2)(i)-(iii) of the Act, and thus, is liable for those violations by the LS Common Enterprise, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).  *See Commodity Futures Trading Com'n. v. Baragosh*, 278 F.3d 319, 330 (4th Cir. 2002) (under the CEA, an individual who "directly or indirectly" controls a corporation that has violated the CEA "may be held liable for such violation in any action brought by the Commission to the same extent as such controlled [corporation]" if the CFTC proves: "(1) that a corporation violated the Act; (2) that the defendant "directly or indirectly" controlled that corporation; and (3) that the controlling person "did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation"), *quoting* 7 U.S.C.A. § 13c(b).

50.     During the relevant period, Lake Shore Limited and the Lake Shore Group, while acting as CPOs and as part of the LS Common Enterprise, violated Section 4*o*(1)(A) and (B) of the Act, 7 U.S.C § 6*o*(1)(A) and (B), by using the mails or other means or instrumentalities of interstate commerce, directly or indirectly, to employ any device, scheme, or artifice to defraud pool participants or prospective pool participants, or engaged or are engaging in transactions, practices or a course of business that operated as fraud or deceit upon pool participants or prospective pool participants.

51.     Since at least 2002, Lake Shore Limited, while acting as a CTA and as part of the LS Common Enterprise, violated Section 4*o*(1)(A) and (B) of the Act, 7 U.S.C § 6*o*(1)(A) and (B), by using the mails or other means or instrumentalities of interstate commerce, directly or indirectly, to employ any device, scheme, or artifice to defraud pool participants or prospective pool participants, or engaged or are engaging in transactions, practices or a course of business that operated as fraud or deceit upon pool participants or prospective pool participants.

52.     Mr. Baker controlled the LS Common Enterprise and did not act in good faith or knowingly induced, directly or indirectly, the Lake Shore Group's and Lake Shore Limited's violations of Section 4o(1)(A) and (B) of the Act, 7 U.S.C § 6*o*(1)(A) and (B), and thus, is liable for those violations committed by the Lake Shore Group and Lake Shore Limited, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

53.     During the relevant period, Lake Shore Limited violated Section 4n of the Act, 7 U.S.C. §§ 6n (2002), and Commission Regulations 1.31, 4.23, and 4.33, 17 C.F.R. §§ 1.31, 4.23, and 4.33 (2008) by refusing to, upon request of the CFTC, make available for inspection its books and records or the books and records of its predecessor corporation LSAM Inc., including records that would show the actual performance of the Pools, and by refusing to furnish the

name and address of each client, subscriber or participant, and submit samples or copies of all reports, letters, circulars, memoranda, publications, writings, or other literature or advice distributed to clients, subscribers, or participants, or prospective clients, subscribers or participants to the CFTC upon its request.

54.     Mr. Baker controlled the LS Common Enterprise and did not act in good faith or knowingly induced, directly or indirectly, Lake Shore Limited's violations of Section 4n of the Act, 7 U.S.C. §§ 6n, and Commission Regulations 1.31, 4.23, and 4.33, 17 C.F.R. §§ 1.31, 4.23, and 4.33, and thus, is liable for those violations committed by Lake Shore Limited, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

_Need for Permanent Injunction and Other Ancillary Equitable Relief_

55.     The CFTC has made a showing that Mr. Baker, individually and as controlling person of the LS Common Enterprise, has engaged, is engaging, and is about to engage in acts and practices in violation of the Act and Commission Regulations.  Notwithstanding his default, the totality of the circumstances establish that, unless restrained and enjoined by this court, there is a reasonable likelihood that Mr. Baker will continue to engage in the acts and practices alleged in the Second Amended Complaint and in similar acts and practices in violation of the Act.

56.     Because the issues of necessary equitable relief regarding appropriate restitution for defrauded pool participants, disgorgement and a civil monetary penalty for LS Common Enterprise Defendants are still unresolved, the court reserves those issues for further proceedings.

### V.     Order of Permanent Injunction

IT IS HEREBY ORDERED that Mr. Baker, his officers, agents, servants, employees, attorneys and all other persons who are in active concert with him are permanently restrained, enjoined and prohibited from directly or indirectly:

1.     Cheating or defrauding or attempting to cheat or defraud other persons and willfully deceiving or attempting to deceive other persons by making false, deceptive or misleading representations of material facts, by failing to disclose materials facts, or by misappropriating customer funds in or in connection with orders to make, or the making of, contracts of sale of commodities for future delivery, made or to be made for or on behalf of any other person, in violation of Sections 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. §6b(a)(2)(i) and (iii);

2.     Willfully making false reports or statements or causing false reports or statements to be made to other persons, in or in connection with orders to make, or the making of, contracts of sale of commodities for future delivery, made or to be made for or on behalf of any other person, in violation of Section 4b(a)(2)(ii) of the Act, 7 U.S.C. §6b(a)(2)(ii);

3.     Using the mails or any means or instrumentality of interstate commerce, directly or indirectly, to employ any device, scheme or artifice to defraud any perspective or actual pool participant or to engage in any transaction, practice or course of business which operates as a fraud or deceit upon any prospective or actual pool participant by making false, deceptive or misleading statements of material facts, by failing to disclose material facts, or by misappropriating customer funds, in violation of Section 4o(1)(A) and (B) of the Act, 7 U.S.C. §6o(1)(A) and (B);

4.      Refusing, upon request of the CFTC, to make available for inspection CPO or CTA books and records, and the name and address of each client, subscriber or participant, and samples or copies of all reports, letters, circulars, memorandums, publications, writings, or other literature or advice distributed to clients, subscribers, or participants, or prospective clients, subscribers or participants, in violation of Section 4n of the Act, 7 U.S.C. §§ 6n, and Commission Regulations 1.31, 4.23, and 4.33, 17 C.F.R. §§ 1.31, 4.23, and 4.33.

IT IS FURTHER ORDERED that Mr. Baker is permanently enjoined from engaging, directly or indirectly, in any activity related to trading in any commodity interest, as that term is defined in Section 1a(4) of the Act, 7 U.S.C. § 1a(4) ("commodity interest"), including but not limited to, the following:

1.      trading on or subject to the rules of any registered entity, at that term is defined in Section 1a(29) of the Act, 7 U.S.C. § 1a(29);

2.      engaging in, controlling or directing the trading for any commodity interest acount for or on behalf of any other person or entity, whether by power of attorney or otherwise;

3.      soliciting or accepting any funds from any person in connection with the purchase or sale of any commodity interest;

4.      giving advice or price quotations of other information in connection with the purchase or sale of commodity futures and options contracts;

5.      entering into any commodity interest transactions for his own personal account, for any account in which he has a direct or indirect interest and/or having any commodity interests traded on his behalf; and

6.      applying for registration or claiming exemption from registration with the CFTC in any capacity, or engaging in any activity requiring such registration or exemption from registration with the CFTC, except as provided for in Regulation 4.14 (a)(9), 17 C.F.R. § 4.14(a)(9), or acting as a principal, agent or any other officer or employee of any person registered, exempted from registration or required to be  registered with the CFTC, except as provided for in Regulation 4.14 (a)(9), 17 C.F.R. § 4.14(a)(9);

7.      engaging in any business activities related to commodity interest trading.

IT IS FURTHER ORDERED that Mr. Baker, his officers, agents, servants, employees, attorneys and all other persons who are in active concert with him are permanently enjoined from directly or indirectly destroying, mutilating, concealing, altering, or disposing of any of the books, records, documents, correspondence, brochures, manuals, electronically stored data, tape recordings, or other property of the LS Common Enterprise, wherever such materials may be situated, that refer or relate in any manner to any transaction or matter described in the Second Amended Complaint in this case;

IT IS FURTHER ORDERED that Mr. Baker shall immediately identify and provide an accounting for all assets and property that he currently maintains inside or outside the United States, including, but not limited to, all funds on deposit in any financial institution, futures commission merchant, bank, or savings and loan accounts held by, under the control of, or in his name, or the name of Lake Shore Limited, the Lake Shore Group and/or all of the names of the entities that comprise the LS Common Enterprise whether jointly or otherwise,

IT IS FURTHER ORDERED that Mr. Baker, his officers, agents, servants, employees, attorneys and all other persons who are in active concert with him grant the Receiver and the CFTC or its representatives immediate access to all books, records and other documents of the LS Common Enterprise Defendants, wherever such materials may be situated, for purposes of inspecting and copying such materials;

IT IS FURTHER ORDERED that the funds on deposit at MF Global UK Limited, Newedge Group SA (formerly Fimat International Banque SA), and Lehman Brothers International Europe, that are the subject of the interpleader action in the High Court of Justice, Queen's Bench Division, London, England, are customer funds which shall be transferred to the

Receiver for the benefit of the Lake Shore clients to be distributed to the clients through the Receivership estate pursuant to further orders of this court. The funds on deposit in the Lake Shore accounts at Sentinel Management Group are also customer funds. As soon as possible given Sentinel's bankruptcy case, the Lake Shore funds on deposit at Sentinel shall be transferred to the Receiver for the benefit of the Lake Shore clients to be distributed to the clients through the receivership estate pursuant to further orders of this court;

IT IS FURTHER ORDERED that Mr. Baker, and all persons insofar as they are acting in the capacity of his agents, servants, successors, employees, assigns, and attorneys, and all persons insofar as they are acting in active concert or participation with the LS Common Enterprise, who receive actual notice of such order by personal service or otherwise, are enjoined, from directly or indirectly, withdrawing, transferring, removing, dissipating, concealing, or disposing of, in any manner, any funds, or other property, wherever situated, including but not limited to, all funds, personal property, money or securities held in safes, safety deposit boxes, and all funds on deposit in any financial institution, bank or savings and loan account held by, under the control of, or in the name of the LS Common Enterprise Defendants.

IT IS FURTHER ORDERED that Mr. Baker immediately repatriate and transfer to the Receivership estate all funds, documents and assets outside of the United States;

IT IS FURTHER ORDERED that that because the issues of necessary equitable relief regarding appropriate restitution for defrauded pool participants, disgorgement and a civil monetary penalty for Mr. Baker are still unresolved, they are hereby reserved for further proceedings before this court.

**VI.     Conclusion**

For the reasons above, and as detailed in this order, the CFTC's motion for entry of a

default judgment and for a permanent injunction against Philip J. Baker [#584] is granted.


DATE:   September 17, 2008                          *Blanche M. Manning*
                                                    _____
                                                    Blanche M. Manning
                                                    United States District Judge