## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES COMMODITY | ) | |
| FUTURES TRADING COMMISSION, | ) | |
|     Plaintiff, | ) | |
| | ) | |
|     v. | ) | 07 C 3598 |
| | ) | |
| LAKE SHORE ASSET MANAGEMENT | ) | |
| LIMITED, et al., | ) | |
|     Defendants. | ) | |

### ORDER ENTERING A DEFAULT JUDGMENT, A PERMANENT
### INJUNCTION, AND OTHER ANCILLARY RELIEF AGAINST
### DEFENDANT LAKE SHORE ASSET MANAGEMENT LIMITED

The CFTC's motion for entry of default judgment, a permanent injunction, and other ancillary relief directed at Lake Shore Asset Management Limited ("LSAM") is before the court. The court previously entered a partial default judgment as to Lake Shore Limited. *See* Docket Nos. 577 & 578. For the following reason, the CFTC's motion is granted.

## I.    Background

On June 26, 2007, the CFTC filed a one-count complaint directed at LSAM. The CFTC alleged that LSAM was a registered commodity trading advisor ("CTA") and commodity pool operator ("CPO") and had improperly refused to make its books and records available for inspection or to provide information about its commodity pool participants and trading activity as required by the Commodity Exchange Act, as amended (the "Act"). On June 27, 2007, this court entered an ex parte statutory restraining order against LSAM which, among other things, froze LSAM's assets and granted the CFTC immediate access to all of LSAM's books and records. See Docket No. 12.

On August 8, 2007, the CFTC filed a first amended complaint alleging that LSAM was part of a common enterprise ("LS Common Enterprise"), which included the Lake Shore Group of Companies, Inc. Ltd. ("Lake Shore Group") and was controlled by Philip Baker. In addition to alleging that the defendants violated the recordkeeping and inspection provisions of the Act, the first amended complaint further alleged that LSAM, the Lake Shore Group and Baker violated the Act's anti-fraud provisions by defrauding commodity pool participants by misrepresenting the performance of the pools LSAM operated and issuing false account statements. Docket No. 84.

Shortly after it filed its amended complaint, the CFTC filed a motion for a preliminary injunction. On August 28, 2007, after conducting a three-day hearing, this court entered an 86-page order granting the motion in part and denying it in part. The court found that LSAM, the Lake Shore Group and Lake Shore Asset Management Inc. (LSAM's predecessor company), and the other Lake Shore entities controlled by Philip Baker operated as a common enterprise and were essentially all the same, explaining that "this case is the poster child for the transaction of business through a maze of interrelated companies" because "all of the evidence presented to the court indicates that all of the Lake Shore companies … were under common control and did not operate at arm's-length." Docket No. 118, at 46.

Next, the court made extensive findings regarding LSAM's control of pool assets (held in the name of Lake Shore Alternative Financial Asset Ltd., Lake Shore Alternative Financial Asset Account I Ltd., Lake Shore Alternative Financial Asset Account II Ltd., Lake Shore Alternative Financial Asset Account III Ltd., and Lake Shore Alternative Financial Asset Fund IV Limited, currently known as Geneva Corporation Funds World Limited and/or Genevacorp Funds World Ltd.). In addition, the court found that the CFTC had established a likelihood of success on its

claim that LSAM fraudulently solicited pool participants, provided false information to existing participants, and otherwise defrauded pool participants. The court also held that LSAM was bound by the Act and was required to comply with, among other things, the Act's requirements regarding recordkeeping and production. Based on the entire record, the court then found that an asset freeze was necessary to protect customer funds.

LSAM moved to stay the preliminary injunction order pending the disposition of its appeal from that order. On September 7, 2007, the United States Court of Appeals for the Seventh Circuit denied LSAM's motion for a stay pending appeal. On October 4, 2007, this court entered a 42-page order that, among other things, detailed LSAM's efforts to avoid complying with the Act, its discovery obligations, and the preliminary injunction order. Docket No. 192. The court then appointed Robb Evans & Associates as Receiver and entered an order outlining the duties and powers of the Receiver. Docket No. 194.

From October of 2007 to January of 2008, the court entered numerous orders relating to LSAM's failure to comply with its orders, found that LSAM was in civil contempt of court, and referred this case to the United States Attorney for investigation and possible prosecution of criminal contempt charges against LSAM and Baker personally. Docket Nos. 191, 299, 322, 347, 363 & 402.

On December 28, 2007, the Seventh Circuit issued an opinion affirming the preliminary injunction as to LSAM. *Lake Shore Asset Management Limited v. Commodity Futures Trading Commission*, 511 F.3d 762 (7th Cir. 2007). The Seventh Circuit left the asset freeze in place and rejected LSAM's claim that the CFTC was improperly trying to regulate acts outside the United States and control assets held in foreign countries that had been invested by individuals and entities outside the United States. The Seventh Circuit then found that the preliminary injunction

bound all other members of the corporate group under Rule 65(d) to the extent that they were acting in concert with LSAM. The Seventh Circuit also held, however, that this court could not directly enjoin the entities that make up the Lake Shore common enterprise unless they were first named as defendants, served with process and given an opportunity to defend. *Id*. at 766-67.

Once the mandate issued, on January 16, 2008, the court amended the preliminary injunction order to only directly bind LSAM. Docket No. 390. On February 19, 2008, the CFTC filed a second amended complaint seeking injunctive and other equitable relief against several additional entities and commodity pools controlled by Baker, including entities found in various foreign jurisdictions, because the additional entities and commodity pools, LSAM, Lake Shore Group and Baker, acting in concert with each other as a common enterprise, were violating the anti-fraud provisions of the Act. The allegations in the second amended complaint were consistent with the extensive evidence about LSAM's pools that was presented at the previous preliminary injunction hearing.

Since its appointment, the Receiver has made numerous demands on various Lake Shore entities and the London futures commission merchants ("FCMs") requesting turnover of the frozen Lake Shore funds held by the London FCMs, and pursued litigation in London to secure the funds so they can be distributed to the investors, who are the rightful owners of these monies. Entities controlled by Baker opposed these efforts, despite the fact that the investors' money indisputably belongs to the investors. The London litigation was resolved on March 27, 2009, with the entry of a consent order issued by the High Court of Justice, Queen's Bench Division, London, England. In that order, the High Court recognized the amended receivership order entered by this court on April 24, 2008, and held that the Receiver shall have such powers and authority within England and Wales as if it had been appointed a receiver by the High Court of

England and Wales. Moreover, the consent order awarded the Receiver virtually all of the funds deposited at the London FCMs (approximately $75.4 million, plus accrued interest). The only monies not awarded to the Receiver were approximately $103,000, which were paid to solicitors for the Baker-controlled entities.

The Receiver also participated in bankruptcy proceedings relating to Sentinel Management Group, an Illinois FCM that was the cash manager and the sub-custodian for the Lake Shore funds, as LSAM is one of Sentinel's largest creditors. *See In re Sentinel Management Group*, No. 07-14987 (Bankr. N.D. Ill). Both the Receiver and Baker-controlled entities filed competing proofs of claim in the Sentinel bankruptcy, and on July 21, 2008, the bankruptcy court disallowed and expunged the proofs of claims filed by the Baker-controlled entities.

On December 19, 2008, Frederick Grede, as liquidation trustee, made an interim distribution to the holders of allowed claims pursuant to the provisions of the confirmed fourth amended plan of liquidation. The Receiver received a total of over $34 million under the initial distribution on December 19, 2008. Docket No. 620.

On April 24, 2008, the court granted the CFTC's motion for entry of a default judgment and entered a permanent injunction order against the newly added defendants. Docket No. 552. It also entered an amended receivership order to address developments in this action. Docket No. 554. On June 10, 2008, the court granted the CFTC's request to sanction LSAM based on LSAM's long history of flouting the court's orders and its disregard of its obligations under the Federal Rules of Civil Procedure, and entered a partial default judgment as to LSAM. Docket No. 578. On September 17, 2008, this court entered a default judgment and permanent

injunction order against Baker, which permanently enjoined him from further fraudulent conduct and from trading commodity futures. Docket No. 597.

On January 30, 2009, this court entered an order authorizing a claims verification procedure. Docket No. 631.

## II.     Service of Process

Service was effected upon LSAM by delivering a copy of the summons and complaint to Laurence Mehl Rosenberg, LSAM's Director, on June 28, 2007, at LSAM's Chicago office, 875 North Michigan Avenue, Suite 1562, Chicago, Illinois 60611. Docket No. 16. LSAM was properly served, therefore, pursuant to Federal Rule Civil Procedure 4(h).

## III.    Personal Jurisdiction over LSAM

As this court has previously determined in its order granting the preliminary injunction (Docket No. 118), LSAM was a registered CTA and CPO and its promotional materials repeatedly represented that it was doing business as a CFTC registrant and NFA member, with an office located in Chicago, Illinois. Docket No. 118, at 48. Moreover, LSAM traded commodity futures contracts on United States exchanges and kept the bulk of the customer funds at Sentinel. Docket No. 118, at 49.

The Seventh Circuit has held that subject matter jurisdiction over international disputes concerning commodity futures transactions exists if either the "conduct" or "effects" tests are met. *Tamari v. Bache & Co. (Lebanon) S.A.L.*, 730 F.2d 1103, 1108 (7th Cir. 1984); *Pyrenee, Ltd. v. Wocom Commodities, Ltd.*, 984 F.Supp. 1148, 1155 (N.D. Ill. 1997) (collecting cases holding that the tests are alternative).

-6-

The conduct test focuses on conduct within the United States that relates to the alleged fraud and authorizes jurisdiction when that conduct is "material to the successful completion of the alleged scheme." *Tamari*, 730 F.2d at 1108. To establish jurisdiction under the conduct test, a plaintiff must point to some United States activity by the defendant. *Mak v. Wocom Commodities Ltd.,* 112 F.3d 287, 289 (7th Cir. 1997) ("the transmission of commodity futures orders to the United States from foreign parties is an essential step in the consummation of any scheme to defraud through futures trading on the United States exchanges"); *Tamari*, 730 F.2d at 1108 (holding that subject matter jurisdiction was proper because the dispute involved commodity transactions that were executed on United States exchanges). In turn, the effects test considers whether foreign activities have "caused foreseeable and substantial harm to interests in the United States[,]" including the protection of the integrity of domestic markets from the harm of improper foreign transactions. *Tamari*, 730 F.2d at 1108.

The evidence presented to this court conclusively establishes that LSAM traded on United States exchanges, including the Chicago Mercantile Exchange, the Chicago Board of Trade, and the New York Mercantile Exchange, and used those exchanges to facilitate a fraud. Moreover, LSAM is a registered CTA and CPO and acted as such in connection with the commodity pools it operated. In addition, LSAM maintained an office in Chicago, Illinois, and its management, administrative and operations personnel were located in Chicago. Docket No. 118, at 6. LSAM's promotional literature also touted its registration status with the CFTC.

The CFTC has jurisdiction to address the conduct of its own registrants. *See* 7 U.S.C. § 2 (a)(1)(A); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 360-67 (1982) (discussing the history of the Act and noting that it grants broad powers to the CFTC to enforce the Act); *Lake Shore Asset Management Limited v. CFTC*, 511 F.3d 762 at 765-66 (finding that

because Lake Shore registered with the CFTC and NFA and traded on United States exchanges, it must abide by federal law). Based on all of these factors, jurisdiction over LSAM is proper under both the conduct and effects tests.

## IV. Findings of Fact and Conclusions of Law

### A. Findings of Fact

1. This court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, which authorizes the CFTC to seek injunctive relief against any person whenever it shall appear to the CFTC that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation or order thereunder.

2. Venue properly lies with this court pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1(e), in that LSAM, operating as part of the LS Common Enterprise, transacted business in this district, and the acts and practices in violation of the Act have occurred, are occurring, or are about to occur within this district.

3. Service was properly effected upon LSAM by delivering a copy of the summons and complaint to Laurence Mehl Rosenberg, LSAM's Director, on June 28, 2007, at LSAM's Chicago office, 875 North Michigan Avenue, Suite 1562, Chicago, Illinois 60611.

4. LSAM has willfully and deliberately failed to comply with numerous orders entered by the court and to comply with the discovery process. Accordingly, this court struck defendant LSAM's amended answer to the second amended complaint and entered a partial default judgment against LSAM. Docket No. 578. This court now enters a permanent injunction against LSAM.

5.    The allegations of the CFTC's second amended complaint are well-pleaded and hereby taken as true.  This order is supported by the following facts.

*Plaintiff*

6.    Plaintiff Commodity Futures Trading Commission is an independent federal regulatory agency that is charged with administering and enforcing the Act, 7 U.S.C. §§ 1 et seq. (2006), and the Commission Regulations promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq*. (2008).

*Defendant Lake Shore Asset Management Limited*

7.    Lake Shore Asset Management Limited had an office at 875 N. Michigan Ave., Suite 1562, Chicago, Illinois 60611-7449.  LSAM was incorporated in Bermuda in September 2006.  Baker is LSAM's president and managing director.  LSAM was registered with the CFTC as both a CPO and a CTA beginning in January of 2007 pursuant to Section 4m of the Act, 7 U.S.C. §6m (2006), and held itself out as a CFTC registrant.  LSAM was also a member of the National Futures Association ("NFA").  LSAM is the reorganization and continuation of Lake Shore Asset Management Inc. ("LSAM Inc.").

*LS Common Enterprise Defendants*

8.    The LS Common Enterprise, which is controlled by Baker, is composed of: LSAM; the Lake Shore Group; Lake Shore Alternative Financial Asset Account Ltd. a/k/a Lake Shore Alternative Financial Asset Ltd. ("LS Acct" or "LS Asset"); Lake Shore Alternative Financial Asset Account 1 Ltd.; ("LS Acct 1"); Lake Shore Alternative Financial Asset Account II Ltd.; ("LS Acct 2"); Lake Shore Alternative Financial Asset Account III Ltd. ("LS Acct 3"); Lake Shore Alternative Financial Asset Fund Ltd. ("LS Fund 1"); Lake Shore Alternative Financial Asset Fund II Ltd. ("LS Fund 2"); Lake Shore Alternative Financial Asset Fund III

Ltd. ("LS Fund 3"); Lake Shore Alternative Financial Asset Fund IV Ltd., currently known as Geneva Corporation Funds World Ltd. ("LS Fund 4"); Lake Shore Alternative Financial Asset Fund IV US, LLC ("LS Fund 4 –US"); Lake Shore Alternative Financial Asset Yen Fund 1 ("Yen Fund 1"); Lake Shore Alternative Financial Asset Yen Fund Limited Class II ("Yen Fund 2"); Lake Shore Alternative Financial Asset Yen Fund Limited Class III ("Yen Fund 3"); Hanford; (collectively "LS Common Enterprise"). All of the entities that make up the LS Common Enterprise were under the control of Baker, were inextricably interrelated to each other, and did not operate at arm's length.

9.      Offering memoranda for the LS Common Enterprise's commodity pools showed LSAM Inc. and LSAM at various times as their investment manager; Roth Mosey & Partners as their administrator; and KPMG as their auditor. Moreover, all of the commodity pools used the same NFA identification number. All of the LS Common Enterprise's Funds reported their purported performance on the same website. All of the commodity pools used fact sheets on Lake Shore Group letterhead to promote the pools. LS Common Enterprise promotional materials refer to Lake Shore, the Lake Shore Group, LSAM Inc., and LSAM interchangeably. The fact sheets for each of the pools stated that the pools are managed by LSAM, a CTA and CPO registered with the CFTC. All of the commodity pools were marketed by the same sales representatives.

10.     Finally, and consistent with the Receiver's more recent analysis of the Lake Shore funds, pool participant funds were commingled.

*Background*

11.     All of the corporations and entities identified above operated in concert with each other as a common enterprise, and were controlled by Baker.

12.     Beginning in January of 2002 at the latest, LSAM, Baker, and the other LS Common Enterprise defendants fraudulently solicited and accepted or caused to be accepted at least $300 million from at least 700 individuals and entities worldwide for the purpose of, among other things, trading commodity futures contracts in several commodity pools.

13.     During the relevant period, LSAM, operating as part of the LS Common Enterprise, through its employees, agents and officers including Baker, refused to, upon request of the CFTC, to make available for inspection its books and records or the books and records of its predecessor corporation LSAM Inc., including records that would show the actual performance of the commodity pools, and refused to furnish the name and address of each client, subscriber or participant, and submit samples or copies of all reports, letters, circulars, memorandums, publications, writings, or other literature or advice distributed to clients, subscribers, or participants, or prospective clients, subscribers or participants to the CFTC upon its request.

14.     The LS Common Enterprise operated at least twelve commodity pools; eight of these commodity pools acted as feeder pools that fed into the remaining four commodity pools. The eight feeder pools were Yen Fund 1, Yen Fund 2 and Yen Fund 3 (collectively the "Yen Funds"), LS Fund 1, LS Fund 2, LS Fund 3, Lake Shore Alternative Financial Asset Fund IV Limited –Class E ("LS Fund 4-E") and LS Fund 4-US.  These eight pools fed into the following four pools: LS-Acct, LS Acct-1, LS Acct-2, and LS Fund 4.  These twelve pools will be referred to collectively as the "Pools."

*LS Common Enterprise's Operation*

15.     During the relevant period, Baker and the LS Common Enterprise fraudulently solicited and accepted funds to invest in the Pools for trading in, among other things, exchange

traded futures contracts on equity indices, United States Treasury Notes and currencies traded on United States exchanges. At least some of the contracts given to prospective pool participants stated that they would be governed by Illinois law, the Commodities Exchange Act, and any other federal laws applicable in Illinois, and provided that they could only be modified in writing.

16.     All of the Lake Shore entities were under common control and did not operate at arm's-length. The Lake Shore entities operated as a common enterprise in which the entities were inextricably interrelated to each other. Lake Shore's promotional materials, private placement memos and organizational charts demonstrate that the pools and funds were not operated as separate and distinct entities, but instead, were controlled by Baker and the same individuals who operated and managed them under the umbrella of the Lake Shore Group.

17.     Baker controlled all the Lake Shore entities, pools and funds. Baker is: 1) the Managing Director, Principal and President of LSAM; 2) the co-founder and managing partner of the Lake Shore Group and Lake Shore Institutional and Dealer relations; 3) the contact person for LSAM listed on its Due Diligence; 4) the Managing Partner of LSAM Inc.; 5) the Managing Partner of Hanford; and 6) the person with primary responsibility for managing LSAM and the Lake Shore Group's overall international business development, operations, sales and marketing.

18.     The evidence (including forensic accounting performed by the Receiver appointed by this court) shows that the LS Common Enterprise misappropriated customer funds. Approximately $10.2 million earned as income on accounts in the name of several of the Pools was paid to an account owned by Hanford, a Baker controlled entity. Similarly, from May 11, 2007 to June 20, 2007, approximately $1.1 million was wired from the Sentinel Management Group, Inc. accounts to Anglo International Associates Ltd. for the payment of

LSAM's administrative expenses, even though the offering memoranda stated that "[t]he

Investment Manager renders the services set forth in the Investment Management Agreement at

its own expense, including fees to the Investment Advisor, the salaries of employees necessary

to render such services, all general overhead expenses attributable to its offices and employees

and other expenses incident to the rendering of such services."

19.     Sentinel account documents show that as early as June 2001, Baker, along with

others, was authorized to transfer funds among all Lake Shore accounts at Sentinel during the

relevant time.

20.     The Pool accounts and funds were traded at Man Financial Limited, now known

as MF Global, London, England, Lehman Brothers International Europe in London, England ,

and Fimat International Banque SA UK Branch, London, England, now known as Newedge

Group-UK Group.  The Pools also had accounts with Sentinel, which was the sub-custodian of

the funds (Bank of New York was the custodian).

*LS Common Enterprise's Solicitations*

21.     The LS Common Enterprise, under Baker's direction, solicited prospective

participants to invest in the Pools in various ways including, but not limited to, a web of sales

representatives throughout the world, and at least one website, www.lakeshorefunds.com.  The

LS Common Enterprise provided to potential participants, among other things, a form entitled

"Qualitative Firm Evaluation and Due Diligence," confidential explanatory memoranda and a

subscription agreement for the various pools.  The explanatory memoranda for several pools

were also available on the LS Common Enterprise's website.

22.     Each pool's explanatory memoranda represented that LSAM was the investment

manager and investment advisor of the funds and touted LSAM's registration as a CTA and

CPO, and as a member of the NFA. Earlier versions represented that LSAM Inc. was the investment manager and investment advisor of the funds and touted LSAM Inc.'s registration as a CTA.

*Baker and the LS Common Enterprise Defendants Misrepresented the Performance of the Pools*

23.     When soliciting prospective sales representatives, Baker misrepresented the performance of Lake Shore's funds in order to persuade them to represent the Lake Shore funds. While Baker told prospective sales representatives that Lake Shore's Funds were very profitable during the relevant period, the LS Common Enterprise accounts at Man, Lehmann, and Fimat, in the aggregate, lost more than $35 million during that period.

24.     Baker and the Lake Shore Common Enterprise misrepresented the profits and losses incurred by the Pools and provided pool participants and prospective pool participants with false performance tables that misrepresented the Pools' respective and collective track records.

25.     Performance tables for LS Fund 1, which were provided to pool participants through the LS Common Enterprise Defendants' website, represented the following as the total annual returns:

| | |
|---|---|
| for 2003 | 22.48% |
| for 2004 | 29.81% |
| for 2005 | 18.95% |
| for 2006 | 5.73% |
| for 2007 | 2.82%. (January 2007 to March 2007) |

These performance results were false. The only trading accounts open during 2003 and 2004 were at Man and were unprofitable in those calendar years. Instead of being profitable between January 2003 and May 2007, the LS Asset account at Man lost at least $22 million.

-14-

26.     The performance table dated December 31, 2006 for LS Fund 4 showed returns as follows:

| | |
|---|---|
| for 2002 | 55.50% |
| for 2003 | 37.02% |
| for 2004 | 33.80% |
| for 2005 | 40.30% |
| for 2006 | 21.40%. |

This performance table consists of an average of the returns of Funds 1 through 4. In computing the average of returns, LS Common Enterprise used hypothetical results for LS Fund 1 showing a 55.50% profit for 2002, when the actual trading for 2002 resulted in a loss of $1.4 million.

27.     The LS Common Enterprise admitted in its due diligence publications that its largest drawdown was in July 2002 when it experienced a "– 48.56% drawdown." However, in preparing the performance table included in printed materials and on the Lake Shore website, as described above, Lake Shore used simulated performance results for 2002 to show profits instead of the actual unprofitable performance. In fact, in the performance table for the month of July 2002, the LS Common Enterprise represented the monthly return to be +7.62% and omitted the material fact that it had actual losses of 47% during one month.

28.     During 2006 and 2007, the LS Common Enterprise reported to its pool participants that LS Fund 4 had profited by 21.40% and 8.58%, respectively. These purported performance results were false because the trading accounts at Lehman for accounts entitled LS Fund 4 from October 2006 through June 2007 had trading losses totaling about $4.4 million. Also, the trading accounts at Fimat for accounts entitled LS Fund 4, were first funded in May 2007 and lost approximately $260,000 during May 2007. There were no trading accounts for LS Fund 4 at Man.

-15-

29.     The performance tables that the LS Common Enterprise published on its website for its prospective and actual pool participants were false because they showed profits when, in fact, the LS Common Enterprise commodity futures trading accounts at Man, Lehman and Fimat indicate that the accounts had experienced significant losses trading commodity futures. From February of 2002 through June of 2007, the LS Common Enterprise accounts at Man, Lehman and Fimat, in the aggregate, lost more than $35 million.

*Baker and the LS Common Enterprise Defendants Issued False Statements to Investors*

30.     Each week, on its password protected portion of its website, the LS Common Enterprise posted the account value for each of its pool participants. Participants in the Pools could access this information to determine how their investment was performing. The reported account values were consistent with the false statements made in the performance tables published on the Lake Shore website. Consequently, the LS Common Enterprise distributed or caused to be distributed false account statements to pool participants because the statements showed that they were earning substantial profits when the trading accounts in the names of the pools lost approximately $35 million overall.

31.     Roth Mosey, the accounting firm retained by Baker that prepared investors' account statements, computed the net asset value of Lake Shore's Pools and participant's individual shares in the Pools by using valuations provided by Baker, instead of obtaining the Pools' account statements directly from the three FCMs and computing net asset value from the FCMs' account statements. By this arrangement, Baker was able to cause account statements to be distributed to investors showing substantial profits, when the trading accounts in the names of the pools lost over $35 million overall.

32.     Prior to March 2007, the LS Common Enterprise also issued false statements to some of its clients that were transmitted in hard copy.  These statements were also false.

*LS Common Enterprise Defendants Misrepresented the Amount of Funds Under Management*

33.     The LS Common Enterprise's claim that it managed over $1 billion in assets was also false.  LS Common Enterprise defendants represented on their website as recently as June 11, 2007, that the Pools contained $293.5 million in participants' funds and that the Lake Shore Group had $1.05 billion in assets under management.  In fact, as of June 27, 2007, the total Pool funds at Man, Lehman, Fimat and Sentinel were approximately $230 million. Although the LS Common Enterprise claimed that the shortfall is accounted for by the undisclosed amount of investor funds on deposit in separately managed accounts ("SMAs), the evidence shows that the SMA funds were in fact deposited in the Pools.

34.     The amount of funds under management was a material fact considered by several of the participants, who would not have invested in the Lake Shore Funds if they had known the true amount of funds being managed by the LS Common Enterprise at the time of their initial investment.

*Misappropriation of Investor Funds – Incentive Fees*

35.     The LS Common Enterprise told its investors that it would be compensated through an incentive fee of 25% of the net new appreciation for each fund.  Lake Shore promotional materials specifically stated that, "[n]o performance Fee will be payable until prior losses are recouped."  Thus, incentive fees were only payable when the funds were profitable.

36.     The statements that the LS Common Enterprise issued to one of its Customers ("Customer A") illustrate the kind of misappropriation that occurred via incentive fees.  The court has reviewed Lake Shore Group statements sent to Customer A.  Customer A had accounts

in LS Fund 4 and LS Fund 3. In May 2007, LS Fund 4's trading accounts at Fimat and Lehman lost money, but Customer A's May 2007 statement reports profits and shows that the account was charged an incentive fee.

37.     Customer A's statements for his investment in LS Fund 3 show that he was improperly charged an incentive fee in April and June 2007. According to the Receiver's Report, LS Fund 3 invested in LS Acct 2. Consequently, the profits and losses in LS Fund 3 would reflect the trading in LS Acct 2. Customer A's account statement for LS Fund 3 reported profits in April 2007 and represented that the Fund had reached a new account value high. Thus, Lake Shore deducted an incentive fee from the customer's account. However, the LS Acct 2 trading account lost more than $1.7 million in March 2007 and the $173,000 profit in April was not sufficient to cover the March losses. Hence, no incentive fee was due. This was not an isolated incident. In June 2007, Customer A's account was again charged an incentive fee, even though in May 2007, the LS Acct 2 trading account lost $3.4 million; consequently the June profits of $1.8 million were not sufficient to recoup the losses. Again, no incentive fee was due. All customer money paid to the LS Common Enterprise Defendants as incentive fees in excess of the amounts authorized by the clients were misappropriated.

## Unauthorized Transfers to Hanford

38.     Hanford, a company controlled by Baker, received all of the income generated by the Lake Shore accounts at Sentinel — approximately $10.2 million. In the Pool Offering Memoranda, the LS Common Enterprise represented that LS Acct, LS Acct 1 and LS Acct 2 "will not pay the Fund any interest on cash balances or funds held by the Custodian." The Custodian is defined as Bank of New York. This disclosure says that the investors will not receive any bank interest on their funds. It does not say that they will not receive the income

earned through trading by the sub-custodian Sentinel Management Group, nor does it authorize Lake Shore to pay all of the trading profits earned at Sentinel to an undisclosed Baker-owned entity.

39.     The Lake Shore pool participants did not authorize the transfers of the income at Sentinel to Hanford.  Therefore, the Defendants, operating as the LS Common Enterprise, misappropriated approximately $10.2 million of customer funds by transferring them to Hanford.

*Unauthorized Transfers to Anglo-International*

40.     The Pools' offering memoranda state "The Investment Manager renders the services set forth in the Investment Management Agreement at its own expense, including fees to the Investment Advisor, the salaries of employees necessary to render such services, all general overhead expenses attributable to its offices and employees and other expenses incident to the rendering of such services."

41.     Between May 11, 2007 and June 20, 2007, the LS Common Enterprise transferred $1.1 million from the Pool accounts at Sentinel to Anglo for administrative expenses.  These transfers were in direct contradiction to the disclosures contained in the offering memorandum. Therefore, these funds were misappropriated.

*The Common Enterprises' Separate Managed Accounts*

42.     The LS Common Enterprise's sales representative for the Colombian region was Jose Fernando Hurtado.  All but four of his clients invested in SMAs.  The contract that Hurtado and his clients signed with LSAM Inc. stated that LSAM Inc., headquartered in Chicago, was registered with the CFTC and is a member of the NFA.  The contract also specified that the custody of client's assets would be held by Sentinel, a qualified brokerage firm in the United States, and that all account statements would be made by Lake Shore Alternative Financial Asset

Limited. Additionally, the contract states that it is to be governed according to the laws of Illinois, including the United States Commodity Exchange Act and that the contract may only be changed by written modification.

43.     As noted above, the evidence shows that the SMA funds were in fact deposited in the Pools.

*Lake Shore Funds I through IV Become the Geneva Corporation*

44.     After CFTC filed its complaint against Lake Shore, Hurtado had two telephone conversations with Baker. In the first phone conversation, on the morning of July 5, 2007, Baker told Hurtado that the CFTC lawsuit was the result of a mistake by a former lawyer and that Lake Shore was hiring a new lawyer to correct the problem. Baker also told Hurtado that he had a "Day After Plan," which was the movement of Lake Shore's business from the United States to Europe.

45.     Baker related that Lake Shore would have a new fund administrator located in Switzerland to replace Roth Mosey in Canada. Baker also told Hurtado that Lake Shore had $1 billion under management — $250 million in SMAs and funds and $750 million in direct managed accounts ("DMAs"). Baker explained that the new DMAs would be in the name of each client and that LSAM would have trading authorization and manage the account.

46.     Hurtado's second phone conversation with Baker was on August 3, 2007. During that conversation, Baker told Hurtado he was happy because the appellate court ruled that the funds could be moved and he could implement the Day After Plan. Baker also explained to Hurtado that the new company would be called Geneva Corp. and would replace Lake Shore's Funds I through IV. Geneva Corp. appears to be the successor of Lake Shore Funds 1 through 4.

**B.      Conclusions of Law**

47.      From at least 2002 to the present, LSAM, operating as a common enterprise, by and through its employees and officers, cheated or defrauded or attempted to cheat or defraud and willfully deceived or attempted to deceive pool participants by misrepresenting the profits and losses of the Pools, failing to disclose trading losses and other material facts relating to the Pools, and misappropriating pool participant funds in violation of Sections 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. § 6b(a)(2)(i) and (iii) (2006),with respect to acts occurring before June 18, 2008, and for violating Sections 4b(a)(1)(A) and (C) of the Act as amended by the Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, Title XIII (the Commission Reauthorization Act ("CRA")), § 13102, 122 Stat. 1651, to be codified at 7 U.S.C. §§ 6b(a)(1)(A) and (C), with respect to acts occurring on or after June 18, 2008.

48.      LSAM, operating as a common enterprise, by and through its employees and officers, also willfully made or caused to be made false reports to the pool participants who invested money with the defendants to trade commodity futures contracts in violation of Section 4b(a)(2)(ii) of the Act, 7 U.S.C. §6b(a)(2)(ii) (2006),with respect to acts occurring before June 18, 2008, and violated Sections 4b(a)(1)(B) of the Act as amended by the CRA, to be codified at 7 U.S.C. § 6b(a)(1)(B), with respect to acts occurring on or after June 18, 2008.

49.      Since at least 2002, LSAM and the Lake Shore Group, by and through their employees and officers, acted as a CPO in that they engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise and in connection therewith, solicited, accepted or received funds, securities or property from others for the purpose of trading in any commodity for future delivery on or subject to the rules of any contract market or derivatives transaction execution facility.

50.     During the relevant period, LSAM and the Lake Shore Group by and through their employees and officers, while acting as a CPO, violated Section 4*o*(1)(A) and (B) of the Act, 7 U.S.C § 6*o*(1)(A) and (B) (2006), in that they directly or indirectly employed or are employing a device, scheme, or artifice to defraud pool participants or prospective pool participants, or engaged or are engaging in transactions, practices or a course of business that operated as fraud or deceit upon pool participants or prospective pool participants by means of the acts and practices described in the above paragraphs.

51.     In connection with such conduct, LSAM and the Lake Shore Group used or are using the mails or other means or instrumentalities of interstate commerce, directly or indirectly, to engage in business as a CPO.

52.     Since at least 2002, LSAM, while acting as a CTA, violated Section 4*o*(1)(A) and (B) of the Act, 7 U.S.C § 6*o*(1)(A) and (B) (2006), by using the mails or other means or instrumentalities of interstate commerce directly or indirectly to employ any device, scheme, or artifice to defraud pool participants or prospective pool participants, or engaged or are engaging in transactions, practices or a course of business that operated as fraud or deceit upon pool participants or prospective pool participants.

53.     During the relevant period, LSAM violated Section 4n of the Act, 7 U.S.C. §§ 6n (2006), and Commission Regulations 1.31, 4.23, and 4.33, 17 C.F.R. §§ 1.31, 4.23, and 4.33 (2008) by:  refusing to, upon request of the CFTC, make available for inspection its books and records or the books and records of its predecessor corporation LSAM Inc., including records that would show the actual performance of the Pools, and by refusing to furnish the name and address of each client, subscriber or participant, and submit samples or copies of all reports, letters, circulars, memoranda, publications, writings, or other literature or advice distributed to

clients, subscribers, or participants, or prospective clients, subscribers or participants to the CFTC upon its request.

*Need for Permanent Injunction and Other Ancillary Equitable Relief*

54.     The CFTC has established that LSAM, operating as a common enterprise, has engaged, is engaging, and is about to engage in acts and practices in violation of the Act and Commission Regulations.  The totality of the circumstances establish that, unless restrained and enjoined by this court, there is a reasonable likelihood that LSAM will continue to engage in the acts and practices alleged in the Second Amended Complaint and in similar acts and practices in violation of the Act.

55.     Because the issues of necessary equitable relief regarding appropriate restitution for defrauded pool participants, disgorgement and a civil monetary penalty for LSAM and the LS Common Enterprise Defendants are still unresolved, the court reserves those issues for further proceedings.

**V.     Order of Permanent Injunction**

IT IS HEREBY ORDERED that LSAM, its officers, agents, servants, employees, attorneys and all other persons who are in active concert with it are permanently restrained, enjoined and prohibited from directly or indirectly:

1.     Cheating or defrauding or attempting to cheat or defraud other persons and willfully deceiving or attempting to deceive other persons by making false, deceptive or misleading representations of material facts, by failing to disclose materials facts, or by misappropriating customer funds in or in connection with orders to make, or the making of, contracts of sale of commodities for future delivery, made or to be made for or on behalf of any other person, in violation of Sections 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. §6b(a)(2)(i) and

(iii) (2006), with respect to acts occurring before June 18, 2008, and for violating Sections 4b(a)(1)(A) and (C) of the Act as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(A) and (C), with respect to acts occurring on or after June 18, 2008;

2.       Willfully making false reports or statements or causing false reports or statements to be made to other persons, in or in connection with orders to make, or the making of, contracts of sale of commodities for future delivery, made or to be made for or on behalf of any other person, in violations of Section 4b(a)(2)(ii) of the Act, 7 U.S.C. §6b(a)(2)(ii) (2006), with respect to acts occurring before June 18, 2008, and violated Sections 4b(a)(1)(B) of the Act as amended by the CRA, to be codified at 7 U.S.C. § 6b(a)(1)(B), with respect to acts occurring on or after June 18, 2008;

3.       While acting as a CPO and a CTA, using the mails or any means or instrumentality of interstate commerce, directly or indirectly to employ any device, scheme or artifice to defraud any perspective or actual pool participant or to engage in any transaction, practice or course of business which operates as a fraud or deceit upon any prospective or actual pool participant by making false, deceptive or misleading statements of material facts, by failing to disclose material facts, or by misappropriating customer funds, in violation of Section 4o(1)(A) and (B) of the Act, 7 U.S.C. §6o(1)(A) and (B) (2006);

4.       Refusing, upon request of the CFTC, to make available for inspection CPO or CTA books and records, and the names and addresses of each client, subscriber or participant, and samples or copies of all reports, letters, circulars, memorandums, publications, writings, or other literature or advice distributed to clients, subscribers, or participants, or prospective clients, subscribers or participants.

-24-

IT IS FURTHER ORDERED that LSAM, is permanently enjoined from engaging, directly or indirectly, in any activity related to trading in any commodity interest, as that term is defined in Section 1a(4) of the Act, 7 U.S.C. § 1a(4), including but not limited to, the following:

1. trading on or subject to the rules of any registered entity, at that term is defined in Section 1a(29) of the Act, 7 U.S.C. § 1a(29);

2. engaging in, controlling or directing the trading for any commodity interest account for or on behalf of any other person or entity, whether by power of attorney or otherwise;

3. soliciting or accepting any funds from any person in connection with the purchase or sale of any commodity interest;

4. giving advice or price quotations of other information in connection with the purchase or sale of commodity futures and options contracts for themselves and others;

5. entering into any commodity interest transactions for their own personal account, for any account in which they have a direct or indirect interest and/or having any commodity interests traded on their behalf; and

6. applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9), or acting as a principal, agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the CFTC, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2008);

7. engaging in any business activities related to commodity interest trading.

IT IS FURTHER ORDERED THAT LSAM its officers, agents, servants, employees, attorneys and all other persons who are in active concert with it are permanently enjoined from directly or indirectly destroying, mutilating, concealing, altering, or disposing of any of the books, records, documents, correspondence, brochures, manuals, electronically stored data, tape recordings, or other property of the LS Common Enterprise, wherever such materials may be

-25-

situated, that refer or relate in any manner to any transaction or matter described in the second amended complaint;

IT IS FURTHER ORDERED that LSAM, its officers, agents, servants, employees, attorneys and all other persons who are in active concert with it shall grant the Receiver and the CFTC or their representatives immediate access to all books, records and other documents of the LS Common Enterprise Defendants, wherever such materials may be situated, for purposes of inspecting and copying such materials;

IT IS FURTHER ORDERED that the funds originally on deposit at the London FCMs, which have been awarded to the Receiver by the High Court of London, England, are to be held by the Receiver for the benefit of the Lake Shore clients to be distributed to the clients through the Receivership estate pursuant to further orders of this court. The funds on deposit at Sentinel Management Group are also customer funds. As soon as possible given Sentinel's bankruptcy case, any remaining Lake Shore funds held by Sentinel shall be transferred to the Receiver for the benefit of the Lake Shore clients to be distributed to them through the receivership estate pursuant to further orders of this court;

IT IS FURTHER ORDERED that LSAM and any successors thereof, and all persons insofar as they are acting in the capacity of its agents, servants, successors, employees, assigns, and attorneys, and all persons insofar as they are acting in active concert or participation with LSAM, who receive actual notice of such order by personal service or otherwise, are restrained from directly or indirectly, withdrawing, transferring, removing, dissipating, concealing, or disposing of, in any manner, any funds, or other property, wherever situated, including but not limited to, all funds, personal property, money or securities held in safes, safety deposit boxes,

and all funds on deposit in any financial institution, bank or savings and loan account held by, under the control of, or in the name of LSAM;

IT IS FURTHER ORDERED that LSAM immediately repatriate and transfer to the Receivership estate all funds, documents and assets outside of the United States;

IT IS FURTHER ORDERED that because the issues of necessary equitable relief regarding appropriate restitution for defrauded pool participants, disgorgement and a civil monetary penalty for LSAM is still unresolved, they are reserved for further proceedings before this court.

## VI.    Conclusion

For the reasons above, and as described in this order, the CFTC's motion for entry of a default judgment and permanent injunction against LSAM [Docket No. 647] is granted.

DATE:   May 11,2009

Blanche M. Manning
Blanche M. Manning
United States District Judge