# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES COMMODITY FUTURES TRADING COMMISSION, Plaintiff, | ) ) ) ) | |
| v. | ) ) | 07 C 3598 |
| LAKE SHORE ASSET MANAGEMENT LIMITED, et al., Defendants. | ) ) ) | |

## MEMORANDUM AND ORDER

Andorra Bank Agricol Rieg. S.A. ("Andbanc") describes itself on its website as "a financial institution able to offer services tailored to the clients and on a global scale." It seeks leave to file a claim approximately eight months after its claims bar date in the amount of $7,535,939.77.[1] The receiver opposes the motion, contending that Andbanc's delay is unreasonable. For the following reasons, Andbanc's motion is denied.

## I. Background

### A. The Claims Verification Procedure

In the January 30, 2009, order outlining procedures governing the submission of claims ("claims procedure order"), the court directed the receiver to provide all investors with notice of the claim verification process, as well as the claims bar date. Specifically, the claims procedure order provides that:

> [t]o participate in the claim process investors must provide the Receiver with the information requested in the Notice within forty five (45) days of the date of the Notice. Investors who fail to provide the Receiver with this information within the

---

[1] $7,535,939.77 is the total amount it invested in the Lake Shore Funds and does not track the methodology for computing claims ordered by the court, under which Andbanc would potentially receive a percentage of $6,622,100 using the formula approved by the court.

forty five (45) day time period will be barred from participating in the distribution of the receivership unless they can demonstrate to the Court good cause for the delay, all reasonable diligence in submitting the information at the earliest possible date thereafter, and absence of any prejudice to the receivership estate.

January 30, 2009, order at ¶ 4 (Dkt. No. 631).

### B. Andbanc's Investment in the Lake Shore Funds

Andbanc is a private banking institution located in the principality of Andorra, which is between France and Spain.[2] It submitted an affidavit from Santiago Mora Torres, Andbanc's

---

[2] According to the United States Department of State website:

Andorra is the last independent survivor of the March states, a number of buffer states created by Charlemagne to keep the Muslim Moors from advancing into Christian France. Tradition holds that Charlemagne granted a charter to the Andorran people in return for their fighting the Moors. In the 800s, Charlemagne's grandson, Charles the Bald, made Count of Urgell overlord of Andorra. A descendant of the count later gave the lands to the diocese of Urgell, headed by Bishop of Seu d'Urgell.

In the 11th century, fearing military action by neighboring lords, the bishop placed himself under the protection of the Lord of Caboet, a Spanish nobleman. Later, the Count of Foix, a French noble, became heir to Lord Caboet through marriage, and a dispute arose between the French Count and the Spanish bishop over Andorra.

In 1278, the conflict was resolved by the signing of a pareage, which provided that Andorra's sovereignty be shared between the Count of Foix and the Bishop of Seu d'Urgell of Spain. The pareage, a feudal institution recognizing the principle of equality of rights shared by two rulers, gave the small state its territory and political form.

Over the years, the title was passed between French and Spanish rule until, in the reign of the French King Henry IV, an edict in 1607 established the head of the French state and the Bishop of Urgell as co-princes of Andorra . . . .

Until recently, Andorra's political system had no clear division of powers into executive, legislative, and judicial branches. A constitution was ratified and approved in 1993. The constitution establishes Andorra as a sovereign parliamentary democracy that retains as its heads of state two co-princes.

Chief Investment Officer and Deputy Managing Director. Mr. Mora is responsible for overseeing all of Andbanc's investments, has "20 years' experience at several different financial institutions and hold[s] a degree in business administration from the University of Barcelona (Spain)." Mora Dec. at ¶ 1 (Dkt. No. 730-1).

In 2006, Andbanc began to invest in Lake Shore Alternative Financial Asset Fund Limited II and Lake Shore Alternative Financial Asset Fund Limited III. It invested on its own behalf, and is not an institutional investor. It contends that it ultimately invested $7,535,939.77.

Unfortunately for Andbanc and Lake Shore's other investors around the globe, the Lake Shore funds were not on the up and up, as detailed in numerous orders issued in this civil commodities fraud case starting in August of 2007.[3] Andbanc accessed its account statements via the now defunct www.lakeshorefunds.com website, and did not receive any paper statements from any Lake Shore entity. According to Andbanc, it regularly consulted the website to check on its investment until October of 2007, when the website was shut down.

Alarmed by the sudden disappearance of the website – especially given the amount of its investment – Andbanc called Lake Shore's offices and learned that all of Lake Shore's funds had been frozen and Lake Shore and its officers were potential targets of a criminal investigation. Shortly afterwards, Andbanc alleges that a representative of the United States Commodities Futures Trading Commission ("CFTC") "contacted Andbanc's legal department with questions in connection with criminal proceedings and an investigation involving the directors of the Lake

---

http://www.state.gov/r/pa/ei/bgn/3164.htm#history (last visited Mar. 5, 2010).

[3] A subsequent criminal commodities fraud case against Philip Baker, the head of the Lake Shore enterprise, was unsealed on June 15, 2009, and is currently pending. *United States v. Baker*, No. 09 CR 175 (N.D. Ill.).

Shore Funds." *Id*. at ¶ 7. According to Andbanc, neither the Lake Shore employee nor the CFTC told it about a "receivership action." *Id*.

Andbanc's concerns about the defunct website – which was its only portal to records regarding its $7.5M investment – were allegedly assuaged by learning that Lake Shore's assets were frozen due to a criminal investigation. Relying on unspecified "relevant parallel provisions of Andorran law," Andbanc "presumed that no further action in respect of its Lake Shore Funds accounts was necessary because the accounts had been frozen, an agency of the U.S. Government was in control, and the assets would be distributed to their rightful owners in due course." *Id*. at ¶¶ 8-9.

### C. Notification of the Bar Date Provided by the Receiver

In the meantime, proceedings in the civil case were continuing apace. On March 10, 2009, pursuant to the claims procedure order, the receiver represents that it served Andbanc with two separate notices (one for each of Andbanc's accounts) via FedEx. The receiver has provided the court with copies of the delivery confirmation, which state that "C. Stamp" signed for them. Andbanc contends that it did not receive either notice.

Andbanc first agrees that the address used by the receiver is correct. Nevertheless, it states that it is registered with the National Futures Association ("NFA") and asked the NFA to direct all correspondence to Mr. Mora's attention. It then concludes that the envelopes must have gotten lost because they were not directed to a specific person at Andbanc. Notably, however, the address on the Lake Shore account statements that Andbanc provided to the receiver do not include any specific person's name, and the address on the Lake Shore account statements

matches the one used by the receiver.   Second, Andbanc denies that any of its employees are named "C. Stamp."

### D. Andbanc Decides to Divest its Holdings in the Lake Shore Funds

Allegedly secure in its belief that it could wait for a refund to arrive on its doorstep from the United States with no action on its part whatsoever, two years passed.  On November 13, 2009, due to a decision to divest some of its investments, including its holdings in the Lake Shore funds, Andbanc employees "conducted an Internet search for news relating to the Lake Shore Funds."  Motion for Leave to File Late Claim at 4 (Dkt. 730).

Andbanc quickly located the receiver's website, which had been providing investor notices and updates regarding the civil case beginning shortly after its appointment in October of 2007.  Visitors to the website view the following:



*See* http://www.robbevans.com/html/lakeshore.html (last visited Mar. 5, 2010).

Andbanc's description of its Internet search indicates that its efforts to uncover information about the fate of its $7.5M investment appear to be limited to locating the receiver's website, as its filings indicate that Andbanc staff does not appear to have clicked on any of the links, which include "Investor Notices" and "U.S. District Court Orders and Other Court Filings." Specifically, despite the fact that these links contain information about the claims process that was promptly posted by the receiver, Andbanc contends that as of November 13, 2009 (when it first found the receiver's website), information about the bar date was not posted. Thus, it concludes that as of November 13, 2009, it could not have learned about the bar date from the website. Mora Dec. at ¶ 14. It also contends that it never received any notices from the receiver regarding the bar date.

Based on what appears to have been a cursory look at very limited portions of the receiver's website and no further Internet research, Andbanc emailed the receiver two account statements and retained counsel in the United States. On November 18, 2009, the receiver responded with an email informing Andbanc that it was barred from participating in the receivership distribution because it had failed to comply the requirements set forth in the claims procedure order.[4] The receiver also advised Andbanc that "if you want to be a part of the claim procedure, you will need to ask the Judge's permission for the late filing of the claim." *Id*. at Ex. 4 (Nov. 18, 2009, email from Lillian Lee, an employee of the receiver, to Andbanc).

---

[4] The notices sent to Andbanc were dated March 10, 2009. Thus, the claims bar date for Andbanc was April 24, 2009. However, under the claims procedure order, each claimant had an additional 45 days from date of service of written notice of the calculation of the claim to object to the proposed amount. Counting from this date, the latest claim bar date for any claimant was in July of 2009.

At an unspecified date in November of 2009, Andbanc asserts that its newly retained United States counsel: (1) brought the court's January 30, 2009, order authorizing a claims verification procedure, which contained the bar date for claims to its attention for the first time; and (2) advised it that United States and Andorran law differed regarding actions necessary to recover investments when a court in the United States appoints a receiver in a civil case.

The claims bar date for Andbanc was April 24, 2009. Andbanc objected to the proposed distribution plan on November 20, 2009, and then waited almost another month (until December 17, 2009) before filing a motion requesting leave to file a late claim.

## II. Discussion

Andbanc contends that good cause exists to allow the filing of a late claim because it did not receive notice of the receivership and claims bar date until November of 2009, it exercised reasonable diligence in submitting the required information at the earliest possible date and the receiver will not be prejudiced by the submission of a late claim. The parties disagree regarding the applicable standard. Andbanc suggests a "good cause" test based on the language of the claims procedure order, which provides that late claimants will be "barred from participating in the distribution of the receivership unless they can demonstrate to the Court good cause for the delay, all reasonable diligence in submitting the information at the earliest possible date thereafter, and absence of any prejudice to the receivership estate." The receiver, on the other hand, asserts that the well-known "excusable neglect" standard in Rule 60(b)(1) applies.

The court finds, as a matter of law, that Andbanc's decisions regarding its investment were flatly unreasonable and can only be attributed to an utter lack of diligence given what Mr. Mora, a 20-year veteran of the banking industry, admits he knew in 2007 and Andbanc's failure

to take any reasonable steps to act on that knowledge until late 2009. This is especially true given that the receiver posted selected court orders and filings – including orders regarding the claims verification procedure and the bar date – shortly after they appeared on the court's docket.

In addition, Mr. Mora's purported assumption that United States and Andorra substantive and procedural rules governing court proceedings are alike so he did not have to take any action (such as retaining counsel in the United States to verify his assumption) is equally mind-boggling. Given Andorra's unique history as well as Andbanc's self-proclaimed global presence, even if the court accepts that Mr. Mora genuinely believed this, any such belief would be objectively unreasonable.

The court acknowledges that it is possible that Mr. Mora consulted Andbanc's "legal department." Mora Dec. at ¶ 7 (Dkt. 730-1). Even if he did so, this does not change the result, because if he consulted an Andorran attorney on an issue of United States federal law and was incorrectly told that he could follow Andorran law with respect to this federal court proceeding, he is bound by his chosen agent's advice. *See, e.g., Bakery Machinery & Fabrication, Inc. v. Traditional Baking, Inc.*, 570 F.3d 845, 848-49 (7th Cir. 2009) (malpractice is not an extraordinary circumstance that justifies "prolonging litigation against the original adversary"); *see also Link v. Wabash Railroad Co.*, 370 U.S. 626, 633-34 (1962) ("Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation").

Thus, under the good faith/reasonable diligence standard proposed by Andbanc, its motion must be denied and chalked up as a very costly mistake. Under the excusable neglect

standard proposed by the receiver, however, Andbanc still has a chance. The determination of excusable neglect "is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission. These include . . . the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Pioneer Investment Services Co. v. Brunswick Assocs. Ltd. Partnership*, 507 U.S. 380, 395 (1993).

Andbanc will be prejudiced if its motion for leave to file a late claim is denied, as it will then be barred from receiving any portion of the receivership estate. Because Andbanc precipitated its present pickle due to its own inaction, however, this factor does not help its cause. *See Raymond v. Ameritech Corp.*, 442 F.3d 600, 607-08 (7th Cir. 2006).

With respect to the length of the delay and its potential impact on judicial proceedings, the receiver states that given that Andbanc's late claim would represent almost 6.6% of the initial distribution, allowing the claim at this point would require it to significantly revise the entire proposed distribution. Such a recalculation would then require that all claimants be given another opportunity to object. Andbanc minimizes the impact that its error will have on the other investors, asserting that the receiver can obtain new numbers by simply pushing a few buttons and that the other investors need not be given time to object to a revised proposed distribution because no investors have objected to any other investor's proposed distribution to date.

Even if the receiver can easily redo its calculations (an issue which the court need not reach), the court is deeply concerned about the effect of redoing the numbers given how close the court is to approving a distribution formula. Andbanc's speculation that no investor will object

to the receiver's revised calculations is not dispositive: they might, and the court would allow them the opportunity to do so if it granted Andbanc's motion given the impact that granting leave to file a late claim would have on the calculations.[5] This would necessarily delay the initial distribution. All of the defrauded investors have been deprived of their own money for a significant amount of time, and the court declines to delay the distribution further and penalize the other investors to save a single investor from the consequences of its own delicts.[6] *See In re K-Mart Corp.*, 381 F.3d 709, 714 (7th Cir. 2004) (affirming rejection of claim that was one day late and valued at .00125% of the total proposed distribution due to the unfair prejudice that would result).

The court next acknowledges the receiver's argument that dealing with a late claim would be costly and deplete the receivership estate. This fact is not compelling, as the court could order Andbanc to reimburse the receiver for any expenses attributable to the filing of a late claim as a condition precedent to allowing Andbanc to recover any monies from the receivership estate.

Turning to the reason for the delay and Andbanc's good faith, Andbanc contends that disallowing its claim would be unfair because the receiver failed to provide it with notice of the

---

[5] It is true that denying Andbanc's motion will increase the amount of money available to other investors. Andbanc characterizes this as an unfair windfall to other investors. To the extent that Andbanc's actions benefit other investors, however, the fault lies with Andbanc itself and is not a reason to allow Andbanc to file a late claim.

[6] On a related note, the court notes in the interests of completeness that it considered conditioning leave to file a late claim on Andbanc attempting to compensate the other investors for the delay in receiving their initial distributions. It then rejected this concept, as any award of interest (calculated at a rate that would doubtless spawn additional litigation and delay) would be insufficient since receiving a distribution and being able to use those funds in any way desired is not equivalent to receiving the distribution at a later point plus some amount of interest. Moreover, in any event, given the total amount held by the receiver vs. the amount potentially recoverable by Andbanc, the concept is not feasible as it is not cost-effective.

claims bar date.  According to Andbanc, it acted quickly once it learned that it needed to do so to have any hope of receiving a portion of the monies held by the receiver on behalf of investors.  As noted above, the receiver served Andbanc with two separate notices (one for each of Andbanc's accounts) via FedEx on March 10, 2009.  Andbanc located the receiver's website on November 13, 2009, objected to the receiver's proposed distribution plan on November 20, 2009, and filed a motion seeking leave to file a late claim on December 17, 2009.

Due process requires notice that is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *See, e.g., Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).  Andbanc's main claim regarding notice is that the receiver failed to direct the Fed Ex letters to Mr. Mora's attention.  However, Mr. Mora's name was not on Andbanc's Lake Shore account information.  To the extent that Mr. Mora did not receive the letters because his name was not on the address labels, Andbanc's failure to ensure that adequate procedures for processing mail were in place is, yet again, its own fault.  Andbanc is not a mom and pop storefront:  it is a sophisticated financial institution that styles itself as offering "high quality service to Andorra and to the entire world." *See* http://www.andbanc.com/eng/home/index.asp (last visited Mar. 5, 2010).

Finally, even if the identity of the recipient of the letters (C. Stamp) is not an Andbanc employee and wrongfully diverted the letters from Andbanc, Andbanc had actual knowledge  – *in November of 2007* – of an asset freeze imposed due to litigation in the United States about the Lake Shore funds and a possible criminal investigation.  As discussed above, its failure to undertake even the most cursory of investigations regarding the fate of its $7.5M investment

during the next two years means that even if it did not receive actual notice of the bar date, it had constructive notice since this information was readily available. *See, e.g., In re Madison Management Group, Inc.*, No. 93 CV 04777, 2000 WL 288515, at *5 (N.D. Ill. Feb. 23, 2000) (Williams, J.).

In short, bar dates allow the court to administer a case and resolve disputes efficiently. *See In re Stavriotis*, 977 F.2d 1202, 1206 (7th Cir. 1992). Nevertheless, the court may overlook irregularities in extraordinary cases in the interests of fairness and justice. *Parke-Chapley Const. Co. v. Cherrington*, 865 F.2d 907, 911 (7th Cir. 1989). The court is certainly sympathetic to Andbanc's plight, as it is undisputed that Andbanc invested in the Lake Shore funds and denying relief will work a serious hardship on Andbanc since it will not be able to receive a percentage of $6,622,100 (the amount actually creditable to Andbanc using the methodology previously approved by the court).

Yet, in the end, the court agrees with the receiver that the situation is due to Andbanc's own negligence, inattention and/or lack of concern regarding its $7.5M investment that it knew had been frozen in 2007 by a foreign government in connection with criminal allegations of misappropriation of funds and fraud. The notion that denying Andbanc's motion is tantamount to punishing it "based on conjecture that, with the benefit of hindsight, it should have engaged in further investigation prior to November of 2009" is, therefore, simply incorrect. Motion for Leave to File Late Claim at 12 (Dkt. 730). Andbanc's conduct is not in a gray area, since its explanations for its failure to act clearly fail to justify the requested relief, especially given the harm to the other investors, who are entitled to receive their money back at the earliest possible

time consistent with an orderly distribution of the receivership estate. Accordingly, in an exercise of the court's discretion, Andbanc's motion for leave to file a late claim is denied.

### III. Conclusion

For the reasons stated above, Andbanc's motion for leave to file a late claim [#730] is denied.


DATE:   March 5, 2010

                                                                       _____
Blanche M. Manning
United States District Judge