**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES COMMODITY** | ) | |
| **FUTURES TRADING COMMISSION,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **07 C 3598** |
| | ) | |
| **LAKE SHORE ASSET MANAGEMENT** | ) | |
| **LIMITED, et al.,** | ) | |
| **Defendants.** | ) | |

## MEMORANDUM AND ORDER

The receiver's motion for approval of a proposed distribution plan and method to be used in calculating disbursements to investors, along with objections from GAMAG Black & White, Ltd., the Royal Bank of Canada, Jose Fernando Hurtado (whose objections are styled as being on behalf of himself and 73 other investors), and Andorra Bank Agricol Rieg. S.A. ("Andbanc") are before the court. For the following reasons, the receiver's motion is granted and all of the objections are overruled.

## I.      Background

In a nutshell, in this civil commodities fraud case, the court found that the defendants (Philip Baker and numerous intertwined Lake Shore entities) defrauded investors by making material misrepresentations and omissions regarding certain commodity pools. Specifically, the court found that the defendants presented false financial statements and false performance tables to investors that misrepresented the pools' investment performance. Default judgments and permanent injunctions have been entered against all of the defendants.

### A.  The Receiver

On October 4, 2007, the court appointed Robb Evans to serve as the temporary equity receiver, and on April 24, 2008, the court entered an amended order appointing a receiver (the "Receivership Order") [Dkt. No. 554].  The Receivership Order appointed Robb Evans as receiver for the Lake Shore common enterprise ("LS Common Enterprise"), which was defined to include the following entities:

> Lake Shore Asset Management Limited ("LSAM"), Lake Shore Group of Companies, Lake Shore Asset Management Inc., Lake Shore Alternative Financial Asset Account Limited a/k/a Lake Shore Alternative Financial Asset Ltd., Lake Shore Alternative Financial Asset Account I Limited, Lake Shore Alternative Financial Asset Account II Limited, Lake Shore Alternative Financial Asset Account III Limited, Lake Shore Alternative Financial Asset Fund Limited, Lake Shore Alternative Financial Asset Fund II Limited, Lake Shore Alternative Financial Asset Fund III Limited, Geneva Corporation Funds World Limited and/or Genevacorp Funds World Ltd. (formerly known as Lake Shore Alternative Financial Asset Fund IV Limited), Lake Shore Alternative Financial Asset Fund IV US, LLC, Lake Shore Alternative Financial Asset Yen Fund I, Lake Shore Alternative Financial Asset Yen Fund Limited Class II, Lake Shore Alternative Financial Asset Yen Fund Limited Class III, Hanford Investments Ltd., all funds, properties, premises, accounts and other assets directly or indirectly owned, beneficially or otherwise, by the LS Common Enterprise, individually or collectively, including, but not limited to, funds on deposit at Sentinel Management Group, Inc. . . . .

Receivership Order at 2-3.

The Receivership Order also directed the receiver to, among other things, take custody and control of all of the funds, property, accounts and other assets of LSAM in the possession of, or under the control of the LS Common Enterprise, and to marshal, preserve, account for and liquidate all assets of the LS Common Enterprise for purposes of making a distribution to the clients of the LS Common Enterprise (hereinafter referred to as "claimant(s)" or "investor(s)"). *See id.* at 4-5.

### B.  Funds Recovered by the Receiver

The total funds under management by LSAM at the time of the receiver's appointment was approximately $273.5M.  Since its appointment, the receiver has taken possession and control of $110,285,941.15 in receivership assets.  Although the receivership defendants were completely uncooperative, the receiver was able to obtain funds from two sources.  First, Sentinel Management Group — the cash manager and subcustodian for the Lake Shore Alternative Financial Asset Funds — filed a voluntary bankruptcy petition on August of 2007 in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division (Case No. 07-14987).  The receiver is the second largest unsecured creditor in the Sentinel bankruptcy case, and received distributions in the amount of $34,787,915.87, $25,581.03, and $1,048,742.28 from the Sentinel Liquidation Trustee.[1]

Second, the London Futures Commission Merchants (MF Global UK Limited, Lehman Brothers International (Europe) and Newedge Group SA (formerly Fimat International Banque SA)) paid $76,303,994.75 into the court as a result of the receiver's claim in an interpleader action in the High Court of Justice, London, England.

The receiver has reported to the court that it is pursuing other avenues on behalf of the investors.  In addition, Philip Baker, the head of the LS Common Enterprise, is currently a defendant in a criminal case pending in this district, *United States v. Baker*, No. 10 CR 175.  The court takes judicial notice of the fact that Mr. Baker appears to have acknowledged that he

---

[1]  The receiver represents that the Trustee may make further distributions, but the timing and amount of any such distributions is unknown and largely dependent on recoveries by the Trustee in certain pending lawsuits.  According to the receiver, the Trustee is currently holding funds of approximately $450M, $440M of which is being held in reserve accounts pending the outcome of the various lawsuits filed by the Trustee.

possesses funds subject to this court's asset freeze. *See United States v. Baker*, No. 10 CR 175, Dkt. 17 at 3-4.[2] Thus, future distributions of additional funds over and beyond the Sentinel and London FCM funds are possible.

### C.  The Claims Verification Procedure Order

After the receiver recovered funds from the London FCMs and the Trustee made its initial distribution, the receiver filed a motion seeking an order authorizing a claims verification procedure [Dkt. No. 623].  On January 30, 2009, the court granted the receiver's motion and entered an order approving the claims verification procedure proposed by the receiver (the "Claims Procedure Order") [Dkt. No. 631].[3]  Pursuant to that order, the receiver notified investors of the claim verification process and claims bar date.  The receiver also completed its analysis of all of the claims it received.

---

[2]  Specifically, Mr. Baker's counsel stated:

Fourth, Mr. Baker anticipates filing a motion with the Court pursuant to *United States v. Monsanto*, 924 F.2d 1186 (2d Cir. 1991). This motion, which Mr. Baker intends to file imminently, will ask the Court to unfreeze certain assets for the sole purpose of permitting Mr. Baker to pay reasonable legal fees incurred in connection with the defense of this criminal case.  The motion will require analysis of a complex and lengthy asset freeze order entered against Mr. Baker in the CFTC litigation. It will also entail substantial briefing, and will necessitate an evidentiary hearing. It would be unproductive to engage in substantial pretrial motions practice in advance of Mr. Baker's anticipated *Monsanto* motion.

*United States v. Baker*, No. 10 CR 175, Dkt. 17 at 3-4.

[3]  The court subsequently amended this order twice to clarify that the receiver could share investor information with the CFTC [Dkt. No. 676] and then to allow the receiver to share investor information with the United States Attorney's Office so investors, if desired, could receive updates about the criminal case against Mr. Baker [Dkt. No. 754].

**II.      The Methodology Used by the Receiver to Determine Proposed Claims**

Pursuant to the Claims Procedure Order, the receiver employed the following methodology in calculating the proposed claims:

(a)      As previously determined by this Court, because funds were commingled, all investors in the identified funds were merged into a single investor claimant class. All claims will be treated similarly and all [c]laimants, regardless of which Fund they invested in, will be entitled to share in all receivership assets subject to this receivership proceeding;

(b)      Investor account balances were credited only for funds actually deposited or paid by the [i]nvestor into their accounts ("Deposits");

(c)      Any credits characterized as gain on an [i]nvestor's account to increase the account balance were reversed;

(d)      Any actual payments of purported interest and actual payments for any other purposes, such as withdrawals of investment amounts and commissions, were treated as a return of capital ("Pre-receivership Payments") and the account balance was reduced accordingly; and

(e)      No interest was credited.

Dkt. No. 631. The receiver has done a laudable job verifying information provided by investors, especially given the complexity of the scheme and LSAM's failure to turn over its books and records.

The receiver also submitted a Report of Approved Claim Amounts and Motion for Approval of the Receiver's Calculation of Claims and for Disallowance of Certain Claims (the "Claims Calculation Motion") [Dkt. No. 678]. In sum, the receiver determined that the net investor claims totaled $268,668,762.71 (total deposits of $287,805,165.87 less total pre-receivership payments of $19,136,403.16). In the order approving the Claims Calculation Motion (the "Claims Calculation Order") [Dkt. No. 688] the court disallowed twelve claims

totaling $2,729,787 (the "Disallowed Claims") because the investors associated with those

claims made total deposits of $813,027.28 and received pre-receivership payments from LSAM

totaling $912,176.13. Thus, they received more than a 100% recovery of the amounts invested

and are not entitled to any further monies.

The court also disallowed sixteen additional claims based on the failure of the claimants

to provide all information required under the terms of the Claims Procedure Order. One of those

claimants (Schroder & Co. Bank AG) subsequently provided additional information and is now

an allowed claimant. Other Disallowed Claimants are still in discussions with the receiver, who

thus proposes that it hold back $1,000,000 as a reserve for Disallowed Claims. The investor

accounts for these claimants made total deposits of $3,113,963.16 and received pre-receivership

payments of $285,027.31, which is a net deposit of $2,828,935.85.

In the Claims Calculation Order, the court approved the method proposed by the

receiver to calculate the approved claims and further ruled that the receiver should calculate its

proposed distribution based upon an approved claims base totaling $263,533,203.297 (the

"Approved Claims Base"). In particular, under the terms of the Claims Calculation Order, the

court held that distribution would be made from a common pool comprised of all receivership

assets and that all claimants would be treated as a single investor class.

As noted above, the receiver is currently holding $110,285,941.15 in receivership assets.

The receiver currently seeks approval of an initial distribution in the amount of $107,000,000

which consists of a net distribution of $103,915,051.20 to the Approved Claims Base, assuming

repayment of the Post Freeze Deposits in the amount of $3,084,948.80 (100% of deposits made

after entry of this court's asset freeze order). *See* Dkt. 692, Ex. 1 (receiver's chart summarizing

calculation of initial distribution amount). The receiver further proposes to hold back: (1) $1,000,000 from the receivership assets available for distribution to cover the ongoing costs of the receivership, including payment of previously accrued expenses and future anticipated legal fees, accounting fees and administrative costs; (2) an additional $1,000,000 as a reserve for Disallowed Claims; and (3) $1,023,859.18 for the disputed Avalon claim (41.79% of the disputed Avalon claim in the amount of $2,450,010).[4]

## III. Funds Available for Distribution

There is a significant shortfall in funds available for distribution because the funds due to the claimants who comprise the Approved Claims Base substantially exceed the funds recovered by the receiver. The receiver anticipates that it will receive additional funds from the Trustee in the Sentinel bankruptcy case, but states that the amount and timing of any future distributions is unknown at this time. No claimant has challenged the receiver's calculation of the amount of funds available for distribution.

The receiver's calculations are as follows:

*Total Funds Under Management*: $290,098,441 (per Schedule 1 to Receiver's First Report) [Dkt. No. 334];

*Losses on funds held by London FCMs*: $38,155,370 (this includes broker's commissions of $23,174,766 or 60.74% of the depletion in fund balance);

---

[4] Institutional investors Avalon Absolute Return Funds PLC (an investment fund organized under the laws of Ireland) and Avalon Value Fund (a sub-fund) (collectively, "Avalon") filed a motion [Dkt. 723] seeking an exemption from a portion of the claims verification procedure based on a conflict between Irish law and the court's order requiring institutional investors such as Avalon to provide the receiver with the names and contact information of beneficial owners on whose behalf claims are being filed. Avalon recently advised the court that it has reached an agreement with the receiver and sought leave to withdraw its motion. That request [Dkt. 765] is granted.

*Introducing Broker's Fees paid to or for the benefit of Hanford Investments Ltd.* ("Hanford") by London FCMs: $23,174,7669[5] (included in the $38,155,370 total, above);

*Amount paid by Sentinel to Hanford*: $10,239,295;

*Sentinel Account Balance at time of bankruptcy filing*: $165,545,340;

*Sentinel distribution received from the Trustee*: $35,862,239; and

*Sentinel shortfall*: $129,683,101($165,545,340 total claims filed by the receiver minus $35,862,239 received to date; further distributions may reduce this total).

## IV. The Receiver's Treatment of "Profit"

The receiver did not have copies of statements showing purported profits, as this information was maintained on the Lake Shore client database, which LSAM transferred from Canada to Bermuda and then to Switzerland in defiance of this court's orders. Pursuant to the Claims Procedure Order, the receiver credited investors for actual deposits and did not credit any alleged gain to any investor when calculating the Approved Claims Base.

In addition, the receiver disallowed any claim where the investor received pre-receivership payments in excess of its total deposits. This resulted in disallowed claims based on overpayments of $99,148.85 for twelve investors. The receiver does not intend to file suit against those investors to recover the overpayments because the investors are located in foreign countries and it would not be cost effective to do so.

---

[5] According to the receiver, commissions from Man Financial (now MF Global UK Ltd.) totaled $22,008,035 and commissions from Lehman Brothers International (Europe) totaled $1,166,731. Commissions were initially paid directly to Hanford, and beginning in April of 2006, were paid to Anglo International Associates, a London payroll services company. Hanford paid expenses and sales commissions, and the remaining commission income was split between Philip Baker and John Kurgan and sent to companies they controlled. The receiver states that it intends to file a separate report detailing the Hanford transactions; it should request a specific date to do so.

The receiver then considered the treatment of pre-receivership payments to investors who were not fully repaid. A total of 127 investors in the Approved Claims Base received pre-receivership payments. For those investors, the total deposits were $86,179,078.20 and the total pre-receivership payments were $17,939,199.72. The receiver verified these deposits and pre-receivership payments by examining Sentinel bank records (because all Lake Shore funds were initially deposited at accounts at the Bank of New York and maintained by Sentinel) and documents turned over by the claimants.

Total pre-receivership payments represent less than 25% of the total deposits of the investors. The anticipated initial distribution is approximately 40% of the net investor claims. Thus, there are sufficient funds, after accounting for losses, to support the repayments to the investors as being made from their own funds and not from funds provided by new investors.

## V.   The Receiver's Position Regarding the Return of Funds Invested after the Statutory Ex Parte Restraining Order

On June 27, 2007, the court entered a statutory ex parte restraining order (the "Restraining Order") [Dkt. No. 12] based on the original CFTC complaint, a motion seeking the order and a memorandum in support. The purpose of the Restraining Order was to "preserve the status quo and to protect public customers from loss and damage." *See id*. at 1. The Restraining Order prohibited parties with actual notice of its entry from withdrawing or transferring funds out of the Lake Shore accounts. However, it did not prohibit the deposit of additional funds into the Lake Shore accounts, so after the Restraining Order was entered, Sentinel bank records show that twenty one investors deposited an additional $3,084,948.80 into the Lake Shore accounts (the "Post Freeze Deposits").

According to the receiver's calculations, returning the Post Freeze Deposits will make less than a 1% difference in the distribution. The receiver then proposes that for the purposes of the proposed distributions, all investors should receive a 100% return of their Post Freeze Deposits prior to the pro rata distribution of the remaining funds, reasoning that this is consistent with the court's intent to prevent additional losses to investors.

## VI.     Distribution of Receivership Assets

### A.     Overview

The receiver contends that consistent with the court's prior orders, the court should order a pro rata distribution, where all investors in the Approved Claims Base are treated alike. With respect to the methods of effectuating a pro rata distribution in this case, the receiver considered the "Rising Tide" method and the "Net Investment" method, and asserts that the "Rising Tide" method is the more equitable of the two distribution methods under the facts and circumstances of this case.

Certain investors object to a pro rata distribution or champion the "Net Investment" method because they receive more money that way.

*GAMAG*

GAMAG contends that certain Lake Shore entities agreed to maintain a custodial account with Sentinel on its behalf so the court should classify its claim (and the claims of any other custodial account holders) separately, as opposed to making a pro rata distribution among all investors.

*Royal Bank of Canada*

The Royal Bank of Canada has filed a succinct objection objecting to the receiver's motion to the extent it seeks to distribute receivership assets using the "Rising Tide" method instead of the "Net Investment" method. According to the Royal Bank of Canada, the "Rising Tide" method benefits some investors but only at the significant expense of others, and "[i]t is inequitable to choose a methodology that disadvantages one set of investors, in order to make another set of investors whole." Royal Bank of Canada Objections, Dkt. 707 at ¶ 2.

Specifically, the Royal Bank of Canada acknowledges that 840 investors (approximately 85%) will recover approximately 1.9% more money using the "Rising Tide" method, whereas 129 investors (approximately 13%) receive less money under that methodology. Nevertheless, it contends that the majority of the 129 investors who will receive less money under the "Rising Tide" methodology would lose significantly more money than 840 investors have to gain. Thus, it concludes that the court should use the "Net Investment" method because it is unfair to penalize the minority of investors for the insignificant gain of the majority.

*Mr. Hurtado*

Mr. Hurtado (and a group of other investors he purports to represent) also advocate the "Net Investment" method.

*Andbanc*

Andbanc does not generally object to the receiver's proposed distribution plan or the method the receiver suggests should be used to calculate disbursements. Instead, its objection is based on its motion for leave to file a late claim, which the court recently denied. *See* Dkt. 764.

**B.     Standard of Review**

The court is afforded wide discretion in approving a distribution plan of receivership funds.  *SEC v. Enterprise Trust Co.*, 559 F.3d 649, 652 (7th Cir. 2009) (individuals whose property is marshaled by a receiver and whose claims are resolved in the receivership proceeding are "like creditors of a debtor in bankruptcy, [and] must accept the distribution that the court believes appropriate").  Moreover, as noted by the receiver, the "primary purpose of equity receiverships is to promote orderly and efficient administration of the estate by the district court for the benefit of creditors."  *SEC v. Hardy*, 803 F.2d 1034, 1038 (9th Cir. 1986); *F.T.C. v. 3R Bancorp*, No. 04 C 7177, 2005 WL 497784, at *3 (N.D. Ill. Feb. 23, 2005).

**C.     Should the Distribution be on a Pro Rata Basis?**

The receiver champions a pro rata distribution, which is consistent with the court's prior orders.  GAMAG, a holding company of hedge funds organized under the laws of the Bahamas, objects, asserting that certain Lake Shore entities agreed to maintain a custodial account with Sentinel on its behalf so the court should classify its claim (and the claims of any other custodial account holders) separately, as opposed to making a pro rata distribution.  In other words, GAMAG wants to be first in line and treated separately so it receives 100% of its investment back, plus interest, before any other investors receive a distribution.[6]

---

[6] GAMAG is under no circumstances entitled to interest.  First, the court has reviewed the Portfolio Management Agreement signed by GAMAG, which provides at page 4 that no interest shall be paid on cash balances.  Second, the Claims Procedure Order does not provide for interest and there is no reason to add this to any claim given the general inadequacy of funds to repay investors.

First, GAMAG did not file a timely objection to the Claims Calculation Motion, and the court agreed with the receiver that funds should be distributed on a pro rata basis. GAMAG's challenge to a pro rata distribution is, therefore, untimely.

In any event, it fails on the merits. GAMAG's position is based on its interpretation of where its funds were supposed to be held based on the agreements it signed with the relevant Lake Shore entities. GAMAG may have intended Lake Shore to hold its funds in separately managed custodial accounts or may have intended to purchase shares in the capital of Lake Shore. Nevertheless, GAMAG does not dispute that its funds were deposited in an account at Sentinel with funds of other investors.

This is consistent with the court's prior findings as well as the receiver's analysis, which concludes that all of the funds were hopelessly commingled.[7] The court is very familiar with the record in this complex case, which has been pending since June of 2007. There is a limited pool of money and a long line of defrauded investors. Quite simply, GAMAG's claim that it maintained a custodial account with the relevant Lake Shore fund while the other investors actively invested their funds with the Lake Shore Common Enterprise is a non-starter. GAMAG is not entitled to preferential treatment and is in no different position than any of the numerous other defrauded claimants.

Approaching its argument from a slightly different angle, GAMAG also suggests that the court should treat it like a general unsecured creditor because the Lake Shore fund it invested in

---

[7] This problem was not confined to the Lake Shore entities themselves, as the bankruptcy court held that Sentinel, a registered futures commission merchant ("FCM") holding Lake Shore funds, also commingled assets it controlled. *See In re Sentinel*, No. 07 B 14987 (N.D. Ill. Bankr. Sept. 30, 2009) [Dkt. 1452 at 8].

was obligated to hold GAMAG's funds in a custodial account, but should treat other investors like "shareholders" because they invested their monies in common funds managed by the Lake Shore Common Enterprise. Under this view of the world, GAMAG would again be entitled to move to the head of the line and recover the entire value of its funds before any proceeds are disbursed to the other investors pursuant to the distribution method approved by the court. *See, e.g., Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988) ("a dissenting class of unsecured creditors must be provided for in full before any junior classes can receive or retain any property under a reorganization plan"). GAMAG's contention that it is a creditor rather than one of many claimants, while creative, does not merit further discussion. GAMAG's objections are, therefore, overruled.

### D.    Should Post Freeze Deposits be Returned?

As indicated above, the receiver proposes that the Post Freeze Deposits be returned prior to making a pro rata distribution of the remaining funds to the investors. None of the investors have objected. The court's original statutory restraining order imposing an asset freeze was meant to protect existing investors and preserve the status quo. It finds that investors whose initial investments post-date the statutory restraining order should receive a full return because while their funds are part of the receivership estate, they were never invested in the Lake Shore Funds. Thus, post-freeze investors are not the same as the pre-freeze investors. *See CFTC v. Equity Financial*, 2005 WL 2143975, at *13; *see also Anderson v. Stephens*, 875 F.2d 76, 79 (4th Cir. 1989) ("Both law and equity dictate that the investors whose checks were deposited after the freeze order are entitled to a full return of their funds"). Accordingly, the Post Freeze Deposits shall be returned in full.

**E. Should Assets be Distributed Using the "Rising Tide" or "Net Investment" Method?**

As noted above, the receiver has considered and evaluated two alternative methods of calculating the proposed pro rata distribution of the receivership assets: the "Rising Tide" method and the "Net Investment" method.

**1. The "Rising Tide" Method**

Under the "Rising Tide" method, investors are allowed to retain previously received funds, but those funds are credited dollar-for-dollar against investors' respective pro rata share based on the full amount of their investment. *See, e.g,. CFTC v. Equity Financial Group, LLC*, 2005 WL 2143975, at *24-25 (distributions under the "Rising Tide" method are "calculated according to the following formula: (actual dollars invested x pro rata multiplier) – withdrawals previously received = distribution amount"). *Id*. at *24.

The receiver describes the "Rising Tide" method as follows:

Step 1: *Gross Distribution* = Gross deposits invested by approved claimants x gross pro rata multiplier[8]

Step 2: *Net Distribution* = Gross distribution minus pre-receivership payments received by approved claimants

Step 3: *Adjustments* = total overpayments x adjustment pro rata multiplier[9]

Step 4: *Allowed Distribution* = Gross Distribution – Adjustments

---

[8] The gross pro rata multiplier is calculated based on the sum of the pre-receivership Payments and the current total distribution amount, divided by the total gross Deposits of the approved claimants.

[9] The adjustment pro rata multiplier is calculated based on the respective individual Net Distribution amount divided by the total Net Distribution amount for the approved claimants who have a positive Net Distribution amount.

-15-

Under this method, distributions are only made to approved claimants who have a positive Net Distribution (*i.e.*, only investors who previously received funds in an amount less than their respective pro rata distribution amount receive additional funds as part of the distribution plan). *See id.* This means that approved claimants who already received pre-receivership payments greater than the calculated Gross Distribution ("Overpayments") do not receive additional funds as part of the distribution plan at this time. Notably, however, since it is not cost-effective to retrieve the Overpayments, these claimants would be allowed to retain the Overpayments.

To arrive at the Allowed Distribution amount, the receiver proposes adjustments for allocating the Overpayments among the approved claimants who received pre-receivership Payments less than the Gross Distribution or who received no pre-receivership Payments. Overpayments are to be deducted on a pro rata basis from the Gross Distribution amounts calculated for the approved claims. The calculation of the Allowed Distribution for the claimants having a positive Net Distribution involves the third and fourth steps, described above.[10]

### 2. The "Net Investment" Method

Under the "Net Investment" method, any funds previously received by an investor are subtracted from the total amount invested prior to calculating the investor's pro rata share. *Id.* at *24; *CFTC v. Franklin*, 652 F. Supp. 163 (W.D. Vir. 1996). This means that each investor with

---

[10] Should additional receivership funds become available to make a second distribution, the Allowed Distribution amounts will also be calculated utilizing the above four steps. The Net Distribution will take into account the first distributions received by approved claimants (*i.e.*, Net Distribution = Gross Distribution - Pre-receivership Payments – 1st distributions received by approved claimants).

an approved claim would receive a pro rata distribution of his or her current outstanding balance, regardless of whether that investor previously withdrew funds.

### 3. "Equality is Equity"

The receiver asserts that the "Net Investment" method is inequitable because it allows investors who received pre-receivership payments to recover more than their proportionate share of their respective original investments and thus recommends that the court approve the use of the "Rising Tide" method in calculating the distribution to the Approved Claim Base. The court has examined the receiver's distribution calculation [Dkt. 692, Ex. 2] regarding the impact of the "Rising Tide" method:

—    29 investors (*i.e.*, approximately 13%) will receive less money if the "Rising Tide" method is utilized.

—    14 investors (*i.e.*, approximately 1%) will recover the same amount regardless of which method is applied because they only made Post Freeze Deposits and thus would receive 100% regardless of the formula chosen by the court.

—    2 investors (*i.e.*, approximately .2%) will recover .20% and 1.66% more, respectively, if the "Rising Tide" method is utilized.

—    840 investors (*i.e.*, approximately 85%) will recover approximately 1.9% more if the "Rising Tide" method is utilized.

The receiver suggests that by utilizing the "Rising Tide" method and crediting any prior payments received by investors, more funds will be available to all of the investors in the Approved Claims Base. It also notes that unlike the "Net Investment" method, the "Rising Tide" method does not penalize investors based upon the timing of their investments because all investors share equally in the available monies.

Ultimately, the court agrees with the receiver that the "Rising Tide" method is the most equitable because it prevents an investor who previously received funds as withdrawals from "benefitting at the expense of other investors by retaining the benefit of the full amount of his withdrawal *plus* a distribution calculated on the basis of net funds invested, rather than the recommended distribution amount adjusted to take into account all amounts already received." *CFTC v. Equity Financial Group, LLC*, 2005 WL 2143975, at *25 (emphasis in original) (internal quotations omitted).

Moreover, there is no reason to allow certain investors to receive different percentages of their initial investment given that all of the investors were all equally victimized by the conduct of the Receivership Defendants. Instead, the Supreme Court's pronouncement in the original Ponzi scheme case is apt: "equality is equity." *Cunningham v. Brown*, 265 U.S. 1, 13 (1924) (approving pro rata distribution of commingled funds obtained through an illegal scheme perpetrated by Charles Ponzi); *see also SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80, 88-89 (2d Cir. 2002) ("Courts have favored pro rata distribution of assets where . . . the funds of the defrauded victims were commingled and where victims were similarly situated with respect to their relationship to the defrauders"); *United States v. 13328 and 13324 State Highway North*, 89 F.3d 551, 553-54 (9th Cir. 1996) (same) (collecting cases).

Accordingly, because the "Rising Tide" method benefits over 85% of the approved claimants and 13% of the claimants would benefit under the application of the "Net Investment" method but receive more than their fair share of the available funds, the court approves the use of the "Rising Tide" method.

### 4. Objections

Unsurprisingly, investors who would receive more money under the "Net Investment" method champion its use. Their basic position is that the majority of the 129 investors who receive less money under the "Rising Tide" methodology lose significantly more money under that method than 840 investors gain using that method. According to the Royal Bank of Canada, the court should not penalize the minority of investors for the insignificant gain of the majority. Mr. Hurtado (and a group of other investors he purports to represent) also advocate the "Net Investment" method.

The propriety of using the "Net Investment" method, however, does not turn on whether mathematically, a group of investors will lose more under the "Rising Tide" method than other investors will gain. Instead, as discussed above, the court must determine which method is equitable given the facts and circumstances of this case. Here, a straight pro rata distribution of the available funds, irrespective of any pre-receivership payments received by investors, would be inequitable because it unfairly elevates investors who received pre-receivership payments over those who did not.

The fact that certain investors may not receive a distribution under the "Rising Tide" method is thus not germane. Investors who received pre-receivership payments may not recover more than their proportionate share of their respective initial investments than other investors. This is what would happen if the investors who received pre-receivership payments were allowed to retain those payments *and* also receive a pro rata distribution today. In this regard, the court notes that the "Net Investment" method adherents do not propose that they return their pre-receivership payments so that all of the investors can receive a true proportionate share of their

-19-

initial investments. Thus, their championing of the "Net Investment" method as the fairest way to divide up the available funds is reminiscent of George Orwell's *Animal Farm*. George Orwell, *Animal Farm* (1945) ("All animals are equal. But some animals are more equal than others").

Mr. Hurtado also contends that the "Net Investment" method more fairly reflects the allocation of costs of the receivership across all investors. According to Mr. Hurtado, since this case is being administered as a "common fund," all investors have covered the receiver's costs so all of the investors should receive some benefit from those borne costs by sharing in the initial distribution. The fact that the receiver's costs are being shared by all investors, however, does not justify a distribution that ultimately favors investors who received pre-receivership payments.

The court also notes that Mr. Hurtado's position is not well-taken because he received over $940,000 in commission payments on behalf of the investors he purports to represent.[11] It requires an impressive amount of chutzpah for Mr. Hurtado to assert that he, of all people, should receive additional monies from the general pool (and thus receive a higher percentage return than other investors) simply because the pool is bearing the receiver's costs. In sum, therefore, the court declines to allow certain investors to profit from the fact that they fortuitously withdrew funds from their Lake Shore accounts or received payments from a Lake Shore entity prior to the receivership.

## VII. Conclusion

For the above reasons:

1.      The receiver's motion for approval of a proposed distribution plan and method used in the calculation of disbursements to investors [Dkt. 692] is granted. The

---

[11]  The receiver does not appear to believe that attempting to recover this payment would be cost effective given Mr. Hurtado's location.

receiver shall use the "Rising Tide" method to calculate the distribution, and the court approves the receiver's calculations, see Dkt. 692-2;

2.      The objections filed by GAMAG Black & White, Ltd. [Dkt. 698], the Royal Bank of Canada [Dkt. 707], Jose Fernando Hurtado [Dkt. 704], and Andorra Bank Agricol Rieg. S.A. [Dkt. 709] are overruled.

3.      The receiver is authorized to serve all investors in the Approved Claims Base via Federal Express or electronic mail with a one page Notice of Proposed Distribution indicating that the Motion with all Exhibits including the amount of their proposed distribution can be viewed on the Receiver's website. The court also approves the Notice of Proposed Distribution provided by the receiver (Dkt. 692-4).

4.      A return of 100% of all Post Freeze Deposits ($3,084,948.80) is approved;

5.      A hold back in the sum $1,000,000 is approved as a reserve for Disallowed Claims;

6.      A hold back in the sum of $1,023,859.18 is approved for Avalon's disputed claim;

7.      A hold back in the sum of $1,000,000 is approved for anticipated costs of locating and recovering any misappropriated assets and for the receiver's administrative costs in making the distribution;

8.      A total initial distribution in the sum of $107,000,000 to the investors in the Approved Claims Base in the amounts set forth in Dkt. 692-2 is approved.

9.      Avalon's motion for an exemption from a portion of the claims verification procedure [Dkt. 723] and its motion for leave to withdraw its request for an exemption [Dkt. 765] are pending. The motion to withdraw is granted, and the clerk is directed to terminate the underlying motion for an exemption.

10.     The receiver shall promptly advise the court when it expects to be able to file its report detailing the Hanford transactions.


DATE:   March 15, 2010

                                           *Blanche M. Manning*
                                           Blanche M. Manning
                                           United States District Judge